**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**Attorney for Plaintiff**
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLEN BARNES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EDISON INTERNATIONAL, SOUTHERN CALIFORNIA EDISON COMPANY, PEDRO J. PIZARRO MARIA RIGATTI, KEVIN M. PAYNE, WILLIAM M. PETMECKY III, THEODORE F. CRAVER, JR. and WILLIAM JAMES SCILACCI,<br><br>Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Glen Barnes ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included,

among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Edison International and Southern California Edison Company ("SCE", and together with Edison International, "Edison" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Edison securities between February 23, 2016, and November 12, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Edison International was founded in 1886 and is based in Rosemead, California. Edison International is the parent holding company of SCE. SCE is an investor-owned public utility primarily engaged in the business of supplying and delivering electricity to an approximately 50,000 square mile area of southern California.

3.     The Company supplies electricity primarily to residential, commercial, industrial, agricultural, and other customers, as well as public authorities through transmission and distribution networks. Its transmission facilities consist of lines ranging from 33 kV to 500 kV and substations; and distribution system comprises approximately 53,000 line miles of overhead lines, 38,000 line miles of underground lines, and 800 substations located in California. The Company serves approximately 5 million customers.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, the Company was in violation of state law and regulations; (iii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On November 8, 2018, two wildfires started in Southern California, designated the Hill Fire and the Woolsey Fire. The Hill Fire, which broke out in Ventura County, subsequently grew to 4,531 acres, according to the California Department of Forestry and Fire Protection ("Cal Fire").  Stretching from Los Angeles County to Ventura County, the Woolsey Fire burned 93,662 acres, including 83 percent

of all National Parks Service land in the Santa Monica Mountains National Recreation Area, according to Cal Fire.

6.     On November 12, 2018, the California Public Utilities Commission ("CPUC") launched an investigation into Edison's subsidiary SCE, in order to "assess the compliance of electrical facilities with applicable rules and regulations in fire-impacted areas."

7.     Following CPUC's announcement, Edison International's stock price fell $7.44 per share, or more than 12%, to close at $53.56 per share on November 12, 2018. Over the following days, as the Hill and Woolsey Fires continued to burn, Edison International's stock price continued to fall, closing at $47.19 on November 15, 2018, a total drop of 32% from its price prior to CPUC's announcement.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Edison is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

12. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

13. Plaintiff, as set forth in the attached Certification, acquired Edison securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14. Defendant Edison International is a California corporation with its principal executive offices located at 2244 Walnut Grove Avenue (P.O. Box 976), Rosemead, California 91770. Edison International's common stock trades in an efficient market on the New York Stock Exchange under the ticker symbol "EIX."

15. Defendant SCE, is a California corporation with its principal executive offices located at 2244 Walnut Grove Avenue (P.O. Box 976), Rosemead, California 91770. SCE's securities are traded on the NYSE American LLC (together with the New York Stock Exchange, "NYSE").

16.     Defendant Theodore F. Craver, Jr served as the Chief Executive Officer of Edison International from 2008 until his resignation, effective September 30, 2016.

17.     Defendant Pedro J. Pizarro has served as the Chief Executive Officer of Edison International since October 2016.  Prior to that, he served as President of Edison International from June 2016 to September 2016 and President of SCE from October 2014 to May 2016.

18.     Defendant Maria Rigatti served as the Chief Financial Officer of Edison International since October 2016, and prior to her appointment as CFO of Edison international she served in the same capacity for SCE.

19.     Defendant Kevin M. Payne served as President and Chief Executive Officer of SCE since June 2016.

20.     Defendant William M. Petmecky has served as Vice President, Chief Financial Officer and Controller of SCE since October 2016.

21.     Defendant William James Scilacci, served as the Chief Financial Officer of Edison International until his resignation, effective September 30, 2016.

22.     The Defendants referenced above in ¶¶ 16-21 are sometimes referred to herein collectively as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or

-6-

shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS
### Background

24.     Edison International was founded in 1886 and is based in Rosemead, California. Edison International is the parent holding company of SCE. SCE is an investor-owned public utility primarily engaged in the business of supplying and delivering electricity to an approximately 50,000 square mile area of southern California.

25.     The Company supplies electricity primarily to residential, commercial, industrial, agricultural, and other customers, as well as public authorities through transmission and distribution networks. Its transmission facilities consist of lines ranging from 33 kV to 500 kV and substations.  Its distribution system comprises approximately 53,000 line miles of overhead lines, 38,000 line miles of underground lines, and 800 substations located in California. The Company serves approximately 5 million customers.

## **Materially False and Misleading Statements Issued During the Class Period**[1]

26.    The Class Period begins on February 23, 2016, when the Company filed its annual statement on Form 10-K for the fiscal year December 31, 2015 (the "2015 10-K"). In the 2015 10-K, the Company acknowledges that SCE's operations are regulated by CPUC. Specifically, "CPUC has the authority to regulate, among other things, retail rates, energy purchases on behalf of retail customers, SCE capital structure, rate of return, issuance of securities, disposition of utility assets and facilities, oversight of nuclear decommissioning funding and costs, and aspects of the transmission system planning, site identification and construction, including safety and environmental mitigation."

27.    The Company touted its investment in the safety of its equipment, stating that the "**SCE is investing in and strengthening its electric grid and driving operational and service excellence to improve system safety, reliability and service** while controlling costs and rates.

28.    Defendants acknowledged in 2015 10-K that their business may result in damage to private and public property, as well as injuries to bystanders, stating in relevant part:

> **The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.**

---

[1] Emphasis added throughout, unless otherwise noted.

Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant. The CPUC has increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.

29.    Relatedly, the 2015 10-K discussed the risks posed to the Company's financial condition and operations should they be responsible for wild-fires, stating in relevant part:

***Weather-related incidents and other natural disasters could materially affect SCE's financial condition and results of operations.***

Weather-related incidents and other natural disasters, including storms, wildfires and earthquakes, can disrupt the generation and transmission of electricity, and can seriously damage the infrastructure necessary to deliver power to SCE's customers. These events can lead to lost revenues and increased expenses, including higher maintenance and repair costs. They can also result in regulatory penalties and disallowances, particularly if SCE encounters difficulties in restoring power to its customers on a timely basis. These occurrences could materially affect SCE's business, financial condition and results of operations, and the inability to restore power to SCE's customers could also materially damage the business reputation of SCE and Edison International

***SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.***

Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. In addition, the insurance that has been obtained for

-9-

wildfire liabilities may not be sufficient. Uninsured losses and increases in the cost of insurance may not be recoverable in customer rates. A loss which is not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operations. Furthermore, insurance for wildfire liabilities may not continue to be available at all or at rates or on terms similar to those presently available to Edison International.

*    *    *

*Wildfire Insurance*

**Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment.** Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the risk of severe wildfire events. On June 1, 2015, Edison International renewed its liability insurance coverage, which included coverage for SCE's wildfire liabilities up to a $610 million limit (with a self-insured retention of $10 million per wildfire occurrence). Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period (June 1, 2015 to May 31, 2016). SCE also has additional coverage for certain wildfire liabilities of $390 million, which applies when total covered wildfire claims exceed $610 million, through June 14, 2016. SCE may experience coverage reductions and/or increased insurance costs in future years. **No assurance can be given that future losses will not exceed the limits of SCE's insurance coverage.**

30.    The 2015 10-K discussed a prior incident where its equipment malfunctioned and caused multiple fires in Long Beach, California:

**In July 2015, SCE's customers who are served via the network portion of SCE's electric system in Long Beach, California experienced service interruptions due to multiple underground vault fires and underground cable failures.** No personal injuries have been reported in connection with these events. SCE instituted an internal investigation and commissioned an external investigation of these events and their causes**, which revealed that**

*the main cause of the interruptions was a lack of adequate management oversight of the downtown network system. The investigations also revealed deficiencies in maintaining the knowledge base on the configuration and operation of the system, and a lack of sophisticated controls needed to more efficiently and effectively prevent and respond to the cascading events that occurred*.

31.    On February 21, 2017, when the Company filed its annual statement on Form 10-K for the fiscal year December 31, 2016 (the "2016 10-K").  In the 2016 10-K, the Company acknowledges that SEC's operations are regulated by CPUC. Specifically, "CPUC has the authority to regulate, among other things, retail rates, energy purchases on behalf of retail customers, SCE capital structure, rate of return, issuance of securities, disposition of utility assets and facilities, oversight of nuclear decommissioning funding and costs, and aspects of the transmission system planning, site identification and construction, *including safety*."

32.    The Company touted its purported dedication to improve its infrastructure in the 2016 10-K, highlighting the SCE's "plans" to modernize its electric grid, stating in relevant part:

**Electricity Industry Trends**

The electric power industry is undergoing transformative change driven by technological advancements such as customer-owned generation and energy storage, which could alter the nature of energy generation and delivery. California's environmental policy objectives are accelerating the pace and scope of the industry change. The electric grid is a critical enabler of the adoption of new energy technologies that support California's climate change and GHG reduction objectives, which continue to be publicly supported by California policy makers notwithstanding a potential change in the federal approach to such matters. The grid is also key to enabling more customer choices with respect to new energy technologies. ***The***

-11-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***transformative change taking place in the electric power industry is integral to Edison International's strategy.***

***SCE plans to be a key enabler of the adoption of new energy technologies that benefit customers of the electric grid while also helping the state of California achieve its environmental*** goals. SCE expects to achieve these objectives through modernizing the electric grid to improve the safety and reliability of the transmission and distribution network and enabling increased penetration of DERs [distributed energy resources]. SCE's ongoing focus to drive operational and service excellence should allow it to achieve these objectives while controlling costs and customer rates. SCE's focus on the transmission and distribution side of the utility business aligns with California's policy supporting competitive power markets. It also represents a lower risk than investment in conventional, natural gas-fired generation, which faces potentially stricter GHG limits as well as the increasing competitiveness of renewable resource fueled generation….

33.    Further, discussing its capital expenditure plans "[t]o support a safe and reliable transmission and distribution network, and to modernize the electric grid", the Company stated that it forecasted capital expenditures of up to $19.3 billion for 2017 through 2020.  More specifically, the Company forecasted capital expenditures of $4.16 billion in 2017, $182 million of which was to be used to modernize its electric grid. Commenting on these forecasted expenditures, the 2016 10-K states that the "2017 capital expenditures is a baseline of grid modernization spending that will promote increased safety and reliability and also allow for a timely ramp-up of grid modernization capital expenditures in subsequent years. "

Class Action Complaint

34.     The Company also discussed its General Rate Case ("GRC")[2] for 2018, stating that "[t]he capital programs requested in SCE's 2018 GRC are focused on safety and reliability through investments in the distribution grid to replace aging equipment and enhance capabilities to integrate increasing amounts of DERs."

35.     Discussing the ratemaking process overseen by CPUC, the 2016 10-K notes the importance of safety measures put in place by SCE, explaining:

> Revenue authorized by the CPUC through triennial GRC proceedings is intended to provide SCE a reasonable opportunity to recover its costs and earn a return on its net investments in generation and distribution assets and general plant (also referred to as "rate base") on a forecast basis. The CPUC sets an annual revenue requirement for the base year which is made up of the operation and maintenance costs, depreciation, taxes and a return consistent with the authorized cost of capital (discussed below). In the GRC proceedings, the CPUC also generally approves the level of capital spending on a forecast basis. Following the base year, the revenue requirements for the remaining two years are set by a methodology established in the GRC proceeding, which generally, among other items, includes annual allowances for escalation in operation and maintenance costs and additional changes in capital-related investments. ***The CPUC is conducting a triennial safety model assessment proceeding ("S-MAP") to evaluate the utility models used to prioritize safety risks, examine the utilities' assessment of their key risks and their proposed mitigation programs, and develop requirements for annual reporting of risk spending and mitigation results.*** The risk assessment approach developed in the S-MAP will be incorporated into SCE's triennial GRC through a Risk Assessment and Mitigation Phase (RAMP), which will be initiated by November 15 in the year preceding each GRC application filing date. SCE's first RAMP will be filed in November 2018 for its 2021 GRC. The purpose of the RAMP is to provide information about the utility's assessment of its key safety risks and its proposed programs for mitigating

---

[2] GRCs are proceedings used to address the costs of operating and maintaining the utility system and the allocation of those costs among customer classes.  For California's three large investor-owned utilities (IOUs), the GRCs are parsed into two phases. Phase I of a GRC determines the total amount the utility is authorized to collect, while Phase II determines the share of the cost each customer class is responsible and the rate schedules for each class.  Each large electric utility files a GRC application every three years.  For smaller utilities, authorized costs and allocation of costs are done in just one phase.

those risks. The information developed during the RAMP will inform the utility's recommended projects and funding requests in the subsequent phase of the GRC.

36.     The 2016 10-K also contained statements nearly identical to those detailed above in ¶ 28, concerning the risks associated with the "generation, transmission and distribution of electricity[,]" and wild-fires. The 2016 10-K also discussed the Company's service interruptions in Long Beach, detailed above in in ¶ 30, which were caused by equipment fire and resulted in various penalties.

37.     On February 22, 2018, the Company filed its annual statement on Form 10-K for the fiscal year December 31, 2017 (the "2017 10-K").  In the 2017 10-K, the Company acknowledges that SEC's operations are regulated by CPUC. Specifically, "CPUC has the authority to regulate, among other things, . . . disposition of utility assets and facilities, . . . and aspects of the transmission system planning, site identification and construction, *including safety and environmental mitigation.*"

38.     The 2017 10-K also contained statements nearly identical to those detailed above in ¶ 28, concerning the risks associated with the "generation, transmission and distribution of electricity[,]" and weather-related incidents.

39.     The 2017 10-K also discussed various risks to the company as a result of wild-fire related liabilities:

*Damage claims against SCE for wildfire-related losses may materially affect SCE's financial condition and results of operations.*

Prolonged drought conditions and shifting weather patterns in California resulting from climate change as well as increased tree mortality rates have

increased the duration of the wildfire season and the risk of severe wildfire events. Severe wildfires and increased urban development in high fire risk areas in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of utility practices and/or the failure of electric and other utility equipment. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement. However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires. An inability to recover uninsured wildfire-related costs could materially affect SCE's business, financial condition and results of operations. For example, if SCE is found liable for damages related to the December 2017 Wildfires, and SCE is unable to, or believes that it will be unable to, recover those damages, SCE may not have sufficient cash or equity to pay dividends to Edison International or may be prohibited from declaring such dividends because it does not meet California law requirements for the declaration of dividends. . . .

**SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.**

Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. Edison International, SCE or its contractors may experience coverage reductions and/or increased wildfire insurance costs in future years. No assurance can be given that losses will not exceed the limits of SCE's or its contractors' insurance coverage. SCE may not be able to recover uninsured losses and increases in the cost of insurance in customer rates. Losses which are not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operations.

-15-

Class Action Complaint

40.     The   2017   10-K   also   discussed   wildfires   in   southern   California   in December of 2017, and noted the serious risks that may arise should the Company be found responsible for the fires.  Specifically, the filing stated in relevant part:

**Southern California Wildfires**
In December 2017, several wind-driven wildfires (the "December 2017 Wildfires") impacted portions of SCE's service territory and caused substantial damage to both residential and business properties and service outages for SCE customers.

The largest of these fires, known as the Thomas Fire, originated in Ventura County and burned acreage located in both Ventura and Santa Barbara Counties. According to the most recent California Department of Forestry and Fire Protection ("Cal Fire") incident information reports, the Thomas Fire burned over 280,000 acres, destroyed an estimated 1,063 structures, damaged an estimated 280 structures and resulted in two fatalities. During 2017, SCE incurred approximately $35 million of capital expenditures related to restoration of service resulting from the December 2017 Wildfires.

The causes of the December 2017 Wildfires are being investigated by Cal Fire and other fire agencies. SCE believes the investigations include the possible role of SCE's facilities. SCE expects that one or more of the fire agencies will ultimately issue reports concerning the origins and causes of the December 2017 Wildfires but cannot predict when these reports will be released or if any findings will be issued before the investigations are completed.

Any potential liability of SCE for December 2017 Wildfire-related damages will depend on a number of factors, including whether SCE is determined to have substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity,

-16-

can be spread across the larger community that benefited from such improvement. However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires.

In addition to liability for property damages, when inverse condemnation is found to be applicable to a utility, the utility may be held liable, without regard to fault, for associated interest and attorney's fees (collectively, "Property Losses"). If inverse condemnation is held to be inapplicable to SCE in connection with the December 2017 Wildfires, SCE could still be held liable for Property Losses if those losses were found to have been proximately caused by SCE's negligence. If SCE was found negligent, SCE also could be held liable for fire suppression costs, business interruption losses, evacuation costs, medical expenses and personal injury/wrongful death claims. These potential liabilities, in the aggregate, could be substantial. Additionally, SCE could potentially be subject to fines for alleged violations of CPUC rules and laws in connection with the December 2017 Wildfires.

SCE is aware of multiple lawsuits filed related to the December 2017 Wildfires naming SCE as a defendant. One of these lawsuits also named Edison International as a defendant. At least four of these lawsuits were filed as purported class actions. The lawsuits, which have been filed in the superior courts of Ventura, Santa Barbara and Los Angeles Counties allege, among other things, negligence, inverse condemnation, trespass, private nuisance, and violations of the public utility and health and safety codes. SCE expects to be the subject of additional lawsuits related to the December 2017 Wildfires. The litigation could take a number of years to be resolved because of the complexity of the matters and the time needed to complete the ongoing investigations.

Given the preliminary stages of the investigations and the uncertainty as to the causes of the December 2017 Wildfires, and the extent and magnitude of potential damages, Edison International and SCE are currently unable to reasonably estimate whether SCE will incur material losses and, if so, the range of possible losses that could be incurred.

SCE has approximately $1 billion of wildfire-specific insurance coverage, subject to a self-insured retention of $10 million per occurrence, for

wildfire-related claims for the period ending on May 31, 2018. SCE also has approximately $300 million of additional insurance coverage for wildfire-related occurrences for the period from December 31, 2017 to December 31, 2018 which may be used in addition to the $1 billion in wildfire insurance for wildfire events occurring on or after December 31, 2017 and on or before May 31, 2018, and would be available for new wildfire events, if any, occurring after May 31, 2018 and on or before December 30, 2018. Various coverage limitations within the policies that make up SCE's wildfire insurance coverage could result in material self-insured costs in the event of multiple wildfire occurrences during a policy period. SCE also has other general liability insurance coverage of approximately $450 million but it is uncertain whether these other policies would apply to liabilities alleged to be related to wildfires. Should responsibility for damages be attributed to SCE for a significant portion of the losses related to the December 2017 Wildfires, SCE's insurance may not be sufficient to cover all such damages. SCE or its vegetation management contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of insurance coverage.

In addition, SCE may not be authorized to recover its uninsured damages through customer rates if, for example, the CPUC finds that the damages were incurred because SCE was not a prudent manager of its facilities. The CPUC's Safety and Enforcement Division ("SED") is conducting an investigation to assess the compliance of SCE's facilities with applicable rules and regulations in areas impacted by the December 2017 Wildfires.

41.     Similarly, the 2017 10-K discussed another natural disaster which occurred in Santa Barbara County, California in January of 2018:

**Montecito Mudslides**

In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas (the "Montecito Mudslides"). According to Santa Barbara County, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures, and resulted in at least 21 fatalities, with two additional fatalities presumed.

Six of the lawsuits mentioned above allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the

Montecito Mudslides, resulting in the plaintiffs' claimed damages. SCE expects that additional lawsuits related to the Montecito Mudslides will be filed.

As noted above, the cause of the Thomas Fire has not been determined. In the event that SCE is determined to have liability for damages caused by the Thomas Fire, SCE cannot predict whether the courts will conclude that the Montecito Mudslides were caused by the Thomas Fire or that SCE is responsible or liable for damages caused by the Montecito Mudslides. As a result, Edison International and SCE are currently unable to reasonably estimate whether SCE will incur material losses and, if so, the range of possible losses that could be incurred. If it is determined that the Montecito Mudslides were caused by the Thomas Fire and that SCE is responsible or liable for damages caused by the Montecito Mudslides, then SCE's insurance coverage for such losses may be limited to its wildfire insurance. Additionally, if SCE is determined to be liable for a significant portion of costs associated with the Montecito Mudslides, SCE's insurance may not be sufficient to cover all such damages and SCE may be unable to recover any uninsured losses.

If it is ultimately determined that SCE is legally responsible for losses caused by the Montecito Mudslides, SCE could be held liable for resulting Property Losses if inverse condemnation is found applicable. If SCE is determined to have been negligent, in addition to Property Losses, SCE could be liable for business interruption losses, evacuation costs, clean-up costs, medical expenses and personal injury/wrongful death claims associated with the Montecito Mudslides. These liabilities, in the aggregate, could be substantial. SCE cannot predict whether it will be subjected to regulatory fines related to the Montecito Mudslides.

42. The statements referenced in ¶¶ 26-41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company failed to maintain electricity transmission and distribution networks in compliance with safety requirements and

-19-

regulations promulgated under state law; (ii) consequently, the Company was in violation of state law and regulations; (iii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

43.   On November 8, 2018, two wildfires started in Southern California, designated the Hill Fire and the Woolsey Fire. The Hill Fire, which broke out in Ventura County, subsequently grew to 4,531 acres, according to Cal Fire.  Stretching from Los Angeles County to Ventura County, the Woolsey Fire burned 93,662 acres, including 83 percent of all National Parks Service land in the Santa Monica Mountains National Recreation Area, according to Cal Fire.

44.   The Woolsey and Hill fires impacted a total of 45,470 Edison customers.

45.   On November 9, 2018, the Company issued a press release providing an update on the fires, stating in relevant part:

> ROSEMEAD, Calif., November 9, 2018 — Southern California Edison's Emergency Operations Center has mobilized resources and crews to assist first responders and to begin restoring power in communities affected by the wildfires in Ventura and Los Angeles counties as soon as fire officials say it is safe.
>
> ***The company's top priority continues to be the safety of customers, employees and communities.*** SCE is working closely with first responder partners and is prepared to safely and quickly restore power as soon as possible.

As of 5:45 p.m., 23,000 customers were without power, with 20,000 of them in Los Angeles County, many affected by the fires. SCE is currently monitoring several fires impacting customers within its service territory, including the Hill Fire in Ventura County and the Woolsey Fire in Ventura and Los Angeles counties, which has moved into the Malibu area.

***The fires have damaged SCE equipment and lines and caused outages in fire-affected areas.*** Once it is safe to do so and access has been granted, SCE's damage assessment teams will determine what equipment and repairs are needed before repairs can begin. SCE air patrols may also be required to fully assess damage caused by the fires in more remote areas, but that access is limited due to flight restrictions for fire-fighting operations.

***SCE has been in communication with the California Public Utilities Commission with respect to these fires and has submitted an initial electric safety incident report on the Woolsey Fire reporting an outage in the vicinity.*** The information in the report is preliminary. There has been no determination of origin or cause of either wildfire. SCE will fully cooperate with any investigations.

\*     \*     \*

**Edison's Efforts at Managing the Wildfire Threat in California**

***Safety is the company's top priority and a core value for SCE***. Our employees work vigilantly year-round to strengthen the electric system and protect the public and our employees against a variety of natural and man-made threats. We have long taken substantial steps to reduce the risk of wildfires in our service territory and continue to look for ways to enhance our operational practices and infrastructure. SCE employs design and construction standards, vegetation management practices and other operational practices to mitigate wildfire risk and has collaborative partnerships with fire agencies to maintain fire safety.

46.     On November 12, 2018, the CPUC launched an investigation into Edison's subsidiary Southern California Edison Company in order to "assess the compliance of electrical facilities with applicable rules and regulations in fire-impacted

areas." According to CPUC, electrical infrastructure may have suffered malfunctions near ground zero of the blazes. Specifically, it was reported that on the day the fires began SCE issued an alert to the CPUC that a substation circuit near the Woolsey Fire origin "relayed," or sensed a disturbance on the circuit, just two minutes before Cal Fire said that the devastating fire began.

47.   Following CPUC's announcement, Edison International's stock price fell $7.44 per share, or more than 12%, to close at $53.56 per share on November 12, 2018. Over the following days, as the Hill and Woolsey Fires continued to burn, Edison International's stock price continued to fall, closing at $47.19 on November 15, 2018, a total drop of 32% from its price prior to CPUC's announcement.

## CLASS ACTION ALLEGATIONS

48.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Edison securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Edison securities were actively traded on

the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Edison or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Edison;

- whether the Individual Defendants caused Edison to issue false and misleading financial statements during the Class Period;

Class Action Complaint

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Edison securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

54.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Edison  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- • Plaintiff and members of the Class purchased, acquired and/or sold Edison securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

57.   Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

58.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material

facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:   (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Edison securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Edison securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Edison securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Edison finances and business prospects.

61.     By virtue of their positions at Edison , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the

alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Edison, the Individual Defendants had knowledge of the details of Edison internal affairs.

63.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Edison.  As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Edison businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Edison securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Edison business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise

acquired Edison securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64.     During the Class Period, Edison securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Edison securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Edison securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Edison securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period,

upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

67.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.    During the Class Period, the Individual Defendants participated in the operation and management of Edison, and conducted and participated, directly and indirectly, in the conduct of Edison business affairs.  Because of their senior positions, they knew the adverse non-public information about Edison misstatement of income and expenses and false financial statements.

69.    As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Edison financial condition and results of operations, and to correct promptly any public statements issued by Edison which had become materially false or misleading.

70.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Edison disseminated in the marketplace during the Class Period concerning Edison results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Edison to engage

in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Edison within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Edison securities.

71.    Each of the Individual Defendants, therefore, acted as a controlling person of Edison.  By reason of their senior management positions and/or being directors of Edison, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Edison to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Edison and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Edison.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.  Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 16, 2018                    Respectfully submitted,

                                              **POMERANTZ LLP**

                                              */s/ Jennifer Pafiti*
                                              Jennifer Pafiti (SBN 282790)
                                              468 North Camden Drive
                                              Beverly Hills, CA 90210
                                              Telephone: (818) 532-6499
                                              E-mail: jpafiti@pomlaw.com

                                              **POMERANTZ LLP**
                                              Jeremy A. Lieberman
                                              J. Alexander Hood II
                                              Jonathan Lindenfeld
                                              600 Third Avenue, 20th Floor
                                              New York, New York 10016
                                              Telephone:  (212) 661-1100
                                              Facsimile:  (212) 661-8665
                                              Email:  jalieberman@pomlaw.com
                                                       ahood@pomlaw.com
                                                       jlindenfeld@pomlaw.com

-31-

1

2

3 **POMERANTZ LLP**
Patrick V. Dahlstrom

4 10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

5 Telephone:  (312) 377-1181

6 Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

7

8 **BRONSTEIN, GEWIRTZ**

9 **& GROSSMAN, LLC**
Peretz Bronstein

10 60 East 42nd Street, Suite 4600

11 New York, New York 10165
Telephone: (212) 697-6484

12 Email: peretz@bgandg.com

13

14 *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint

Friday, November 16, 2018

# Edison (EIX)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.   I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Edison International and Southern California Edison Company ("SCE", and together with Edison International, "Edison" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Edison securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Edison securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Edison securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

**Signature**



**Full Name**

Glen Barnes

(redacted)



**Edison International (EIX)**                                                      **Barnes, Glen**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 11/22/2016 | Purchase | 1,000 | $69.7900 |