**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GLEN BARNES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EDISON INTERNATIONAL, SOUTHERN CALIFORNIA EDISON COMPANY, PEDRO J. PIZARRO MARIA RIGATTI, KEVIN M. PAYNE, WILLIAM M. PETMECKY III, THEODORE F. CRAVER, JR., WILLIAM JAMES SCILACCI, SCE TRUST VI, CONNIE J. ERICKSON, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., MIZUHO SECURITIES USA LLC, MUFG SECURITIES AMERICAS INC., PNC CAPITAL MARKETS LLC, TD SECURITIES (USA) LLC, U.S. BANCORP INVESTMENTS, INC., ACADEMY SECURITIES, INC., C.L. KING & ASSOCIATES, INC., DREXEL HAMILTON, LLC, and SAMUEL A. RAMIREZ & COMPANY, INC.,<br><br>Defendants. | Case No.: 2:18-cv-09690-CBM-FFM<br><br>**CLASS ACTION**<br><br>Hon. Consuelo B. Marshall<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION....1
JURISDICTION AND VENUE....7
PARTIES....7
SUBSTANTIVE ALLEGATIONS....12
Background....12
Edison and SCE....12
California's "New Wildfire Reality" ....13
Relevant Statutory and Regulatory Provisions....16
Edison's Prior Fires and Outages....18
Edison's Safety Violations During the Class Period....22
Edison's Aging Electrical Infrastructure....29
Edison Failed to Maintain its Electrical Infrastructure....33
Pole Inspection Issues....33
Pole-Loading Issues....36
Vegetation Management Issues....39
Down Wires....40
Edison Runs its Equipment to Failure....41
Edison's Deficient Risk Assessment Practices....43
Edison Lobbies for Ratepayers to Indemnify its Fire-Related Liability ....45
Edison Causes the Thomas Fire....47
Edison Causes the Woolsey Fire....51
Materially False and Misleading Statements Issued During the Class Period ....59
2015 10-K ....59

May 2, 2016 Press Release....................................................65
Q1 2016 10-Q....................................................66
Q2 2016 10-Q....................................................68
2018 SCE General Rate Case Overview....................................................71
Nov. 1, 2016 Press Release....................................................72
Q3 2016 10-Q....................................................73
Q3 2016 Earnings Call....................................................77
Nov. 2, 2016 Business Update....................................................80
2016 10-K....................................................80
Q4 2016 Earnings Call....................................................88
Q1 2017 10-Q....................................................90
Q1 2017 Earnings Call....................................................92
Preferred Shares Offering....................................................94
Q2 2017 10-Q....................................................95
Q2 2017 Earnings Call....................................................97
Q3 2017 10-Q....................................................99
Q3 2017 Earnings Call....................................................101
2017 10-K....................................................103
Q4 2017 Earnings Call....................................................113
Feb. 23, 2018 Business Update....................................................117
Q1 2018 10-Q....................................................118
Q1 2018 Earnings Call....................................................122
July 26, 2018 Press Release....................................................124
Q2 2018 10-Q....................................................125
Q2 2018 Earnings Call....................................................128
July 27, 2018 Business Update....................................................130

Q3 2018 10-Q....132

Q3 2018 Earnings Call ....135

2018 10-K ....137

Q1 2019 10-Q....147

Q2 2019 10-Q....154

The Truth Emerges....159

The Thomas Fire ....159

The Woolsey Fire....160

CLASS ACTION ALLEGATIONS....164

COUNT I: (Violations of Section 11 of the Exchange Act Against Defendants Edison, SCE, SCE Trust VI, Payne, Petmecky, Erickson, and the Underwriter Defendants) ....167

COUNT II: (Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants) ....168

COUNT III: (Violations of Section 15 of the Securities Act Against Defendants Payne and Petmecky) ....169

COUNT IV: (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the SCE Defendants) ....171

COUNT V: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ....174

PRAYER FOR RELIEF....175

DEMAND FOR TRIAL BY JURY ....175

Lead Plaintiff Iron Workers Local 580 Joint Funds ("Lead Plaintiff") and additional named Plaintiff Irving Lichtman, on behalf of the Irving Lichtman Revocable Living Trust ("Litchtman") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated second amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Edison International ("Edison") and Southern California Edison Company ("SCE"),[1] analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a "Class" consisting of all persons and entities, other than Defendants and their affiliates, who purchased Edison securities from February 23, 2016, through October 29, 2019, both dates inclusive, as well as all persons and entities, other than Defendants and their affiliates, who purchased Edison Securities pursuant or traceable to the Company's Trust Preference Securities Offering (the "Offering") pursuant to the registration statement dated June 14, 2017 and/or the prospectus dated June 19, 2017 (the "Offering Documents"). Plaintiffs seek to pursue remedies against Edison and certain

[1] SCE and Edison are collectively referenced herein as the "Company."

of its officers and directors, and certain underwriters for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and/or the Securities Act of 1933 ("Securities Act").

2. In 2017 and 2018, two massive wildfires occurred within a single 12-month period as a result of Edison's failure to maintain its electrical infrastructure. The Thomas Fire, which burned over 280,000 acres and triggered mudslides that killed nearly two dozen people, children among them, was one of the ten most destructive fires in California history. The Woolsey Fire, which burned more than 96,000 acres and killed three people, is the largest fire in Los Angeles County history.

3. Prior to and during the Class Period, Edison and its SCE subsidiary acknowledged their duty – and publicly represented their ability – to assess and mitigate wildfire risks, as well as to monitor severe weather conditions that posed an increased risk of a wildfire. Edison repeatedly reassured investors of its alleged commitment to safety, dedication to infrastructure improvement, and wildfire mitigation efforts.

4. In the run-up to the Class Period, regulators demanded that Edison ramp up its pole inspections and repairs for overloaded and deteriorated poles. Instead, Edison rewrote its software for the express purpose of minimizing the number of inspections and repairs it would be required to complete.

5. During the Class Period, SCE received dozens of citations in electrical audits carried out by the California Public Utilities Commission ("CPUC") for, among other things, past-due work orders, exposed ground wires, interference with equipment by vegetation, and faulty pole-loading calculations.

6. CPUC's Safety and Enforcement Division ("SED") harshly criticized Edison in January 2017 for lacking a coherent approach to risk assessment, an area critical to wildfire prevention.

7. Edison raised $475 million in the Company's Offering of preferred stock during the Second Quarter of 2017, pursuant to a Registration Statement and a Prospectus which made material misrepresentations regarding the Company's safety record, dedication to infrastructure improvement, wildfire mitigation efforts, lack of any coherent approach to risk assessment, and citations and critical response by the CPUC and the SED.

**The Thomas Fire**

8. On December 4, 2017, sparks by SCE power lines came into contact during high winds at two separate ignition points which started the Thomas Fire. At the time, even though a "Red Flag Warning" had been issued by the National Weather Service in regard to a severe ongoing high-wind event, the SCE Defendants elected not to deactivate Edison's lines.[2]

9. The market understood that Edison had also caused the Thomas Fire, which began in Edison's territory.

10. Accordingly, Edison shares tumbled $10.26 – nearly 14% – between December 4, 2017 and December 5, 2017, eliminating more than $3 billion in market value.

11. After the market closed on December 11, 2017, SCE disclosed that "[t]he causes of the wildfires are being investigated by CAL FIRE… SCE believes the investigations now include the possible role of its facilities."

12. Following SCE's admission that it was being investigated by Cal Fire, other fire agencies and CPUC as the source of the fire, Edison's stock price fell another $4.40 per share, or approximately 6%, to close at $68.58 per share on

[2] Red Flag warnings issued by the National Weather Service identify time periods when conditions are ideal for wildfires.

December 12, 2017.

13. Despite SCE's knowing – no later than late December 2017 – that its equipment had caused the Thomas Fire, the SCE Defendants spent the next ten months telling investors and analysts that they had no direct knowledge of the Company's liability or the extent thereof.

14. Almost a year later – in late October 2018 – SCE belatedly acknowledged its equipment sparked one of the Thomas Fire ignition points.

15. Investigators also determined that SCE was, in fact, responsible for both fires, and found criminal violations – ***including involuntary manslaughter and reckless arson*** – on SCE's part.

**The Woolsey Fire**

16. On November 7, 2018, the National Weather Service "upgraded the current weather event to a Red Flag warning for Los Angeles County, including Malibu beginning Thursday, November 8, 2018 at 8:00 AM through Friday, November 9, 2018 at 8:00 PM. Coastal areas are expecting gusts around 35 MPH, with 50-70 MPH gusts predicted in the mountains."

17. Despite reassuring investors – and the general public – of their capability to do so during high-wind events, the SCE Defendants once again failed to deactivate Edison's lines.[3]

18. On November 8, 2018, the Woolsey Fire started in Southern California, and was not fully contained until November 21, 2018.

19. Between November 10 and 11, 2018, it was gradually revealed that SCE had filed an incident report with CPUC on the evening of November 8, stating that

[3] Indeed, SCE did not proactively deploy its then-existent public safety power shut off plan until June 2019.

there was an interruption to SCE's Big Rock 16 kV circuit near its Chatsworth substation just two minutes before the first report of a fire came in. The substation is located at the same location where the Woolsey Fire began.

20. On November 12, 2018, CPUC launched an investigation into SCE, in order to "assess the compliance of electrical facilities with applicable rules and regulations in fire-impacted areas."

21. Following the November 10-12 disclosures of the November 8, 2018 incident report and CPUC's announcement, Edison's stock price fell $7.44 per share, or more than 12%, to close at $53.56 per share on November 12, 2018. Over the following days, as the Woolsey Fire continued to burn, Edison International's stock price continued to fall, closing at $47.19 on November 15, 2018, a total drop of 32% from its price prior to CPUC's announcement.

22. On December 6, 2018, post-Class Period, SCE sent a letter to CPUC disclosing that Edison crews had discovered a guy wire, or a metal wire attached to the ground that supported the pole, in close proximity to a jumper, which connects power lines, on its Big Rock 16 kV circuit. The significance of this information is that the guy wire and jumper are likely to have contacted with each other or other Edison electrical equipment to start the blaze.

23. On August 30, 2019, the California Attorney General's Office was reported to be conducting a criminal investigation into the cause and origin of the Woolsey Fire.

24. On or about September 26, 2019, the California state court overseeing civil litigation associated with the Woolsey Fire ruled that a redacted version of the California Attorney General's investigative report on the fire could be produced to attorneys involved in the civil litigation, including attorneys for SCE, but not the general public. The court said that the full report would be released in April 2020.

25. On October 29, 2019, SCE disclosed that investigators had again determined that "electrical equipment owned and operated by SCE was the cause of the Woolsey Fire. Absent additional evidence, SCE believes that it is likely that its equipment was associated with the ignition of the Woolsey Fire."

26. Following SCE's admission of its involvement in causing the Woolsey Fire, Edison's stock price declined by $3.24 per share, or more than 5%, to close at $62.16 per share on October 30, 2019.

27. On November 13, 2019, SCE agreed to pay $360 million to twenty-three (23) public entities to settle legal claims in connection with the Thomas Fire and subsequent mudslide, as well as the Woolsey Fire.

28. Under California's "inverse condemnation" statute, which holds utilities legally responsible for fire damage if their equipment is deemed to be a cause, SCE stands to incur billions in liability for the Woolsey Fire. Where CPUC regulators determine that the utility "acted reasonably" to maintain its equipment, the costs can be passed onto ratepayers. But if negligence is established, the utility would have to shoulder the costs. SCE already stands to owe billions of dollars in connection with its role in the Thomas Fire.

29. Accordingly, the Company was motivated to conceal its misconduct in order to preserve its ability to seek ratepayer indemnification for wildfire damages.

30. Company was further motivated by its potential liability to avoid disclosing conduct that carried with it the high risk of investor flight and/or loss of market capitalization.

31. Upon the disclosure or materialization of the risk of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

32. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o and under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

33. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

34. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1391(b). Edison is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

35. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

36. Lead Plaintiff, as set forth in its certification previously filed with the Court, which is incorporated herein, acquired Edison securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or materialization of known risks.

37. Additional named Plaintiff Litchtman purchased 14,000 shares of Edison Trust Preference Securities at $25 per share on June 19, 2017, and was damaged upon the revelation of the alleged corrective disclosures and/or materialization of known risks. Plaintiff Litchtman purchased his Edison shares directly in the Offering from

underwriters RBC Capital Markets, LLC and TD Securities (USA) LLC. The certification for Plaintiff Litchtman was previously submitted to the Court.

38. Defendant Edison is a California corporation with its principal executive offices located at 2244 Walnut Grove Avenue (P.O. Box 976), Rosemead, California 91770. Edison's common stock trades in an efficient market on the New York Stock Exchange under the ticker symbol "EIX."

39. Defendant SCE is a California corporation with its principal executive offices located at 2244 Walnut Grove Avenue (P.O. Box 976), Rosemead, California 91770. SCE's securities are traded in an efficient market on the NYSE American LLC (together with the New York Stock Exchange, "NYSE").

40. Defendant Theodore F. Craver, Jr. ("Craver") served as the Chief Executive Officer ("CEO") of Edison International from 2008 until his resignation, effective September 30, 2016.

41. Defendant Pedro J. Pizarro ("Pizarro") has served as the CEO of Edison International since October 2016. Prior to that, Defendant Pizarro served as President of Edison International from June 2016 to September 2016 and President of SCE from October 2014 to May 2016.

42. Defendant Maria Rigatti ("Rigatti") served as the Chief Financial Officer ("CFO") of Edison International since October 2016, and prior to her appointment as CFO of Edison international she served in the same capacity for SCE.

43. Defendant Kevin M. Payne ("Payne") served as President and CEO of SCE since June 2016, and is also a member of SCE's board of directors.

44. Defendant William M. Petmecky ("Petmecky") has served as Vice President, Chief Financial Officer and Controller of SCE since October 2016.

45. Defendant William James Scilacci ("Scilacci"), served as the Chief Financial Officer of Edison International until his resignation, effective September 30,

2016.

46. The Defendants referenced above in ¶¶40-45 are sometimes referred to herein collectively as the "Individual Defendants."

47. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

48. The Defendants referenced above in ¶¶38-45 are sometimes referred to herein collectively as the "SCE Defendants."

49. Defendant SCE Trust VI is a statutory trust formed under the laws of the State of Delaware by SCE on June 12, 2017.

50. Defendant Connie J. Erickson ("Erickson") has served as Vice President and Controller of SCE since May 2014.

51. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was one of the primary underwriters of the Company's Offering and assisted in the preparation and dissemination of Edison's Offering Documents. Additionally, J.P. Morgan acted as a representative for all of the underwriters involved in the Offering. J.P. Morgan's main offices are located at 277 Park Avenue, New York, NY 10172.

52. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was one of

the primary underwriters of the Company's Offering and assisted in the preparation and dissemination of Edison's Offering Documents. Additionally, Morgan Stanley acted as a representative for all of the underwriters involved in the Offering. Morgan Stanley's main offices are located at 1585 Broadway, New York, NY 10036.

53. Defendant RBC Capital Markets, LLC ("RBC") was one of the primary underwriters of the Company's Offering and assisted in the preparation and dissemination of Edison's Offering Documents. Additionally, RBC acted as a representative for all of the underwriters involved in the Offering. RBC's main offices are located at 200 Vesey Street, 9th Floor, New York, NY 10281.

54. Defendant Wells Fargo Securities, LLC ("Wells Fargo") was one of the primary underwriters of the Company's Offering and assisted in the preparation and dissemination of Edison's Offering Documents. Additionally, Wells Fargo acted as a representative for all of the underwriters involved in the Offering. Wells Fargo's main offices are located at 550 S. Tryon St., 6th Floor, D1086-060, Charlotte, NC 28202.

55. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. Citigroup's headquarters are located at 390-388 Greenwich St., New York, NY 10013.

56. Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. Mizuho's headquarters are located at 320 Park Avenue, 12th Floor, New York, NY 10022.

57. Defendant MUFG Securities Americas Inc. ("MUFG") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. MUFG's headquarters are located at 1633 Broadway, 29th Floor, New York, NY 10019.

58. Defendant PNC Capital Markets LLC ("PNC") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. PNC's headquarters are located at 225 Fifth Ave., 3 PNC Plaza, 26th Floor, Pittsburgh, PA 15222.

59. Defendant TD Securities (USA) LLC ("TD") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. TD's headquarters are located at 31 West 52nd Street, New York, NY 10019.

60. Defendant U.S. Bancorp Investments, Inc. ("U.S. Bancorp") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. U.S. Bancorp's headquarters are located at 800 Nicollet Mall, Minneapolis, MN 55402.

61. Defendant Academy Securities, Inc. ("Academy") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. Academy's headquarters are located at 277 Park Ave., 35th Floor, New York, NY 10172.

62. Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. C.L. King's headquarters are located at 9 Elk Street, Albany, NY 12207.

63. Defendant Drexel Hamilton, LLC ("Drexel Hamilton") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. Drexel Hamilton's headquarters are located at 77 Water Street, Suite 201, New York, NY 10005.

64. Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez & Co.") was an underwriter of the Company's Offering and assisted in the preparation and

dissemination of the Offering Documents. Ramirez & Co.'s headquarters are located at 61 Broadway, Suite 2924, New York, NY 10006.

65. The Defendants referenced above in ¶¶51-64 are sometimes referred to herein collectively as the "Underwriter Defendants."

66. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents.

67. Representatives of the Underwriter Defendants were required to conduct an adequate and reasonable investigation into the business and operations of Edison, an undertaking known as a "due diligence" investigation, yet failed to do so.

68. All of the defendants referenced above are referred to collectively herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

#### Edison and SCE

69. Edison, which was founded in 1886 and is based in Rosemead, California, is the parent holding company of SCE. Edison is a publicly traded company that owns and/or manages an "Electric Plant" as defined in Section 217 of the California Public Utilities Code ("Utilities Code"), and, like its subsidiary SCE, is both an "Electric Corporation" and a "Public Utility" pursuant to, respectively, Sections 218(a) and 216(a) of the Utilities Code. It develops and operates energy infrastructure assets related to the production and distribution of energy such as power plants, electric lines, natural gas pipelines, and liquefied naturel gas receipt terminals.

70. Edison supplies electricity primarily to residential, commercial, industrial, agricultural, and other customers, as well as public authorities through transmission and distribution networks. Edison subsidiaries provide customers with public utility services, and services related to the generation of energy, generation of

electricity, transmission of electricity and natural gas, and the distribution of energy. Its transmission facilities consist of lines ranging from 33 kV to 500 kV and substations. Its distribution system comprises approximately 53,000 line miles of overhead lines, 38,000 line miles of underground lines, and 800 substations located in California. Edison serves approximately five (5) million customers.

71. SCE, based in Los Angeles County, is an investor-owned public utility and one of the nation's largest electric utilities, serving a 50,000 square-mile area within Central, Coastal, and Southern California. SCE is in the business of providing electricity to the residents and businesses of Central, Coastal, and Southern California through a network of electrical transmission and distribution lines. SCE is both an "Electrical Corporation" and a "Public Utility" pursuant to, respectively, Sections 218(a) and 216(a) of the Utilities Code.

**California's "New Wildfire Reality"**

72. The frequency of western U.S. wildfires has increased by 400% since 1970, with California among the states that have experienced the worst damage.

73. According to a recent report by Governor Newsom's wildfire "Strike Force": "The state's fire season is now almost year round …. Wildfires are not only more frequent but far more devastating. Fifteen of the 20 most destructive wildfires in the state's history have occurred since 2000; ten of the most destructive fires have occurred since 2015."[4]

74. The recent Strike Force report cites a variety of causes for the increase in number and severity of California wildfires, including "climate change, development

---

[4] *Wildfires and Climate Change: California's Energy Future*, A Report from Governor Newsom's Strike Force, Exec. Summary at 1 (Apr. 12, 2019), publicly-available at: https://www.gov.ca.gov/wp-content/uploads/2019/04/Wildfires-and-Climate-Change-California%E2%80%99s-Energy-Future.pdf

patterns, [and] deferred utility equipment maintenance."[5]

75. However, as one wildfire prevention activist noted in the midst of the Woolsey Fire catastrophe, "[u]tility-caused wildfires are not 'natural' disasters, even if climate change contributes to their severity …. Such fires do not start without a source, and if utility equipment is old, poorly inspected or poorly maintained it is more likely to be a source of ignition."[6]

76. The recent Strike Force report broadly concurs with this view in explaining that "California's electric utilities must be part of the solution to this problem. In the past four years, equipment owned by California's three largest investor-owned utilities sparked more than 2,000 fires. Utility-caused fires tend to spread quickly and be among the most destructive." (Citation omitted).[7] The report goes on to insist that "[o]ur utilities—public and private—must make needed investments to reduce the risk of utility-ignited fires and, with the new reality of climate change, must do so now."[8]

77. Due to inverse condemnation, which holds a utility strictly liable for wildfire damages if the utility's equipment ignites a wildfire, California's investor-owned utilities stand to incur massive losses stemming from what the Strike Force report calls "a new wildfire reality" and the resultant increase in fire damages:

---

[5] *Id* at. 26.

[6] Jeff McDonald, "A 2016 California Law Meant to Prevent Wildfires. Utility Regulators Delayed Enforcing It." *Tribune News Service* (Dec. 11, 2018), publicly-available at: https://www.governing.com/topics/transportation-infrastructure/tns-california-wildfire-power-2016-prevention-camp-fire-paradise.html

[7] *Id.* at 4.

[8] *Id.*

**Figure-09**
**Wildfire Damages[35]**




[*Source*: Strike Force report at 26.]

78. As the Strike Force report puts it, "[f]inancial experts have opined that these utilities are likely one major fire away from bankruptcy."[9]

79. In a February 2019 interview, Defendant Pizarro stated that "This is a really serious issue that could absolutely impair the health of utilities in this state …. I don't want to speculate about bankruptcy, but this is serious. And the current approach is just not sustainable."

80. Edison, however, has long been aware of its obligation to minimize wildfire risk. In January 2014, then-Governor Jerry Brown declared a state of emergency due to California's continued drought conditions. In June 2014, pursuant to Resolution ESRB-4, CPUC directed SCE and all investor-owned utilities to take remedial measures to reduce the likelihood of fires started by or threatening utility

---

[9] *Id.*, Exec. Summary at 1.

facilities.

81. No later than November 2015, prior to the start of the Class Period, SCE had identified and was aware that its electrical facilities were located in areas where, due to environmental and/or weather conditions, they posed an increased risk of wildfires, including that approximately 75% of SCE's territory was in a designated "High Fire" area; 640,000 trees within SCE's territory were located in "High Fire" areas; and 993 SCE circuits were in "High Fire" areas.[10]

82. In June 2017, prior to the Thomas Fire, SCE advised CPUC that "the insurance market has reacted more severely to the California wildfire risk, and this has significantly increased SCE's premiums."[11]

**Relevant Statutory and Regulatory Provisions**

83. At all times during the Class Period, Edison was obligated to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment and to keep vegetation properly trimmed at a safe distance so as to prevent foreseeable contact with such electrical equipment.

84. Edison was required to comply with a number of statutes, regulations, and standards in the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, as discussed below.

85. Pursuant to Section 451 of the Utilities Code, "[e]very public utility shall

---

[10] SCE, Senate Informational Hearing: Wildfire Safety at 2 (Nov. 18, 2015), publicly-available at: http://seuc.senate.ca.gov/sites/seuc.senate.ca.gov/files/11-18-15_edison_testimony.pdf

[11] SCE, General Rate Case 2018, Rebuttal Testimony, Administrative & General (A&G) Volume 4 - Property & Liability Insurance at 9 (June 16, 2017), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/DCE44214E863CE3F882581410082EBDD/$FILE/SCE24V04.pdf

furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities ... as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

86. More recently, California Senate Bill (SB) 901 (passed and signed into law in 2018) provides that electric utilities must "construct, maintain, and operate [their] electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment."

87. To meet this safety mandate, Edison is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. For example, in extreme fire areas, Edison also must ensure that its power lines can withstand winds of up to ninety-two (92) miles per hour.

88. Edison must also follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code § 4292, Edison is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or comer pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower."

89. Relatedly, Public Resources Code § 4293 mandates Edison maintain clearances of four to ten feet for all of its power lines, depending of their voltage. In addition, "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

90. CPUC General Order ("GO") 165 requires Edison to inspect its distribution facilities to maintain a safe and reliable electric system. In particular,

Edison must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. In addition, every ten years, Edison is required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over fifteen years old.

91. Edison publicly acknowledged these duties in November 2015, when SCE falsely represented to the California State Senate Subcommittee on Gas, Electric, and Transportation Safety (as well as the general public, including investors) that "[a] number of" its "existing practices" had been "enhanced and new activities adopted since 2007 to further improve SCE's ability to manage wildfire risk."[12]

92. Sections 451 and 399.2(a) of the Utilities Code give electric utilities authority to shut off electric power in order to protect public safety. This authority includes shutting off power for the prevention of fires caused by strong winds.

**Edison's Prior Fires and Outages**

93. Edison was aware of the significant risks created by its ineffective vegetation management programs, unsafe equipment, poor risk assessment, and/or aging infrastructure for decades before the Thomas and Woolsey Fires began, and Edison has been repeatedly fined and/or cited for causing massively disruptive fires and power outages.[13]

94. Since 2007, CPUC has levied over $78 million in fines against Edison for electric and fire-related incidents.[14]

95. The 1993 San Bernardino Mill Creek fire was caused by a failure of

---

[12] SCE, Senate Informational Hearing: Wildfire Safety at 10.

[13] "Pole loading" is the calculation of whether a pole meets certain design safety factors based on wind in its location and the facilities attached to the pole.

[14] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_and_Fire_Related_Fines.pdf

Edison's overhead power line equipment. High winds caused a power line to break, spark a fire, and damage a nearby home.

96. In 1997, Edison's failure to trim trees near and around its power lines near its distribution lines caused a 25,100 acre fire in Riverside County.

97. In 1998, Edison signed an undisclosed settlement in relation to a fire in which most of Stearns Wharf in Santa Barbara was burned. In that instance, an investigation concluded that Edison was responsible.

98. In 2006, Edison agreed to pay $14 million to settle a federal suit stemming from the 1994 Big Creek Forest Fire. The suit alleged that Edison did not comply with vegetation clearance requirements around a high-voltage transformer that exploded and ignited nearby dry grass. The Government also alleged that Edison didn't install appropriate animal guards at the location, and that Edison employees also lacked the equipment to stop the fire before it went into the forest.

99. Edison was also held responsible for its role in the 2007 Malibu Canyon Fire. The fire began when three wooden utility poles snapped during high Santa Ana winds and ignited nearby brush. That fire burned 3,836 acres and destroyed or damaged over thirty (30) structures. CPUC alleged that at least one of the poles that fell was overloaded with telecommunication equipment in violation of the applicable standards.

100. CPUC also alleged that Edison misled investigators about the circumstances of the fire. Specifically, "SCE admit[ted] that it violated Rule 1.133 in its communications with the Commission by: 1) not identifying pole overloading and termite damage as possible factors in the pole failures; 2) not providing SED with an accurate copy of an SCE employee's field notes; and 3) not admitting that not all

relevant evidence had been preserved."[15]

101. In response to its responsibility for the Malibu Canyon Fire, Edison agreed to conduct a safety audit and remediation of its utility poles in the Malibu area. In 2013, CPUC fined Edison $37 million for its role in the fire, with $17 million of the settlement to be spent on pole loading assessments and resulting remediation work in Malibu Canyon and surrounding areas.

102. Under the settlement agreement with CPUC, Edison admitted it violated the law by not taking prompt action to prevent its poles in Malibu Canyon from becoming overloaded. Further, Edison admitted that a replacement pole did not comply with CPUC's safety regulations for new construction, which should have caused Edison to take steps to remedy the situation.

103. Edison was also found liable for the 2007 Nightsky fire in Ventura County. The fire burned fifty-three (53) acres and started when sagging, overloaded power lines arced and sparked. The jury determined that Edison had not properly maintained its lines, that there were problems with insulators or conductors on Edison's poles, and that phase to ground faults, relay-tripping, and phase-to-phase imbalances indicated the existence of a chronic, unfixed hazard.

104. In November and December of 2011, Santa Ana winds swept through Edison's territory, knocking down utility facilities, uprooting trees, and causing

---

[15] Rule 1.1 of the Commission's Rules of Practice and Procedure states that:

> Any person who signs a pleading or brief, enters an appearance, offers testimony at a hearing, or transacts business with the Commission, by such act represents that he or she is authorized to do so and agrees to comply with the laws of this State; to maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges; ***and never to mislead the Commission or its staff by an artifice or false statement of fact or law*** (emphasis added).

prolonged power outages (the "San Gabriel Valley windstorms"). Over two-hundred (200) wood utility poles and 1000 overhead electrical lines were affected. CPUC's Safety & Enforcement Division ("SED") performed an investigation and concluded that Edison and communication providers who jointly owned utility poles violated CPUC standards because at least twenty-one (21) poles and seventeen (17) wires were overloaded in violation of safety factor requirements. As a result, CPUC fined Edison $16.5 million.

105. In 2015, multiple power outages on Edison's secondary network system, the electric distribution system that serves downtown Long Beach, occurred, including a five-day outage from July 15 to July 20, 2015, and a four-day outage from July 30, 2015 to August 3, 2015. The Long Beach outages primarily affected 3,825 customers served by Edison's Long Beach secondary network, but at times extended to 30,000 customers, including customers who receive their power from radial circuits that also feed the secondary network. Along with these outages, the failure of electric facilities caused fires in several underground structures, resulting in explosions that blew manhole covers into the air.

106. An investigation into the Long Beach outages revealed leaking, hot, deteriorated, and otherwise damaged cables, none of which were identified by SCE in previous inspections.

107. In connection with the Long Beach outages, SCE admitted that it had violated CPUC regulations by, *inter alia*: (i) failing to operate, monitor, and maintain its secondary network; (ii) failing to properly install or support cables where the fire had begun; (iii) failing to conduct required inspections. SCE further admitted that it violated the Utilities Code's mandate that utilities "promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

108. On November 7, 2015, a wildland fire known as the "Potrero Fire" ignited

in Thousand Oaks, California. The responding Ventura County Fire Protection District investigator noted in his report that he saw "multiple broken ceramic components of power line electrical equipment in the area" that "appeared to have been there prior to the fire." SCE was ultimately held to be in violation of GO 95, Rule 44.3 for failing to replace or reinforce an unsafe utility pole.

109. During the same period in 2017, the Liberty Fire burned three-hundred (300) acres and destroyed one structure and one outbuilding. SCE issued a press release acknowledging its equipment was associated with the fire's ignition. Cal Fire has confirmed SCE equipment was the cause of the Liberty Fire.

**Edison's Safety Violations During the Class Period**

110. Edison was aware of the significant risks created by its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure both before and during the Class Period, when Edison was repeatedly cited and/or fined for safety-related violations, including one involving a fatality. Nevertheless, Edison touted its safety practices to investors during the Class Period.

111. On May 15, 2014, an Edison overhead conductor separated and fell to the ground at the Company's Whittier facility. A person came into contact with the downed, yet still-energized, conductor and was fatally electrocuted. SED's investigators found that the overhead conductor separated at an overhead connector, and that Edison did not maintain the connector for its intended use. Consequently, Edison received a $50,000 citation.

112. In October 2018, CPUC fined SCE $8 million for failing to maintain electrical equipment that injured three U.S. Marines in Twentynine Palms in 2015. In that incident, three active-duty Marines were riding all-terrain vehicles in the desert when one ran into a fallen copper power line that was hanging less than eight feet off the ground and suffered a laceration to his neck. A comrade who rushed to his aid

sustained third-degree burns to his left hand, left bicep and abdomen. A third Marine was also badly shocked by the line.

113. CPUC initially fined SCE $300,000 in connection with the Twentynine Palms incident. SCE appealed that fine, and CPUC reopened its investigation. During the second probe, CPUC discovered that workers had failed for years to replace a nut that helped secure the overhead conductor, prompting CPUC to increase its fine against SCE. CPUC explained that SCE "failed to recognize the severity and hazard of this violation … Consequently, [the utility] labeled this hazardous and dangerous condition as priority level 3 and allowed the unsafe condition to remain uncorrected for several years."

114. CPUC's Electric Safety and Reliability Branch conducts regular "electric audits" of SCE districts during which commission employees review SCE records and field inspections of SCE facilities.

115. Almost all of CPUC's SCE-related audits conducted from 2015 to 2018 cite violations of GO 95for failure to complete work orders by their scheduled due date of corrective action. The audits flag safety violations, most of which related to pole safety, and some of which presented clear fire hazards.

116. An April 4, 2016 to July 15, 2016 audit of SCE's Tehachapi District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2013 to 2016, three work orders were completed past their scheduled date of corrective action;
- GO 95 where ground moulding was loose or missing;
- GO 95 where SCE failed to notify other companies of (a) low communications cable clearance; and (b) a CIP trunk line touching the ground; and
- GO 95 where high voltage signs on poles was either damaged or missing.

117. A July 11, 2016 to July 15, 2016 audit of SCE's Huntington Beach

District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2013 to 2016, seven work orders were completed past their scheduled date of corrective action;
- GO 95 where the above ground clearance of communication service drops on poles was six feet and SCE failed to notify the other companies of this safety hazard when it last inspected the poles;[16]
- GO 95 where a communication service drop was wrapped around the base of the pole, and SCE did not notify the other company of this safety hazard when it last inspected the pole;
- GO 95 where climbing space on a pole was obstructed by a communication cable that was wrapped around the base of the pole;
- GO 95 where ground moulding on poles was warped, bowing out, or missing altogether;
- GO 95 where a service drop was touching the roof of a building;
- GO 95 where a down guy wire on a pole was not taut; and
- GO 95 where pole steps were bent, damaged, or missing.

118. An October 10, 2016 to October 14, 2016 audit of SCE's Arrowhead District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2013 to 2016, an SCE work order was completed past its scheduled date of corrective action;
- GO 95 where down guy wires were not taut or, lacked the appropriate clearance, or touched a pole crossarm;

[16] A "drop" is the portion of a device directly connected to the internal station facilities, such as toward a telephone switchboard, toward a switching center, or toward a telephone exchange.

- GO 95 where high voltage signs on poles was either damaged or missing;
- GO 95 where ground moulding on poles was damaged; and
- GO 95 where conductors supported by poles showed abrasion from vegetation contact.

119. An October 10, 2016 to October 14, 2016 audit of SCE's substation audit of SCE's Orange County and Lighthipe Switching Centers found SCE in violation of, *inter alia*:

- GO 174 where the barbed wire along the southwestern perimeter fence of the Lucas Substation was broken;[17]
- GO 174 where the cable trench covers located northeast of the North Bus A Section 66 kV disconnect of the Hinson Substation were damaged;
- GO 174 where the Peanut 12 kV Circuit Breaker of the Chestnut Substation had a leak on the bottom of tank;
- GO 174 where the No. 2 Bank (12 kV Circuit Breaker) of the Lampson Substation was missing an animal guard;
- GO 174 where the 66 kV No. 2 Bank (south unit) of the Cabrillo Substation was leaking oil; and
- GO 174 where the The Perch 12 kV Circuit Breaker of the Bayside Substation was leaking oil.

120. A February 6, 2017 to February 10, 2017 audit of SCE's Blythe District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2014 to 2017, four work orders were completed

[17] CPUC GO 174, Rule 12, General, states in part: Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.

past their scheduled date of corrective action;

- GO 95 where multiple poles were damaged, in one case just two feet above the ground-line of the pole.

121. An April 17, 2017 to April 21, 2017 audit of SCE's Kernville District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where three work orders were past their scheduled date of corrective action;
- GO 95 where ground moulding on poles was damaged or missing; and
- GO 95 where guy wires were (a) not taut and/or (b) hanging between vegetation.

122. An October 16, 2017 to October 20, 2017 audit of SCE's Monrovia District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where three work orders were completed past their scheduled date of corrective action;
- GO 95 where one or more insulators on a pole were "sunken";
- GO 95 where ground moulding was damaged on three poles, exposing ground wire in two instances;
- GO 95 where climbing spaces on five poles were obstructed by communications cables, vegetation, tree branches, and/or a "buddy pole";[18]
- GO 95 where a service conductor supported on a pole was contacting a bare secondary cable on the same circuit; and
- GO 95 where down guy wires on two poles were contacting communications cables at mid-span.

123. An October 30, 2017 to November 3, 2017 audit of SCE's Long Beach

[18] According to CPUC, a "buddy pole" is an old pole that should be removed, but is instead left in the field.

District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2014 to 2017, SCE completed ***fifty-four (54)*** work orders past their scheduled date of corrective action;
- GO 95 where nine high voltage signs were damaged; and
- GO 95 where ground moulding on four poles was damaged, including two instances of exposed ground wires.

124. A February 5, 2018, to February 9, 2018 audit of SCE's Antelope Valley District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2014 to 2017, SCE completed ***forty-six (46)*** work orders past their scheduled date of corrective action; additionally, as of the audit date, SCE records indicated that it had ***nineteen (19)*** work orders open that were past their scheduled due date of corrective action; and
- GO 95 where ground moulding was damaged on six poles, exposing ground wire in each instance.

125. A March 5, 2018, to March 9, 2018 audit of SCE's San Joaquin Valley District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where, from 2014 to 2017, SCE completed twenty-two (22) work orders past their scheduled date of corrective action.

126. An April 16, 2018, to April 20, 2018 audit of SCE's Catalina Island District found SCE in violation of, *inter alia*:

- GOs 95 and 165 where three work orders were completed past their scheduled date of corrective action;
- GO 95 where service drops and communications cables came into contact in two instances;
- GO 95 where conductors were touching; and
- GO 95 where there were several discrepancies with the pole loading calculation

given that: (1) SCE's calculation with respect to wind load underestimated the pole's lateral deflection and the amount of bending moment caused by the vertical loads; (2) SED Staff found that the three communications span cables had higher attachment height on the subject pole than on the two adjacent poles; (3) SCE's calculation did not appear to take into account the increase in vertical loading on the subject pole that is caused by uneven attachment height; and (4) SCE's pole loading calculation did not appear to include the additional wind loading on the splice boxes, amplifiers, filters, and other incidental wiring and equipment on the communications span cables that are attached to the pole.

127. A May 21, 2018 to May 25, 2018 audit of SCE's Whittier District found SCE in violation of, *inter alia*:

- GO 95 where a service drop supported on a pole and serving a home was touching the roof of the aforementioned home;
- GO 95 where the insulator bracket supporting the service drop to the aforementioned home was detached and hanging below the eave of the home;
- GO 95 where, in three instances, pole crossarms supporting conductors were deteriorated and/or broken;
- GO 95 where a primary conductor on a pole exhibited "birdcaging" near a splice;[19]
- GO 95 where ground moulding was broken at multiple locations and peeling away from the pole, exposing the ground wire; and
- GO 95 where a palm tree growing parallel to the pole had palm fronds obstructing the designated climbing space.

[19] "Birdcaging" or "bird-caging" refers to a situation in which a wire in an impacted strand, *i.e.*, forced into compression, will separate from the core wire.

**Edison's Aging Electrical Infrastructure**

128. For years prior to the outbreak of the Thomas and Woolsey Fires, the SCE Defendants knew that their miles of aging power lines and utility poles posed a serious safety risk of triggering wildfires.

129. On September 1, 2016, in connection with its 2018 General Rate Case ("GRC"),[20] SCE acknowledged that "[p]oles in high-fire areas are [ ] more likely to lead to wildfires."[21]

130. According to a Fact Sheet disseminated by SCE, "[m]ost of SCE's poles were installed just after World War II and the methods we currently use to measure safety have changed."[22]

131. In its 2015 GRC, SCE further qualified that "[t]he average service life of these poles is 45 years."[23] More ominously, SCE's analysis of historical data found that

---

[20] GRCs are proceedings used to address the costs of operating and maintaining the utility system and the allocation of those costs among customer classes. *See* http://www.cpuc.ca.gov/General.aspx?id=10431. GRCs are categorized according to "test year," or the actual historical period of time for which financial and operating data will be required. Therefore, the actual GRC proceedings themselves will typically predate the test year, *e.g.*, proceedings for SCE's 2018 GRC primarily date from 2015-2017.

[21] SCE, 2018 General Rate Case, Transmission & Distribution (T&D) Volume 1 – Operational Overview and Risk-Informed Decision-Making at 36 (Sept. 1, 2016), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/B6856C8981232F75882580210065C0AF/$FILE/SCE02V01.pdf

[22] https://www.sce.com/sites/default/files/inline-files/PoleLoadingProgramFactSheet.pdf

[23] SCE, 2015 General Rate Case, Transmission and Distribution (T&D) Volume 1 - T & D Policy at 6 (Nov. 2013), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/B394F106B39238E888257C210080EE7A/$FILE/SCE-03%20Vol.%2001.pdf

found that poles over 70 years old have an ***80% chance of failure***.[24]

132. Also in its 2015 GRC, SCE identified pole failure as its second-highest risk – out of ten top risks – relating to safety to safety and reliability.[25]

133. Edison's service territory includes 1.4 million utility poles, and 63.3 percent of Edison's electric transmission and distribution system is comprised of overhead lines.

134. In a 2015 report to CPUC addressing the risk factors in its electrical system, Edison noted that "[w]ood poles are more susceptible to decay, woodpecker damage, or failure during a fire compared to concrete or steel poles." Furthermore, poles located in high-wind areas such as in Southern California are "exposed to higher stresses …. [i]f a pole fails and starts a wildfire, the fire is more likely to spread in a high-wind area" and "[i]f a pole fails in service, wildfires are more likely to start in high-fire regions …."[26]

135. In January 2017, SED observed that SCE's pole-loading study sample submitted in connection with its 2018 GRC:

> …. did not utilize a statistically random selection of poles across its service territory. Also, when SCE conducted analysis to compare its previous methodology with a revised sampling methodology, it used completely different sampling poles, not the same cohort as in its original analysis. SED concludes that there is no way to do an "apples-to-apples" comparison

---

[24] CPUC/SED, Staff Report, Southern California Edison Company, General Rate Case, 2015-2017, Application 13-11-003 at 13(Aug. 15, 2014).

[25] *Id.* at 13.

[26] Safety Model Assessment Before the Pub. Utils. Comm'n of the State of Cal. (May 2015), publicly-available at : http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/4841D9996 A06A2B288257E38007AA374/$FILE/A.15-05-XXX%20SMAP%20-%20SCE 01%20SMAP% 20Testimony_M.%20Marelli_S.%20Menon_N.%20Woodward.pdf

> between the previous pole loading assessment methodology and the new revised methodology.[27]

136. In 2017, well before the occurrence of the Liberty and Thomas Fires, CPUC ordered that the creation of a shared utility pole database be investigated for the express purpose of addressing the problems with Edison's infrastructure that caused the 2007 Malibu Canyon Fire and electrical problems in the 2011 San Gabriel Valley windstorms, where weak and faulty power poles maintained by Edison left thousands of people without power for days:

> Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State. Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay.[28]

137. In the June 29, 2017 CPUC press release for its order regarding the creation of a pole database, CPUC President Michael Picker explained that "[p]lain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them."

138. President Picker further stated that, "[n]ot knowing where all the poles are

---

[27] SED, Risk and Safety Aspects of Southern California Edison's 2018-2020 General Rate Case Application 16-09-001 (Jan. 19, 2017), publicly-available at: http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Risk_Assessment/SCE%202018%20GRC%20Report%20Final%20with%20Appendix%20A.pdf

[28] CPUC Order Instituting Investigation into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit (July 10, 2017), publicly-available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K656/191656519.PDF

and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."[29]

139. In response to the proposed shared database and a related Administrative Law Judge (ALJ) request for comments regarding same, SCE submitted comments to CPUC on February 8, 2018.[30] In its comments, SCE argued that (1) the requested feedback on database specifics was "premature" and (2) many of the ALJ's proposed database variables were "problematic" or "not feasible" given the incomplete state of SCE's own internal databases.[31] The rulemaking process with respect to the proposed pole database remains ongoing and incomplete.

140. Less than two months before the Woolsey Fire, SCE, in prepared testimony before CPUC, stated that "the two greatest ignition drivers are 'contact from object' followed by 'equipment/facility failure.' These historical statistics are consistent with the suspected ignition source data for California's investor-owned

---

[29] CPUC Press Release, "CPUC to Examine Utility Pole Safety and Competition; Considers Creation of Pole Database" (July 29, 2017), publicly-available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.PDF

[30] *See generally* Southern California Edison Company's (U 338-E) Comments on Assigned Commissioner and Assigned Administrative Law Judge's Ruling Requesting Comment on Creation of Shared, Statewide Database of Utility Pole and Conduit Information (Feb. 8, 2018), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/A69CD4FD0681664D8825822F00005290/$FILE/I1706027%20et%20al-SCE%20Comments%20on%20Ruling%20re%20Creation%20of%20Shared%20Database.pdf

[31] *See id.* at 2-3.

electric public utilities by the CPUC's Safety and Enforcement Division."[32]

**<u>Edison Failed to Maintain its Electrical Infrastructure</u>**

141. In addition to having no reasonably functional method to track the condition of its infrastructure of its pole stock, Edison failed to timely and properly maintain, inspect, and/or monitor its electrical infrastructure, despite knowing that its failure to do so could trigger highly-destructive fires, as had already happened repeatedly.

**<u>Pole Inspection Issues</u>**

142. While SCE has admitted that it has the ability to "underground" sections of power lines – and thereby do away with poles altogether – as well as otherwise "fire-harden" its distribution system, it has not proposed doing so on a system-wide basis.[33] Instead, those solutions would apply only to "sections of lines" depending on cost-benefit considerations.[34]

143. In its 2015 GRC, SCE revealed that while it "should be replacing over 31,000 poles every year", it was, in fact, "replac[ing] approximately 14,000-18,000 poles each year" and "that approximately half of these poles replacements [we]re based on GO 165-driven pole inspections" rather than any technologically-current tracking system. Shockingly, SCE admitted that during the previous five years, it had replaced just <u>8,000 poles per year</u> (on average). SCE's own submission concluded that "***[t]his is***

---

[32] *See* SCE, Prepared Testimony in Support of Southern California Edison Company's Application for Approval of Its Grid Safety and Resiliency Program – Annotated at 33 (Sept. 10, 2018), publicly-available at: https://www.tellusventure.com/downloads/cpuc/poles/sce_testimony_grid_safety_10sep2018.pdf

[33] SCE, 2015 GRC, T&D Vol. 1 at 29.

[34] *Id.*

***simply not enough***." (Emphasis added).[35]

144. Former Employee ("FE") 1, who worked as a Planner in SCE's Deteriorated Pole Replacement Program ("DPRP") – which was initiated in 2013 – from January 2014 to March 2018, said the DPRP involved replacing an enormous number of deteriorated poles: in 2014, SCE issued about 40,000 work orders for pole replacements. In 2015, it was about 45,000.

145. The figures provided by FE1 stand in marked contrast to SCE's own reporting: in 2016, SCE told CPUC that it had replaced just over 23,000 poles in connection with the DPRP, or slightly more than half of its issued work orders.[36]

146. FE2 was a contractor for SCE between July 2017 and October 2018. Prior to that, FE2 was SCE's South Bay District Manager between June 2014 and January 2016. South Bay is one of the largest and most populous districts in SCE's territory.

147. As District Manager, FE2 learned that the following SCE territories regularly did not hit targets for annual pole replacements: Metro East, North Coast, Santa Barbara and Ventura. Later, the Thomas Fire burned in Santa Barbara and Ventura Counties, while the Woolsey fire likewise affected Ventura County.

148. FE2 confirmed that the progress of each district's pole replacement work was part of the reports and briefing regularly given to Greg Ferree ("Ferree"), Vice-President of Distribution in SCE's Transmission & Distribution division. FE2 personally participated in meetings to provide that information to Ferree until FE2's

---

[35] SCE, 2015 GRC, T&D Vol. 1 at 6.

[36] SCE, General Rate Case 2018, Transmission & Distribution Volume 9, Poles at 5 (Sept. 1, 2016), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/2AC8389C4B47F640882580210066E4E5/$FILE/SCE02V09.pdf

departure in January 2016.

149. FE3 was a Biologist - Technical Specialist for SCE from April 2016 to March 2017, based in Rosemead, California. FE3 also worked for an environmental firm contracted with SCE to conduct biological surveys from 2013 to March 2016.

150. FE3 reported that under SCE's DPRP, a team of pole inspectors would conduct rotating rounds of surveys and tests on SCE's pole stock. Deteriorated poles were to be scheduled for replacement, but only after biologists, such as FE3, conduct a survey of the environmental impact of the replacement work, including impacts to bird nesting activity in, or, or near the pole.

151. The territory in which FE3 conducted surveys for SCE included the area where the Thomas Fire started.

152. FE3 said that upon any sign whatsoever that a bird was nesting on, in or near the pole, SCE would delay replacing the pole until the nest was no longer active.

153. FE3 stated that hundreds, if not a thousand or more, deteriorated poles were subsequently delayed for replacement due to SCE's approach to bird nesting. Specifically, FE3 estimated that approximately 20 to 30 percent of the deteriorated poles scheduled for replacement were delayed due to nesting birds in the years 2015 and 2016.

154. In regard to the Company's overly cautious approach to bird nesting, FE3 explained that Edison owned the right of way under the utility lines, so the Company had a right to replace poles with nests in them – just as a homeowner would have a right to cut down a tree in their yard with active nests in it.

155. FE3 further estimated that based on a cost of $23,400 per pole to replace transmission poles and $15,000 per-pole to replace distribution poles, delaying several hundred to a thousand poles per year could save Edison millions of dollars annually.

**Pole-Loading Issues**

156. Given Edison's longstanding problems with overloaded poles – as demonstrated by its role in causing the Malibu Canyon Fire – CPUC ordered SCE, as part of its 2012 GRC – to conduct a sample of SCE-owned and jointly-owned utility poles to determine whether pole loading complied with current legal standards. The resulting study, conducted by SCE, found that 22.3% of the more than 5,000 poles tested failed to meet current design standards.[37]

157. In the 2012 GRC, CPUC explicitly stressed the connection between SCE's pole remediation – or lack thereof – and fire risk:

> SCE did not establish its ability to undertake intrusive inspections of 130,000 wood poles per year during this rate cycle. However, we are concerned to the degree that some poles in SCE's service territory, particularly jointly-owned poles, may, unknown to SCE, be overloaded. ***Overloaded poles may break and thereby contribute to increased fire and other hazards***. (Emphasis added).[38]

158. In November 2013, SED sent a letter to CPUC discussing SCE's pole-loading study and recommending that: (1) SEC conduct wind analysis in its electrical equipment; (2) SCE should conduct a pole loading analysis of every pole carrying SCE facilities, employing a risk management approach, considering, at a minimum, fire risk, the presence of communications facilities and the number of overloaded poles in the area; and (3) SCE should commence pole mitigation measures as soon as possible,

---

[37] *See* CPUC, A Brief Introduction to Utility Poles (July 31, 2014) at 21, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_Us/Organization/Divisions/Policy_and_Planning/PPD_Work/PPDUtilityPole.pdf

[38] *See* CPUC, Decision On Test Year 2012 General Rate Case For Southern California Edison Company (Dec. 10, 2012), publicly-available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M037/K668/37668274.pdf

and not wait for the pole loading analysis to be completed.[39]

159. In its 2015 GRC, SCE claimed to have designed a Pole Loading Program ("PLP") to "inspect and assess over 1.4 million poles over a seven-year period to identify and then remediate those poles that do not meet the current standards."[40]

160. From the outset, the PLP was a limited, piecemeal solution to the staggering risk posed by SCE's aging pole stock. First, SCE lacked sufficient data to coordinate the PLP with other maintenance efforts, including the DPRP.[41] Second, the PLP was designed to only "include poles that require repair or replacement solely because the pole fails a pole loading assessment."[42] That is, even where a pole had been identified as deficient based on an intrusive physical inspection, it would not be flagged for repair or replacement under the auspices of the PLP.

161. SCE claims that it started its PLP assessments in 2014, but will not complete pole remediation of overloaded poles until 2025.

162. As of January 2017, CPUC confirmed that SCE had no methodology in place to assess for varying levels of pole loading risks.[43]

163. In its 2015 GRC, SCE estimated that 22% of its utility poles were overloaded. ***An overview of SCE's pole-loading study from July 2013 revealed that***

---

[39] *Id.* at 22.

[40] SCE, 2015 General Rate Case Application (Nov. 2013), publicly-available at: http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/D6B9C75A9D53E91288257C22007644A8/$FILE/APP%20SCE-10%20Vol.%2001%20Ch.%20IV.pdf

[41] SCE, 2015 GRC, T&D Vol. 1 at 29.

[42] *Id.* (Emphasis in original).

[43] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Risk_Assessment/SCE%202018%20GRC%20Report%20Final%20with%20Appendix%20A.pdf

***overload was even higher in High Fire Threat Areas – at 23.7%***.[44] Accordingly, SCE forecast it would perform an assessment of 205,754 poles in 2015.

164. However, in its 2018 GRC, SCE disclosed to CPUC that instead of assessing and remediating, it had simply modified its software used to calculate pole loading safety factors, thus reducing the percentage of poles requiring remediation to just 9%.[45]

165. FE1, who was a Planner in SCE's DPRP, stated that the modified software – called SPIDACalc – was less strict about which poles were likely to fail. Consequently, the number of work orders for pole replacements dropped to about 30,000 in 2016, the year before the Thomas Fire.

166. FE1 recalled that after the updated SPIDACalc software – which was deployed in the DPRP in addition to the PLP – began to lower the percentage of failing poles, SCE lowered its projected number for pole replacements each year, and replaced its construction contracts for a smaller scope of work.

167. In fact, SCE was unable to deploy the updated SPIDACalc until ***November 2015***, meaning that Edison had long since blown its assessment targets by the time it arrived at a technology-based rationale for its failure to assess SCE's overloaded pole stock.[46]

168. In early 2017, SED objected that "SPIDACalc software has not been independently verified and validated to test the results provided by the specific software version utilized for SCE's electrical distribution and transmission wood pole

---

[44] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/Safety/Presentations_for_Commission_Meeting/SouthernCaliforniaEdisonPoleLoadingStudy(1).pdf

[45] SCE, General Rate Case 2018, T&D Vol. 9, Poles at 11.

[46] *Id.*

design … against G.O. 95 Overhead Line Construction safety requirements."[47]

169. In its 2018 GRC, SCE disclosed that it had failed to meet its 2015 projections to assess and repair overloaded poles. In contrast to its 2015 projections, SCE only actually performed PLP-related assessments of 142,382 poles in 2015, or 63,372 (30%) fewer than SCE claimed it would conduct, and as a result, SCE repaired 14,310 fewer overloaded poles than it forecast in 2015.

170. SCE further disclosed that out of the poles it assessed, it only performed repairs on 569 poles.

171. In its 2018 GRC, SCE claimed that it had considered changing the duration of its PLP from seven years to ten years – allowing for fewer pole assessments each year – and had adjusted its target assessment rate accordingly. However, SCE had never received official sign-off for the timeline change, and was ultimately required to proceed on a seven-year timeframe.

172. In prepared testimony dated September 10, 2018 – just before the Woolsey Fire – SCE informed CPUC that of the two primary categories of poles necessitating replacement under the PLP, one was "poles subject to particularly high winds []."[48] SCE further clarified that "[t]he specific poles that require replacement will disproportionately be those with higher wind loading conditions."[49]

**<u>Vegetation Management Issues</u>**

173. Edison also failed to manage fire-prone vegetation that threatened its electrical infrastructure (*see*, *e.g.*, ¶¶118, 121, 122 above).

---

[47] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Risk_Assessment/SCE%202018%20GRC%20Report%20Final%20with%20Appendix%20A.pdf

[48] Sept. 10, 2018 Prepared Testimony at 63.

[49] *Id.* at 63.

174. FE4 was employed as an Emergency Management Specialist at SCE from May 2014 to September 2015, and reported to Steven Oda, Business Resiliency senior manager.

175. FE4 explained that while the accepted role of emergency management involves the four aforementioned phases: mitigation, preparedness, response, and recovery, SCE lacked a focus on mitigation.

176. FE4 relayed that one of FE4's colleagues in Emergency Management at SCE, John Chappell ("Chappell"), had been working on and had proposed a fire mitigation program to SCE.

177. Chappell recommended the removal of large areas of dried vegetation around SCE electrical lines and/or equipment, which was creating an increased risk for wildfires.

178. It is FE4's understanding that no mitigation of the dried vegetation as proposed by Chappell was actually done by SCE.

**Down Wires**

179. FE5 was an Incident Investigation Manager at SCE from March 2010 to October 2014, and initially reported to Ed Antillon ("Antillon"), Director of Quality Assurance; followed by Greg Klugian ("Klugian"), who took over the job as Director after Antillon left SCE.

180. When FE5 left SCE toward the end of 2014, SCE did not have a program for regular inspections and upgrades of the conductor wires, fuses, or transformers that were all attached to the utility poles.

181. FE5 stated that whenever SCE has a problem of any kind involving its distribution system, the incident is reported and uploaded into an internal database as a Preliminary Incident Report (or "PRI"). FE5 was tasked with monitoring PRIs and assigning the incidents to a team of incident investigators for further action.

182. FE5 disclosed that SCE received multiple reports of "down wires" daily. Causes of down wires include utility poles falling over often due to rot, the arms of a utility pole breaking off, the wire itself breaking due to age, the wire detaching from the fuse on the pole, and two wires touching each other to cause a short and spark that breaks both.

183. FE5 specially cited down wires as a fire hazard, and recalled that that downed wires caused a few fires a month, and some of those fires spread.

184. FE5 further recalled that investigators made repeated recommendations for actions to take to prevent the problem from occurring again, such as the replacement of aging equipment, poles or wire. The recommendations were memorialized in reports and sent to members of management including Greg McDonald, Director of Safety, Antillon, and Klugian.

185. These recommendations were usually not implemented, according to FE5; instead, SCE deployed stopgap measures such as using a "splitter" to connect the two broken pieces of wire back together.

**Edison Runs its Equipment to Failure**

186. SCE's maintenance failures were compounded by its overall approach to infrastructure maintenance. FE5 characterized SCE's maintenance program for its distribution system as "deal with it when it breaks."

187. In its 2015 GRC, SCE indicated its adherence, at least in part, to "run-to failure" maintenance practices. Under this model, SCE "deal[s] with equipment as it wears out" by "wait[ing] until the equipment fails in service and then replac[ing] it[.]"[50]

---

[50] SCE, 2015 General R ate Case Application, Workpapers, Transmission & Distribution Infrastructure Replacement Programs, SCE-03 Volume 04 at 1 (Nov. 2013), publicly-available at:

188. SCE explained its reliance on run-to-failure as follows: "A run-to-failure strategy can, for some types of equipment, be the preferred approach. For equipment whose in-service failures have minimal consequences, there is little benefit derived from preemptive replacement."[51]

189. Also in the 2015 GRC, SED identified "run to failure" as one of three options deployed by SCE with respect to replacing equipment.[52]

190. SCE, however, did not clarify precisely *what* equipment would be included in the failure-with-minimal consequences category, or what "minimal consequences" even means.

191. For example, SCE, in the same document, repeatedly cites oil-filled transformers as having the potential to cause fires, but does not attribute the same risks to utility pole failure.[53] Likewise, SCE describes energized conductors as "serious fire hazard" while going on to mention vegetation in the following sentence without describing vegetation as a fire hazard at all.[54]

192. SCE's reliance on the run-to-failure option exemplifies the mentality that SED warned of in the 2015 GRC, when it noted that "subjective nature" of SCE's approach "to both the risks presented and the determination of 'acceptable level' down to which the risks can be mitigated." Accordingly, SED suggested that "[t]he more that SCE can use data to support its future proposals, the less subjectivity in balancing risk

---

http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/281B011D6173DA7288257C220075395B/$FILE/APP%20SCE-03%20Vol.%2004.pdf

[51] *Id.* at 2.

[52] CPUC/SED, Aug. 15, 2014 Staff Report at 28.

[53] *Id.* at 72, 77.

[54] *Id.* at 60.

trade-offs will occur."[55]

193. FE6, a former CPUC investigator, agreed that SCE let equipment run until it broke, *i.e.*, the "run to failure or RTF" maintenance program. FE6 further noted that SCE sometimes didn't know when electrical equipment was installed on its poles.

194. In the wake of the Woolsey Fire, SCE was hit with multiple lawsuits alleging that its run-to-failure protocol was a direct cause of the fire.

195. Specifically, it was alleged that (a) in 2015, SCE identified a power pole at Koenigstein Road, the source of the ignition of the Thomas Fire, as needing to be replaced; (b) despite identifying the need, SCE chose not to replace the pole and let it run to failure: (c) the dilapidated power pole that SCE ignored years earlier foreseeably failed, causing an explosion and a shower of sparks that ignited the Thomas Fire; and (d) per its run-to-failure protocol, immediately after the Thomas Fire, SCE finally came to Koenigstein Road and replaced the pole. These allegations were leveled despite the fact that the plaintiffs in these lawsuits pled no damages relating to the Thomas Fire.

196. The lawsuits also argued that by implementing the run-to-failure model and other improper practices, SCE failed to conduct appropriate, timely equipment inspections and maintenance in violation of CPUC regulations, and that preventative inspections and maintenance would have prevented the start of the Woolsey Fire.

**<u>Edison's Deficient Risk Assessment Practices</u>**

197. In January 2017, when SED evaluated Edison's 2018 GRC application, the regulatory agency was highly critical of Edison's risk assessment practices, determining it would be "unwise to accept Edison's risk assessment methods as a basis

[55] CPUC/SED, Aug. 15, 2014 Staff Report at 9.

for determining reasonableness of safety-related program requests."[56]

198. SED found that that "Edison is classifying major categories of spending as safety related, even though they relate to issues of customer satisfaction or electric service reliability than safety."

199. For example, SED found that found that "[w]hile Edison projected improvements in reliability metrics in its testimony from grid modernization, SED did not find that Edison had provided similar projection in terms of improvement in safety metrics." Ultimately, SED concluded that "[g]rid modernization funding requests compete with traditional safety related programs for funding, ***such as prioritized aging infrastructure replacement***." (Emphasis added).

200. Edison also "admitted in testimony that it did not use risk assessment in the identification of its top risks, or to select programs to address those risks, but mostly after-the-fact as a way to measure risk reduction associated with the programs or projects proposed."

201. Perhaps most alarmingly for one of the nation's largest electric utilities in a region affected by increasingly severe wildfires, "SCE's approach to identify threats or risk drivers suffers from an almost non-existent level of granularity" leading to "SCE's current risk-informed decision-making process" being deemed "too immature … to allow [for] meaningful analysis [.]"

202. In sum, SED found that the high risk scores of Edison's infrastructure showed that Edison's current methodology did not prioritize safety. SED determined that Edison needed to make substantial improvements in evaluating and characterizing the risk of its infrastructure.

---

[56]http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Risk_Assessment/SCE%202018%20GRC%20Report%20Final%20with%20Appendix%20A.pdf

203. SCE's methods of determining risk "underestimate[d] both the frequency and consequence/impact of very low frequency and very high consequence events, ***such as highly catastrophic wildfires***. This is particularly true where Edison is relying on historical data as a basis for estimating the frequency and consequence terms." Edison was not even able to "provide even a qualitative prioritization of its risks." (Emphasis added).

204. Throughout the Class Period, Edison continued to obsessively prioritize grid modernization in lieu of aged infrastructure remediation, while not making any substantial improvements in evaluating and characterizing the risk of its infrastructure, as SED strongly recommended.

**Edison Lobbies for Ratepayers to Indemnify its Fire-Related Liability**

205. In 2009, San Diego Gas & Electric ("SDG&E") – one of three California power monopolies along with SCE and Pacific Gas & Electric ("PG&E") – sought permission from CPUC to charge customers almost $400 million in leftover costs from the 2007 Guejito, Rice, and Witch Fires, where damages totaled more than $2 billion, an amount far in excess of PG&E's available insurance.

206. After SDG&E's attempt to insulate itself from liability was rejected by CPUC and failed in court, lobbyists for the monopolies began to press for a legislative iteration of the proposal.

207. Long before the start of the Class Period, it was thus apparent to Edison and other California utilities that disclosure of fire-related malfeasance could result in far-ranging negative financial consequences.

208. In the years leading up to the passage of SB 901 in August 2018, it was reported that PG&E, SCE and SDG&E spent more than $17 million lobbying

legislators for relief from wildfire damages.[57]

209. SB 901, in part, allows power companies to issue bonds to pay for future wildfire-related expenses, and if regulators determine that utilities met the prevention standards in their fire mitigation/prevention plans and other rules, *i.e.,* were not negligent, they will be allowed to pass the bond costs on to their customers.

210. In particular, SB 901 allows a utility, with regulators' approval, to impose a special fee on customers to pay such costs related to wildfires ("rate recovery").

211. Under the Prudent Manager Standard, a utility has the burden to affirmatively prove that it reasonably and prudently operated and managed its system. That means a utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety, reliability, and reasonable cost.

212. If, under the Prudent Manager Standard, the utility is found to have acted negligently, the utility must absorb costs in excess of the utility's insurance.

213. In regulatory proceedings, decided in July 2018, involving SDG&E's request for rate recovery with respect to the 2007 fires, SCE expressly argued that rate recovery should not be used to deter imprudent actions.[58]

214. Regardless, SB 901 did not nullify the governing legal doctrine of inverse condemnation, which holds that when private company like a utility is given access to private property for its equipment, they are responsible for any damage that equipment

---

[57] John Myers, "One small change to California's wildfire prevention law could spark a huge political fight in Sacramento," *Los Angeles Times* (Dec. 3, 2018), publicly-available at: https://napavalleyregister.com/news/local/one-small-change-to-california-s-wildfire-prevention-law-could/article_974129ff-380a-5121-83ee-731374305278.html

[58] *See* Order Denying Rehearing of Decision (D.) 17-11-033 (July 13, 2018), publicly-available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M218/K019/218019946.PDF

causes.

215. Wildfire liability is of existential importance for California utilities: PG&E, with service territory in Northern California, filed for Chapter 11 reorganization on January 29, 2019 in the aftermath of the 2017 and 2018 wildfire seasons, the two most destructive in state history. PG&E cited up to $30 billion in liabilities since many blazes, including the 2018 Camp Fire, have been linked to its equipment.

216. SCE has already seen its credit rating downgraded twice by credit ratings agencies in 2019, leaving it "near the bottom of the investment grade category," and in need for a higher rate of return in order to attract necessary capital.[59] SCE recently requested that the Federal Energy Regulatory Commission ("FERC") include an upward adjustment for SCE's extraordinary wildfire risk in the authorized return on equity (ROE) for the portion of SCE's business regulated by FERC.[60]

217. SCE's ROE request cited "dramatic material changes to SCE's regulatory and financial conditions" since October 2017 – just prior to the Thomas Fire – and underscores the extent to which the SCE Defendants were able to maintain inflated stock prices throughout the Class Period by concealing the fire risks that were the logical result of their inadequate infrastructure maintenance.

**<u>Edison Causes the Thomas Fire</u>**

218. On October 20, 2017, Cal Fire issued a news release to warn of

[59] *See* Robert Walton, "Southern California Edison requests higher ROE, citing wildfire risks," *Utility Dive* (April 12, 2019), publicly-available at: https://www.utilitydive.com/news/southern-california-edison-requests-higher-roe-citing-wildfire-risks/552577/

[60] *Id.*

dangerous weather conditions in Southern California following the devastating Northern California fires. Cal Fire specifically said:

> After one of the deadliest and most destructive weeks in California's history, firefighters are preparing for another significant wind event in Southern California. The National Weather Service has issued several Red Flag Warnings and Fire Weather Watches across Southern California starting this weekend through early next week due to gusty winds, low humidity and high temperatures. In response to these anticipated conditions, CAL FIRE is increasing its staffing levels with additional firefighters, fire engines, fire crews, and aircraft to respond to any new wildfires. **"This is traditionally the time of year when we see these strong Santa Ana winds," said Chief Ken Pimlott, director of CAL FIRE.** "And with an increased risk for wildfires, our firefighters are ready. Not only do we have state, federal and local fire resources, but we have additional military aircraft on the ready. Firefighters from other states, as well as Australia, are here and ready to help in case a new wildfire ignites." The weather warnings stretch from Santa Barbara, San Diego, Orange, Riverside, Los Angeles, San Bernardino and Ventura counties. **The winds are expected to reach gusts of up to 50 mph, along with record breaking heat, fire danger in these areas is high.** It is vital that the public use caution and avoid activities that may spark a new fire. **Any new fires can spread rapidly under these types of weather conditions.**

219. On December 4, 2017, the National Weather Service issued a "Red Flag Warning" which stated, "[t]his will likely be the strongest and longest duration Santa Ana wind event we have seen so far this season. If fire ignition occurs, there will be the potential for very rapid spread… and extreme fire behavior."[61]

220. The National Weather Service issues Red Flag Warnings to alert fire departments and the public of the onset, or possible onset, of critical weather and dry conditions that could lead to rapid or dramatic increases in wildfire activity. A Red

[61] Sonali Kohli, Expect the "Strongest and Longest" Santa Ana Winds of the Season this Week in L.A. Area," *Los Angeles Times* (Dec. 4, 2017 8:10 a.m.), http://www.latimes.com/local/lanow/la-me-ln-fire-risk-20171204-story.html

Flag Warning is issued for weather events that may result in extreme fire behavior that will occur within 24 hours. A Red Flag Warning is the highest alert. During these times, extreme caution is urged because a simple spark can cause a major wildfire.[62]

221. Edison ignored the Red Flag warning, and did not de-energize facilities, despite having the ability to do so, *see* ¶92 above, even though SDG&E submitted de-energization reports to CPUC during the same period.

222. That same day, the Thomas Fire – which ignited during Santa Ana wind conditions – burned more than 280,000 acres and destroyed 1,063 structures in Ventura and Santa Barbara Counties. The Thomas Fire also caused widespread power outages, road and school closures, and forced thousands of residents to be evacuated and local businesses to be shut down. It was, at the time, the largest fire by acreage in state history.

223. Multiple witnesses attested to seeing an SCE transformer on a utility pole located on Koenigstein Road explode, sending a shower of sparks nearby.[63]

224. The Thomas Fire also triggered mudslides in its burn area on January 9, 2018, resulting in twenty-two (22) deaths, including children, and was not fully contained until January 12, 2018.

225. Almost a year later, in late October 2018, Edison admitted that its electrical equipment was "associated with" at least one of the two points of origin of the Thomas Fire.

226. Defendant Pizarro elaborated on the finding in an earnings conference

---

[62] *Red Flag Warnings & Fire Weather Watches*, Cal. Dept. Forestry & Fire Protection, http://calfire.ca.gov/communications/communications_firesafety_redflagwarning

[63] Kit Stolz, "Thomas Fire Had Two Origins," Santa Barbara Independent (Dec. 22, 2017), publicly-available at: https://www.independent.com/2017/12/22/thomas-fire-had-two-origins/

call with investors, stating that the Company expected to "incur material losses" from the Thomas Fire.

227. In March 2019, CPUC and county investigators a publicly released a seventy (70)-plus page report announcing that "[t]he IT's O&C, Intel, [and] collection and evaluation of evidence concluded that the power lines owned and operated by SCE were the cause of the THOMAS fire."[64]

228. The investigation of the fire's origins found that high winds blew Edison power lines into one another, creating an electrical arc that "deposited hot, burning or molten material" into dry vegetation on the ground, setting off the blaze.

229. Investigators cited several possible criminal violations by Edison in connection with the fire, including ***involuntary manslaughter***, ***reckless arson*** and a health-safety code breach for carelessly or negligently causing a fire.

230. The investigators also flagged a violation of GO 95's requirement that "[e]lectrical supply and communication systems … shall be maintained in a condition which will enable the furnishing of safe, proper and adequate service."

231. According to the report, the blaze started in two spots and eventually merged into one fire. One was in a canyon above Steckel Park in the Santa Paula area and where first responders were sent when the blaze broke out at about 6:30 p.m. Dec. 4, 2017. The second spot was on Koenigstein Road near Highway 150, discussed above in connection with Edison's "run-to-failure" policy and practice.

232. The investigative team determined, based on physical evidence, that the power lines associated with both ignition points were connected to the same circuit (the "Castro Circuit").

[64] *See* https://vcfd.org/images/news/Thomas-Fire-Investigation-Report_Redacted_3-14-19.pdf

233. During meetings between investigators and SCE representatives on December 27, 2017, SCE claims investigators Rick McCollum and Julie Olin confirmed the identity of SCE's Castro Circuit, and further reported that at 6:41 p.m. on December 4, SCE's substation reported a remote automatic recloser alert to its system.

234. Investigators observed "***several areas where SCE equipment failed***. The power lines were inspected within the [fire outbreak area] and determined by the [investigative] to have had phase to phase contact on several spans of power lines." (Emphasis added).

235. Data collected by investigators "showed a power interruption associated with SCE equipment on Monday, December 4, 2017, at approximately 6:17 PM." This data was corroborated by several pieces of video imagery also collected by the investigators.

236. As of mid-March 2019, several thousand plaintiffs had already filed Thomas Fire-related lawsuits naming, among others, Edison and SCE, and the deadline for future suits is years away.

237. The Thomas Fire alone has left SCE exposed to liability of billions of dollars in damages.

**Edison Causes the Woolsey Fire**

238. In May 2016, CPUC adopted Fire Map 1, which "depicts areas of California where there is an elevated hazard for ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and other environmental conditions."[65] As of January 19, 2018, the area in and around the Woolsey Fire was

---

[65] National Association of Regulatory Utility Commissioners,"California: CPUC Fire Map Depicts Areas of Elevated Hazards in State; First Step In Creation of Tools to Help Manage Resources" (May 26, 2016), publicly-available at:

color-coded red, indicating "a very high risk of a devastating wildfire."[66]

239. Following the Thomas Fire, on July 12, 2018, CPUC adopted Resolution ESRB-8, which ordered utilities to engage local communities in developing de-energization programs. ESRB-8 further required that utilities submit a report within ten (10) days after each de-energization event, and after high-fire-threat events where the utility provided notifications to local government, agencies, and customers of possible de-energization, even where no de-energization occurred.

240. Aside from ESRB-8, Edison was made aware of the risks of failing to de-energize on July 13, 2018, when CPUC affirmed its denial of SDG&E's request to pass on $379 million in 2007 wildfire-related costs to ratepayers, based, in part, on SDG&E's failure to timely de-energize its lines. SCE was a party to those proceedings.

241. Two days before the start of the Woolsey fire, Edison had activated its emergency operations center and advised customers that it could proactively shut off power as a safety measure due to the windy weather and a Red Flag fire warning. Meteorologists with the National Weather Service had warned that a fire could spread rapidly because of gusty winds, low humidity, and "critically dry fuels," including brush and vegetation.

242. The SCE Defendants, without question, knew about the Red Flag Warning. In fact, SCE retweeted the National Weather Service warning on November 7 – one day before the Woolsey Fire began.

243. The SCE Defendants further knew that a disproportionate number of

---

https://www.naruc.org/bulletin/the-bulletin-053116/california-cpuc-fire-map-depicts-areas-of-elevated-hazards-in-state-first-step-in-creation-of-tools-to-help-manage-resources/

[66] ftp://ftp.cpuc.ca.gov/safety/fire-threat_map/2018/PrintablePDFs/8.5X11inch_PDF/CPUC_Fire-Threat_Map_final.pdf

Edison utility poles requiring replacement were those with higher wind loading conditions.

244. Ultimately, Edison elected not to de-energize its lines: a review of Utility De-Energization Reports archived on CPUC's website does not show any submissions by SCE prior to December 29, 2018, nearly two months after the Woolsey Fire began.[67]

245. The Woolsey Fire started on November 8 in Simi Valley near the Rocketdyne facility in the Santa Susana Pass at approximately 2:24 p.m. The Rocketdyne facility, which was the site of a partial nuclear meltdown in 1959, has been called "one of the most contaminated sites in the country" thus heightening the stakes of Edison's already risky conduct.[68]

246. According to CPUC, SCE's Chatsworth substation is located "within the larger Boeing Rocketdyne Santa Susana complex," as depicted in the below, pre-fire Google Earth image:

[67] *See* http://cpuc.ca.gov/deenergization/. Subsequently, in 2019, local media reported that June 20, 2019 marked "the first time SoCal Edison used its public safety power shut off plan to reduce the risk of wildfires caused by downed power lines." *See* https://losangeles.cbslocal.com/2019/06/21/socal-edison-public-safety-power-outages/.

[68] https://la.curbed.com/2018/11/12/18089298/woolsey-fire-santa-susana-field-lab-rocketdyne




247. The Chatsworth substation is located at E Street and Alfa Road in Ventura County, which is also where Cal Fire says the Woolsey Fire ignited.

248. An incident report from the Ventura County Fire Department states that firefighters arriving at the scene at 2:42 p.m. made contact with the Rocketdyne officer who stated that there were two fires. When asked what started the fires, the Rocketdyne officer stated "[p]ower lines."

249. In addition, the individual who initially called in the fire was Dirk Delong Obenshain ("Obenshain"), an electrician with Contra Costa Electric ("Contra Costa"), based out of their Bakersfield, California, location. Contra Costa is a contractor for SCE. In connection with Plaintiffs' investigation, Mr. Obenshain confirmed that he reported the fire at the Santa Susana Field Lab, also known as RocketDyne site.

250. When asked where he was located when he saw and reported the fire, Mr. Obenshain said he was at the site. He continued and said that he was at the site as an

electrician working at SCE's substation located at the site.

251. "We were working out there," Mr. Obenshain stated, "The fire started when we were out there."

252. A newscast aerial view reporting the start of the Woolsey Fire documents its beginnings directly under SCE's 16Kv power poles, with the Chatsworth substation visible in the foreground:




253. The Ventura County Fire Department's Detailed Incident Report of the Woolsey Fire shows that at 5:59 p.m. – more than three hours after the fire was reported by one of its own contractors – Edison had begun to de-energize power in fire-affected area. This is consistent with the reactive, "after-the-fact" approach to risk management that SED had previously cautioned the Company about. *See* ¶200 above. It also virtually replicated SDG&E's failure to de-energize for almost 2.5 hours after it knew the Witch Fire had started, a decision that Edison knew had exposed SDG&E to catastrophic financial losses. *See* ¶240 above.

254. At 8:12 p.m. on November 8, 2018, or nearly six hours after the start of

the fire, SCE sent an "Electric Safety Incident Report" to CPUC stating that the Chatsworth substation suffered an outage at the "big Rock 16kV circuit" at 2:22 p.m., two minutes before the Woolsey Fire began.[69]

255. Driven by the same powerful Santa Ana winds that gave rise to the November 6, 2018 Red Flag Warning, the Woolsey Fire quickly engulfed over 98,000 acres in Ventura and Los Angeles counties.

256. The fire incinerated over 1,600 structures and damaging hundreds of others, forced as many as 250,000 people to flee their homes, and resulted in the deaths of three civilians, as well as injuries to three firefighters. According to Cal Fire, the Woolsey Fire burned 83 percent of all National Parks Service land in the Santa Monica Mountains National Recreation Area.

257. The Woolsey Fire was not fully contained until November 21, 2018.

258. Approximately two weeks later, SCE released a public statement[70] and submitted a supplemental letter[71] to CPUC acknowledging equipment failures in greater detail near the origin point of the Woolsey Fire.

259. In particular, SCE's letter to CPUC revealed that "SCE's first responding troubleman [*i.e.*, the person who actually goes out to physically check the power grid

---

[69] *See* Electric Safety Incident Reported- Southern California Edison Incident No.: 181108-9003, CPUC (Nov. 8, 2018 8:12 P.M.), publicly-available at https://www.edison.com/content/dam/eix/documents/Woolsey_Electric_Safety_Report.pdf

[70] SCE, Press Release, "SCE Publicly Releases CPUC Submission on the Woolsey Fire," (Dec. 12, 2018), publicly-available at: https://www.businesswire.com/news/home/20181206005977/en/SCE-Publicly-Releases-CPUC-Submission-Woolsey-Fire

[71] Letter from Robert Ramos, Director of Risk and Claims Management, SCE, to SED (Dec. 6, 2018), publicly-available at: https://www.edison.com/content/dam/eix/documents/woolsey_letter_to_cpuc.pdf.

and its connections to its power source] conducted a patrol to evaluate the operational status of its facilities and found no wire down on the 16kV circuit. SCE subsequently found a guy wire in proximity to a jumper at a lightweight tubular steel pole,"[72] meaning that the guy wire, a tensioned cable, was less than eight feet from the jumper and less than six feet from the pole.[73]

260. The guy wire was found on the ground, having failed, and no longer providing support to the intended structure. The following graphic created by Edison depicts a functioning guy wire:




[72] *Id.*

[73] CPUC, State of California Rules for Overhead Electric Line Construction, General Order No. 95 at II-12, II-13, V-52 (Jan. 2015), publicly-available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M146/K646/146646565.pdf.

[Guy Wire, Southern California Edison][74]

261. SCE's press release further stated that "the potential that the Nov. 8 outage was related to contact being made between the guy wire and the jumper remains under review by SCE," as well as "several additional areas of focus."[75]

262. Previously, as of March 2016, SCE had identified more than 2,600 guy wires with noncompliant safety factors.[76]

263. On April 25, 2019, Los Angeles County announced it had filed a lawsuit against SCE to recover costs in connection with the Woolsey Fire.

264. On August 30, 2019, in the course of civil litigation against SCE over the Woolsey Fire, it was revealed that the California Attorney General's Office was in the process of conducting a criminal investigation into the cause and origin of the fire.

265. The criminal investigation became public when the California Attorney General's Office moved to block subpoenas for documents related to the investigation into the Woolsey Fire, arguing that disclosure of the documents would jeopardize the ongoing criminal investigation, which had already been pending for nine (9) months.

266. By late September 2019, the California state court overseeing Woolsey Fire-related civil litigation against SCE had been persuaded to subject the investigative report to a protective order.

267. While a redacted version of the report was made available to attorneys in the civil litigation, including SCE's attorneys, the redacted report cannot be shared with the attorneys' clients, consultants or the public.

268. The court said that the full report would be released in April 2020.

---

[74] https://www.edison.com/content/dam/eix/documents/guywire.pdf

[75] https://www.businesswire.com/news/home/2018120

[76] SCE, General Rate Case 2018, T&D Vol. 9, Poles at 16 n.26.

269. On November 13, 2019, SCE agreed to pay $360 million to settle claims with twenty-three (23) cities and counties impacted by the Thomas Fire, its resultant mudslides, and/or the Woolsey Fire, including Santa Barbara, Ventura and Los Angeles Counties, as well as the cities of Santa Barbara, Malibu, Calabasas, Thousand Oaks, and Westlake Village.

**Materially False and Misleading Statements Issued During the Class Period**[77]

**2015 10-K**

270. The Class Period begins on February 23, 2016, when the Company filed its annual statement on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Craver, Pizarro, Scilacci, and Rigatti.

271. In the 2015 10-K, the Company touted its investment in the safety of its equipment, stating that "***SCE is investing in and strengthening its electric grid and driving operational and service excellence to improve system safety, reliability and service*** while controlling costs and rates."

272. The statements referenced in ¶271 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (iv) the Company failed to utilize a statistically-valid methodology to evaluate

[77] Emphasis added throughout, unless otherwise noted.

pole-loading; (v) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vi) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (vii) the Company failed to properly assess the risks of its equipment; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) consequently, the Company was in violation of state law and regulations; (x) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xi) as a result, the Company's public statements were materially false and misleading at all relevant times.

273. The 2015 10-K discussed Edison's purported infrastructure investment program, as well as the risks posed to the Company's financial condition and operations by its failure to remediate aging infrastructure, stating in relevant part:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates the operational risks and the need for superior execution in its activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

274. The statements referenced in ¶273 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and

compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company failed to replace or reinforce aging and unsafe utility poles and/or attached wires, resulting in fire incidents; (ii) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments – including assessments of age-deteriorated poles – than were actually needed; (iii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment aging and consequent failure; (iv) the Company failed to assess, remediate, repair, and/or replace aging poles as prescribed by CPUC; (v) the Company failed to properly assess the risks of its aging equipment; (vi) consequently, the Company was in violation of state law and regulations; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

275. In addition, the risk factors referenced in ¶273 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, the SCE Defendants had already caused July-August 2015 Long Beach outages, which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶274 above.

276. The SCE Defendants acknowledged in 2015 10-K that their business may result in damage to private and public property, as well as injuries to bystanders, stating in relevant part:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through

> downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** The CPUC has increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations***.

277. The risk factors referenced in ¶276 above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, the SCE Defendants had already (i) failed to maintain electrical equipment that injured three U.S. Marines in Twentynine Palms in 2015; (ii) caused the Potrero Fire of November 2015, in which the Company was cited for failing to replace or reinforce an unsafe utility pole; and (iii) been fined $50,000 on February 12, 2016, prior to the filing of the 2015 10-K, for the fatal electrocution at Edison's Whittier facility. More specifically, the SCE Defendants knew their potential liability extended well beyond "inherent risks" to include risks created by the Company's own reckless disregard of safety, as described in ¶274 above.

278. Relatedly, the 2015 10-K discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> ***SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.***
>
> Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. In addition, the insurance that has been obtained for wildfire liabilities may not be sufficient. Uninsured losses and increases in

> the cost of insurance may not be recoverable in customer rates. A loss which is not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operations. Furthermore, insurance for wildfire liabilities may not continue to be available at all or at rates or on terms similar to those presently available to Edison International.
>
> * * *
>
> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the risk of severe wildfire events***. On June 1, 2015, Edison International renewed its liability insurance coverage, which included coverage for SCE's wildfire liabilities up to a $610 million limit (with a self-insured retention of $10 million per wildfire occurrence). Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period (June 1, 2015 to May 31, 2016). SCE also has additional coverage for certain wildfire liabilities of $390 million, which applies when total covered wildfire claims exceed $610 million, through June 14, 2016. SCE may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's insurance coverage.

279. The risk factors referenced in ¶278 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or prolonged drought conditions to include risks created by the

Company's own reckless disregard of safety, as described in ¶274 above.

280. The 2015 10-K discussed a prior incident where its equipment malfunctioned and caused multiple fires in Long Beach, California:

> ***In July 2015, SCE's customers who are served via the network portion of SCE's electric system in Long Beach, California experienced service interruptions due to multiple underground vault fires and underground cable failures***. No personal injuries have been reported in connection with these events. SCE instituted an internal investigation and commissioned an external investigation of these events and their causes***, which revealed that the main cause of the interruptions was a lack of adequate management oversight of the downtown network system. The investigations also revealed deficiencies in maintaining the knowledge base on the configuration and operation of the system, and a lack of sophisticated controls needed to more efficiently and effectively prevent and respond to the cascading events that occurred.***

281. The statements referenced in ¶280 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) The Long Beach outages affected not only those customers served by Edison's Long Beach secondary network, but at times extended to 30,000 customers, including customers who receive their power from radial circuits that also feed the secondary network, and thus Edison downplayed the systemic risks of its safety violations; (ii) the Company failed to replace or reinforce aging and unsafe electrical infrastructure, resulting in fire incidents; (iii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment aging and consequent failure; (iv) the Company's noncompliant electricity networks created a significantly heightened fire risk; (v) the Company failed to properly assess the risks of its equipment; and (vi) as a result, the Company's public statements were

materially false and misleading at all relevant times.

**May 2, 2016 Press Release**

282. On May 2, 2016, the Company issued a press release filed on Form 8-K with the SEC entitled "Edison International Reports First Quarter 2016 Results; Reaffirms 2016 Earnings Guidance," in which Defendant Craver stated, in part: "At SCE, we continue to see significant rate base growth driven by ***continued investment in infrastructure reliability and public safety*** ...."

283. The statements referenced in ¶282 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (iv) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (v) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vi) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (vii) the Company failed to properly assess the risks of its equipment; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) consequently, the Company's conduct created material risks to public safety, system integrity, and Edison's rate base growth; (x) the Company conflated electric service reliability and safety; and (xi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q1 2016 10-Q**

284. That same day, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2016 10-Q"). The Q1 2016 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the risk of severe wildfire events.*** On June 1, 2015, Edison International renewed its liability insurance coverage, which included coverage for SCE's wildfire liabilities up to a $610 million limit (with a self-insured retention of $10 million per wildfire occurrence). Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period (June 1, 2015 to May 31, 2016). SCE also has additional coverage for certain wildfire liabilities of $390 million, which applies when total covered wildfire claims exceed $610 million, through June 14, 2016. ***SCE may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's insurance coverage.***

285. The risk factors referenced in ¶284 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or prolonged drought conditions to include risks created by the Company's own reckless disregard of safety, as described in ¶283 above.

286. In the Q1 2016 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this MD&A and in Edison International's and SCE's combined 2015 Form 10-K, including the "Risk Factors" section. ***Readers are urged to read this entire report, including the information incorporated by reference, as well as the 2015 Form 10-K, and carefully consider the risks, uncertainties and other factors that affect Edison International's and SCE's businesses***.

287. As discussed above, in the 2015 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates the operational risks and the need for superior execution in its activities***. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous. SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** The CPUC has

increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

288. The risk factors referenced in ¶287(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶275 above.

289. The risk factors referenced in ¶287(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶277 above.

**Q2 2016 10-Q**

290. On July 28, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q2 2016 10-Q"). The Q2 2016 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

*Wildfire Insurance*

Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events.*** SCE

> has approximately $910 million of third party insurance coverage for wildfire liabilities for the period from July 2016 to May 2017. SCE's program includes approximately $90 million in self-insurance at various levels within the $910 million of third party insurance coverage, which combined, equals approximately $1 billion. In addition, SCE has a self-insured retention of $10 million per wildfire occurrence. ***SCE may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's insurance coverage.***

291. The risk factors referenced in ¶290 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or prolonged drought conditions to include risks created by the Company's own reckless disregard of safety.

292. In the Q2 2016 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this MD&A and in Edison International's and SCE's combined 2015 Form 10-K, including the "Risk Factors" section. ***Readers are urged to read this entire report, including the information incorporated by reference, as well as the 2015 Form 10-K***, and carefully consider the risks, uncertainties and other factors that affect Edison International's and SCE's businesses.

293. As discussed above, in the 2015 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates the operational risks and the need for superior execution in its activities***. SCE's financial condition and results of operations could be

materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous. SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***

Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** The CPUC has increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

294. The risk factors referenced in ¶293(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶275 above.

295. The risk factors referenced in ¶293(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as in ¶277 above.

**2018 SCE General Rate Case Overview**

296. On September 1, 2016, the Company filed a presentation on Form 8-K with the SEC – entitled "2018 SCE General Rate Case Overview" – which included the following slide purporting to summarize the Company's 2018 GRC, including the claim that Edison's 2018 GRC filing was "consistent with SEC strategy focusing on safety and reliability by continuing infrastructure investment and beginning grid modernization investments ….":




297. The statements referenced in ¶296 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and

compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (iv) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (v) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vi) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (vii) the Company failed to properly assess the risks of its equipment; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) consequently, SCE's 2018 GRC filing was not "consistent" with any pre-existing "focus on safety"; (x) the Company conflated electric service reliability and safety; and (xi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**November 1, 2016 Press Release**

298. On November 1, 2016, the Company issued a press release filed on Form 8-K with the SEC entitled "Edison International Reports Third Quarter 2016 Results; Reaffirms 2016 Earnings Guidance," in which Defendant Pizarro stated, in part: "We continue to see a long-term opportunity for above-average earnings and dividend growth based on ***SCE infrastructure replacement and electric grid modernization*** .."

299. The statements referenced in ¶298 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading

statements and/or failed to disclose that: (i) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (ii) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (iii) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (iv) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (v) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (vi) the Company failed to properly assess the risks of its equipment; (vii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (viii) the Company's conduct created material risks to Edison's earnings and dividend growth; (ix) the Company conflated issues of electric service reliability and safety; and (xi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q3 2016 10-Q**

300. That same day, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2016 10-Q"). The Q3 2016 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events.*** SCE

> has approximately $1 billion of insurance coverage for wildfire liabilities for the period ending on May 31, 2017. SCE has a self-insured retention of $10 million per wildfire occurrence. SCE or its contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage.

301. The risk factors referenced in ¶300 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or prolonged drought conditions to include risks created by the Company's own reckless disregard of safety, as described in ¶299 above.

302. In the Q3 2016 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this MD&A and in Edison International's and SCE's combined 2015 Form 10-K, including the "Risk Factors" section. ***Readers are urged to read this entire report, including the information incorporated by reference, as well as the 2015 Form 10-K***, and carefully consider the risks, uncertainties and other factors that affect Edison International's and SCE's businesses.

303. As discussed above, in the 2015 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates the operational risks and the need for superior execution in its activities***. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation

> of which can be hazardous. SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant***. The CPUC has increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

304. The risk factors referenced in ¶303(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶275 above.

305. The risk factors referenced in ¶303(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as in ¶277 above.

306. In the Q3 2016 10-Q, the Company further stated, under the heading

"2018 General Rate Case": "***The capital programs requested in SCE's 2018 GRC are focused on safety and reliability through investments in the distribution grid to replace aging equipment*** and enhance capabilities to integrate increasing amounts of Distributed Energy Resources ('DER')."

307. The statements referenced in ¶306 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company was not "focused on safety"; (xii) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xiii) as a result, the Company's public

statements were materially false and misleading at all relevant times.

**Q3 2016 Earnings Call**

308. That same day – November 1, 2016 – the SCE Defendants held a conference call with investors and analysts (the "Q3 2016 Earnings Call"), during which Defendant Pizarro claimed that SCE's 2018 GRC "demonstrate[d] SCE's commitment to … ***maintain[ing] a safe and reliable wires network*** [and] … ***continu[ing] our operational excellence journey to achieve top quartile performance*** in ***safety***, reliability, customer satisfaction and cost."

309. The statements referenced in ¶308 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and

regulations; (xi) consequently, the Company was not "focus[ed] on safety"; (xii) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

310. Also during the Q3 2016 Earnings Call, Defendant Pizarro discussed the 2015 Long Beach fires and outages as follows:

> I also want to comment on the CPUC proceeding examining the SCE customer outages in Long Beach in July 2015. You may recall that we had multiple underground vault fires and underground cable failures, which affected much of the downturn area and adjoining neighborhoods. ***The problems centered in a unique portion of SCE's distribution system that is arranged in network configuration, similar to those used in dense urban areas like Manhattan. Most of our system has a radial design instead. SCE has made a number of changes in our systems and management processes as a result of these outages.*** The CPUC proceeding will determine if fines are warranted and propose penalty amounts, which could be significant but we are not able to estimate these at this early stage of the proceeding. Hearings are scheduled for February of next year.

311. The statements referenced in ¶310 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) The Long Beach outages affected not only those customers served by Edison's Long Beach secondary network, but at times extended to 30,000 customers, including customers who receive their power from radial circuits that also feed the secondary network, and thus Edison downplayed the scope of its safety violations; (ii) the Company failed to replace or reinforce aging and unsafe electrical infrastructure, resulting in fire incidents; (iii) the Company deployed a

"run-to-failure" maintenance model that consciously allowed for equipment aging and consequent failure; (iv) the Company's noncompliant electricity networks created a significantly heightened fire risk; (v) the Company failed to properly assess the risks of its equipment; (vi) the Company failed to remediate these deficiencies between the time of the Long Beach outages and the Q3 2016 Earnings Call; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

312. Later in the Q3 2016 Earnings Call, Defendant Rigatti stated, in response to an analyst question regarding the Company's equity ratio, "[w]e're trying to balance a lot of things in the context of, ***we want to be able to deploy the capital that we need to get the grid modernized, to focus on safety and reliability***, all the things that our customers need, and then also balance that against customer rates as well. So, we're doing a lot of things."

313. The statements referenced in ¶312 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model

that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company was not "focus[ed] on safety"; (xii) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>November 2, 2016 Business Update</u>**

314. On November 2, 2016, the Company filed a presentation on Form 8-K with the SEC – entitled "Business Update November 2016" – which included a slide substantially similar to the one reproduced at in ¶296 above, and which falsely characterized SCE's 2018 GRC filing as "consistent with SCE strategy to focus on safety and reliability."

315. The statements contained in ¶314 were materially false and misleading for the reasons discussed in ¶297 above.

**<u>2016 10-K</u>**

316. On February 21, 2017, the Company filed its annual statement on Form 10-K for the fiscal year ending December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Pizarro, Payne, Rigatti, and Petmecky.

317. In the 2016 10-K, the Company touted its purported dedication to "modernizing the electric grid ***to improve the safety and reliability of the transmission and distribution network*** … ***SCE's ongoing focus to drive operational and service excellence*** should allow it to achieve these objectives while controlling costs and

customer rates."

318. Further, discussing its capital expenditure plans "***[t]o support a safe and reliable transmission and distribution network***, and to modernize the electric grid", the Company stated that it forecasted capital expenditures of up to $19.3 billion for 2017 through 2020.

319. Commenting on these forecasted expenditures, the 2016 10-K states that the "2017 capital expenditures is a baseline of grid modernization spending that will ***promote increased safety and reliability*** and also allow for a timely ramp-up of grid modernization capital expenditures in subsequent years."

320. The statements referenced in ¶¶317-19 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment; (x) the Company was in violation of state law and regulations; (xi)

consequently, the Company did not possess any "ongoing focus to drive operational and service excellence" with respect to safety or any baseline of safety to "increase"; (xii) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

321. The Company also discussed its 2018 GRC, stating that "[t]he capital programs requested in SCE's 2018 GRC ***are focused on safety and reliability through investments in the distribution grid to replace aging equipment*** ….."

322. The statements referenced in ¶321 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in

connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company was not "focused on safety"; (xii) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

323. Discussing the ratemaking process overseen by CPUC, the 2016 10-K notes the importance of safety measures put in place by SCE, explaining:

> ***The CPUC is conducting a triennial safety model assessment proceeding ("S-MAP") to evaluate the utility models used to prioritize safety risks, examine the utilities' assessment of their key risks and their proposed mitigation programs, and develop requirements for annual reporting of risk spending and mitigation results.***

324. The statements referenced in ¶323 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that (i) they were already aware, no later than January 31, 2017, that SED was highly critical of Edison's risk assessment practices; (ii) they were already aware, no later than January 31, 2017, of SED's determination that it would be "unwise to accept Edison's risk assessment methods as a basis for determining reasonableness of safety-related program requests"; (iii) they were already aware, no later than January 31, 2017, of SED's determination that Edison classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (iv) as a result, the Company's public statements were

materially false and misleading at all relevant times.

325. The 2016 10-K discussed Edison's purported infrastructure investment program, as well as the risks posed to the Company's financial condition and operations by its failure to remediate aging infrastructure, stating in relevant part:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

326. The statements referenced in ¶325 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were

actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) consequently, the Company was in violation of state law and regulations; (xi) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xii) as a result, the Company's public statements were materially false and misleading at all relevant times.

327. In addition, the risk factors referenced in ¶325 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, with respect to the July-August 2015 Long Beach outages, which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶326 above

328. The SCE Defendants acknowledged in 2016 10-K that their business may result in damage to private and public property, as well as injuries to bystanders, stating in relevant part:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through

> downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant***. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

329. The risk factors referenced in ¶328 above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, the SCE Defendants had already (i) failed to maintain electrical equipment that injured three U.S. Marines in Twentynine Palms in 2015; (ii) caused the Potrero Fire of November 2015, in which the Company was cited for failing to replace or reinforce an unsafe utility pole; (iii) been fined $50,000 for the fatal electrocution at Edison's Whittier facility; and (iv) received numerous citations for safety violations between April 4, 2016 and February 10, 2017. More specifically, the SCE Defendants knew their potential liability extended well beyond "inherent risks" to include risks created by the Company's own reckless disregard of safety, as described in ¶326 above.

330. Relatedly, the 2016 10-K discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> ***SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.***
>
> Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. Edison International, SCE or its contractors may experience coverage reductions

> and/or increased wildfire insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. Uninsured losses and increases in the cost of insurance may not be recoverable in customer rates. A loss which is not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operation
>
> * * *
>
> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events***. SCE has approximately $1 billion of insurance coverage for wildfire liabilities for the period ending on May 31, 2017. SCE has a self-insured retention of $10 million per wildfire occurrence. ***SCE or its contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage.***

331. The risk factors referenced in ¶330 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or prolonged drought conditions to include risks created by the Company's own reckless disregard of safety, as described in ¶326 above.

332. The 2016 10-K discussed a prior incident where its equipment malfunctioned and caused multiple fires in Long Beach, California:

> ***In July 2015, SCE's customers who are served via the network portion of SCE's electric system in Long Beach, California experienced service interruptions due to multiple underground vault fires and underground cable failures.*** No personal injuries were reported in connection with these events. SCE expects to incur penalties as a result of these events. Although resolution will be subject to settlement discussions with SED and CPUC review and approval, SCE has recorded a liability for the estimated loss.

333. The statements referenced in ¶332 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) The Long Beach outages affected not only those customers served by Edison's Long Beach secondary network, but at times extended to 30,000 customers, including customers who receive their power from radial circuits that also feed the secondary network, and thus Edison downplayed the scope of its safety violations; (ii) the Company failed to replace or reinforce aging and unsafe electrical infrastructure, resulting in fire incidents; (iii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment aging and consequent failure; (iv) the Company's noncompliant electricity networks created a significantly heightened fire risk; (v) the Company failed to properly assess the risks of its equipment; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q4 2016 Earnings Call**

334. On February 21, 2017, the SCE Defendants held a conference call with investors and analysts (the "Q4 2016 Earnings Call"), during which Defendant Pizarro stated, in part:

> I'd like to touch on a few of the key non-financial metrics the board uses in measuring our performance annually. Though they may not be as critical to

> investors, they are critical to how we measure our performance in delivering ***safe***, reliable, clean and affordable electricity to our customers. ***A major priority across our company is being safe*** and though we've improved our performance in our journey to injury free, we have much more to do to meet the performance of our best-in-class peers. ***To that end, we have elevated safety to one of our company's core values and dedicated additional senior leadership in this area***.

335. The statements referenced in ¶334 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) consequently, the Company was in violation of state law and regulations; (xi) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (xii) as a

result, the Company's public statements were materially false and misleading at all relevant times.

**Q1 2017 10-Q**

336. On May 1, 2017, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2017 10-Q"). The Q1 2017 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events.*** SCE has approximately $1 billion of insurance coverage for wildfire liabilities for the period ending on May 31, 2017. SCE has a self-insured retention of $10 million per wildfire occurrence. ***SCE or its contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage.***

337. The risk factors referenced in ¶336 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or drought conditions to include risks created by the Company's own reckless disregard of safety, as described in ¶335 above.

338. In the Q1 2017 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this report and in the 2016 Form 10-K, including the "Risk Factors" section. Readers are urged to read this entire report, including ***information incorporated by reference, as well as the 2016 Form 10-K***, and carefully consider the risks, uncertainties, and other factors that affect Edison International's and SCE's businesses.

339. As discussed above, in the 2016 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on

> public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

340. The risk factors referenced in ¶339(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶327 above.

341. The risk factors referenced in ¶339(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶329 above.

**<u>Q1 2017 Earnings Call</u>**

342. That same day – May 1, 2016 – the SCE Defendants held a conference call with investors and analysts (the "Q1 2017 Earnings Call"), during which Defendant Pizarro stated, in part:

> My comments today focus on Southern California Edison's long-term growth opportunity. I'll start with the SCE 2018 General Rate Case. SCE's filing outline a continued focus on infrastructure reliability investment. It also proposed the first elements of a multi-year grid modernization initiative, one that will be a key enabler of California's ambitious climate change policies, ***as well as supporting improved system reliability and public safety***.

343. Also during the Q1 2017 Earnings Call, Defendant Rigatti stated, in response to an analyst inquiry:

> [W]e actually will file – for our 2021 GRC, we will file a similar filing next

> year. It's part of the process as it is unfolding. ***I think, from a safety culture perspective, we actually already look at all of our capital through a safety lens and are determining all the time, with or without the ramp, whether or not we are appropriately addressing all of the safety concerns and the safety needs of the company. So I would say, you'll continue to see us have that focus on infrastructure replacement, which has both the safety aspect to it as well as the reliability aspect to it***.

344. The statements referenced in ¶¶342-43 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, including in connection with its 2018 GRC, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) consequently, the Company was in violation of state law and regulations; (xi) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than

safety; (xii) the Company did not look at all of its capital "through a safety lens" and was not "determining all the time … whether or not [it] [was] appropriately addressing all of the safety concerns and the safety needs of the company"; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

345. During the Second Quarter of 2017, the Company and the Underwriter Defendants completed the Offering, allowing Edison to raise $475 million on the basis of the false and misleading statements contained in the Offering Documents.

**Preferred Shares Offering**

346. Pursuant to (i) the registration statement on Form S-3 filed by the Company and the SCE Trust VI (File No. 333-206060) dated and filed with the SEC on June 14, 2017 (the "Registration Statement") and (ii) the prospectus dated June 19, 2017 (the "Prospectus") and filed with the SEC on June 20, 2017, SCE issued $475 million of 5.00% Series L preference stock to SCE Trust VI, a special purpose entity formed to issue trust securities.

347. The Underwriter Defendants purchased the preferred shares from SCE Trust VI, and then offered the Trust Preference Securities to the public at the public offering price of $25 per share.

348. SCE Trust VI's ability to make distributions on the Trust Preference Securities was made contingent on its ability to make dividend payments on the Series L Preference Shares.

349. The Offering Prospectus incorporated by reference the 2016 10-K and Q1 2017 10-Q, which were materially false and misleading for the reasons set forth in ¶¶316-33 & 336-41 above.

350. The Offering Registration Statement incorporated by reference the Offering Prospectus, which was materially false and misleading for the reasons set

forth in ¶349 above.

351. As a result, the Offering Documents referred to in ¶346 above were materially false and misleading at all relevant times.

**Q2 2017 10-Q**

352. On July 27, 2017, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q2 2017 10-Q"). The Q2 2017 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events***. SCE has approximately $1 billion of insurance coverage for wildfire liabilities for the period ending on May 31, 2018. SCE has a self-insured retention of $10 million per wildfire occurrence. Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period. ***SCE or its vegetation management contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of insurance coverage.***

353. The risk factors referenced in ¶352 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically,

the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or drought conditions to include risks created by the Company's own reckless disregard of safety, as described in ¶344 above.

354. In the Q2 2017 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this report and in the 2016 Form 10-K, including the "Risk Factors" section. ***Readers are urged to read this entire report, including information incorporated by reference, as well as the 2016 Form 10-K***, and carefully consider the risks, uncertainties, and other factors that affect Edison International's and SCE's businesses.

355. As discussed above, in the 2016 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***

> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations***.

356. The risk factors referenced in ¶355(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶327 above.

357. The risk factors referenced in ¶355(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶329 above.

**Q2 2017 Earnings Call**

358. The same day, July 27, 2017, the SCE Defendants held a conference call with investors and analysts (the "Q2 2017 Earnings Call"), during which Defendant Pizarro claimed that "***[s]afety and reliability are always at the forefront of our capital spending plans and we must now implement those plans in the context of also building a modern grid to integrate distributed energy resources*** that our customers are choosing and that our regulators are supporting."

359. During the same call, Defendant Payne claimed "that grid modernization [ ] has very significant reliability and safety benefits …."

360. The statements referenced in ¶¶358-59 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) consequently, the Company was in violation of state law and regulations; (xi) the Company classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; (xii) the Company had already been told by SED that it should not conflate safety and grid modernization; (xiii) safety was not "always at the forefront" of the Company's capital spending plans and (xiv) as a result, the Company's public statements were materially false and

misleading at all relevant times.

**Q3 2017 10-Q**

361. On October 30, 2017, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2017 10-Q"). The Q3 2017 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> *Wildfire Insurance*
>
> Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. ***Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Drought conditions in California have also increased the duration of the wildfire season and the risk of severe wildfire events.*** SCE has approximately $1 billion of insurance coverage for wildfire liabilities for the period ending on May 31, 2018. SCE has a self-insured retention of $10 million per wildfire occurrence. Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period. SCE or its vegetation management contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of insurance coverage.

362. The risk factors referenced in ¶361 above relating to wildfire insurance were false and misleading because at the time the statements were made, the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation and/or prolonged drought conditions in California. More specifically, the SCE Defendants knew their potential liability extended well beyond inverse condemnation and/or drought conditions to include risks created by the Company's

own reckless disregard of safety, as described in ¶360 above.

363. In the Q3 2017 10-Q, the Company stated that:

> Additional information about risks and uncertainties, including more detail about the factors described in this report, is contained throughout this report and in the 2016 Form 10-K, including the "Risk Factors" section. ***Readers are urged to read this entire report, including information incorporated by reference, as well as the 2016 Form 10-K***, and carefully consider the risks, uncertainties, and other factors that affect Edison International's and SCE's businesses.

364. As discussed above, in the 2016 10-K, the Company discussed the following risk factors, in addition to wildfire insurance:

a) Failure to remediate aging infrastructure:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

b) Damage to private and public property:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property***

> ***damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant.*** No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

365. The risk factors referenced in ¶364(a) above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶327 above.

366. The risk factors referenced in ¶364(b) above relating to prospective citations and fines were false and misleading because at the time the allegedly prospective risks were discussed, they had already come to fruition, albeit on a limited basis, as discussed in ¶329 above.

**<u>Q3 2017 Earnings Call</u>**

367. The same day, October 30, 2017, the SCE Defendants held a conference call with investors and analysts (the "Q3 2017 Earnings Call"), during which Defendant Pizarro stated that:

> Wildfires are all too common in California, and situations like this remind us to stay vigilant in our risk management and to be safe in our day-to-day operations ….
>
> ***We are engaging with regulators on this topic and on the practices and orders that we have implemented to date. These include managing the electric system with a focus on public and worker safety, as well as on reliability of the system.***

> ***In addition to operating practices designed to reduce the risk of wildfires, SCE also invests significant amounts of capital to reduce wildfire risk. Examples include our pole replacement and vegetation management programs. These are all part of our mandate to provide safe, reliable, and ubiquitous electric service,*** even as we and our peer utilities have seen increased siting of new homes and businesses in areas with higher fire risk across the state over the past decades.

368. The statements referenced in ¶367 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) consequently, the Company was in violation of state law and regulations; (xi) the Company classified major categories of spending as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; (xii) the Company had already been told by SED that it should not conflate safety and

reliability; and (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**2017 10-K**

369. On February 22, 2018, the Company filed its annual statement on Form 10-K for the fiscal year ending December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Pizarro, Payne, Rigatti, and Petmecky.

370. In the 2017 10-K, the Company touted its purported dedication to "modernizing the electric grid ***to improve the safety and reliability of the transmission and distribution network … SCE's ongoing focus to drive operational and service excellence*** is intended to allow it to achieve these objectives safely while controlling costs and customer rates."

371. The statements referenced in ¶370 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California,

which had partially materialized with, *inter alia*, the Thomas Fire; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company did not possess any "ongoing focus to drive operational and service excellence" with respect to safety or any baseline of safety to "increase"; (xii) the Company classified major categories of spending as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; (xiii) the Company had already been told by SED that it should not conflate safety and reliability; and (xiv) as a result, the Company's public statements were materially false and misleading at all relevant times.

372. Discussing the ratemaking process overseen by CPUC, the 2017 10-K notes the importance of safety measures put in place by SCE, explaining:

> ***The CPUC is conducting a triennial safety model assessment proceeding ("S-MAP") to evaluate the utility models used to prioritize safety risks, examine the utilities' assessment of their key risks and their proposed mitigation programs, and develop requirements for annual reporting of risk spending and mitigation results.***

373. The statements referenced in ¶372 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that (i) they were already aware, no later than January 31, 2017, that SED was highly critical of Edison's risk assessment practices; (ii) they were already aware, no later than January 31, 2017, of SED's determination that it would be "unwise to accept Edison's risk assessment methods as a basis for determining reasonableness of safety-related program requests"; (iii) they were already

aware, no later than January 31, 2017, of SED's determination that Edison classified major categories of spending – including grid improvement – as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

374. The 2017 10-K discussed Edison's purported infrastructure investment program, as well as the risks posed to the Company's financial condition and operations by its failure to remediate aging infrastructure, stating in relevant part:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

375. The statements referenced in ¶374 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess,

remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had partially materialized with the Thomas Fire; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company did not elevate operational risks; (xii) the Company classified major categories of spending as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; (xiii) the Company had already been told by SED that it should not conflate safety and reliability; and (xiv) as a result, the Company's public statements were materially false and misleading at all relevant times.

376. In addition, the risk factors referenced in ¶374 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already: (i) come to fruition, albeit on a limited basis, with the July-August 2015 Long Beach outages, which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air; and (ii) partially materialized via the Thomas Fire and subsequent mudslides. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶375 above.

377. The SCE Defendants acknowledged in 2017 10-K that their business may

result in damage to private and public property, as well as injuries to bystanders, stating in relevant part:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant***. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

378. The risk factors referenced in ¶377 above relating to prospective citations and fines were false and misleading come to fruition, albeit on a limited basis, with respect to: (i) failing to maintain electrical equipment that injured three U.S. Marines in Twentynine Palms in 2015; (ii) the Potrero Fire of November 2015, in which the Company was cited for failing to replace or reinforce an unsafe utility pole; (iii) the fatal electrocution at Edison's Whittier facility, for which Edison was fined $50,000 on February 12, 2016; (iv) Edison's numerous citations for safety violations between April 4, 2016 and February 9, 2018; and (v) the Liberty Fire. In addition, (vi) the risks had already partially materialized via the Thomas Fire and subsequent mudslides, and the SCE Defendants were directly aware, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that Edison had started the Thomas Fire.

At all relevant times, the SCE Defendants knew their potential liability extended well beyond "inherent risks" to include risks created by the Company's own reckless disregard of safety, as described in ¶375 above.

379. The 2017 10-K also discussed various risks to the Company as a result of wildfire related liabilities, including its possible inability to pay distributions to investors who purchased in the Offering:

> ***Damage claims against SCE for wildfire-related losses may materially affect SCE's financial condition and results of operations.***
>
> ***Prolonged drought conditions and shifting weather patterns in California resulting from climate change as well as increased tree mortality rates have increased the duration of the wildfire season and the risk of severe wildfire events. Severe wildfires and increased urban development in high fire risk areas in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of utility practices and/or the failure of electric and other utility equipment. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement.*** However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires. An inability to recover uninsured wildfire-related costs could materially affect SCE's business, financial condition and results of operations. For example, ***if SCE is found liable for damages related to the December 2017 Wildfires, and SCE is unable to, or believes that it will be unable to, recover those damages, SCE may not have sufficient cash or equity to pay dividends to Edison International or may be prohibited from declaring such dividends because it does not meet California law***

***requirements for the declaration of dividends*** . . . .

380. The 2017 10-K further discussed wildfires in southern California in December of 2017, and noted the serious risks that may arise should the Company be found responsible for the fires. Specifically, the filing stated in relevant part:

> **Southern California Wildfires**
>
> In December 2017, several wind-driven wildfires (the "December 2017 Wildfires") impacted portions of SCE's service territory and caused substantial damage to both residential and business properties and service outages for SCE customers.
>
> The largest of these fires, known as the Thomas Fire, originated in Ventura County and burned acreage located in both Ventura and Santa Barbara Counties. According to the most recent California Department of Forestry and Fire Protection ("Cal Fire") incident information reports, the Thomas Fire burned over 280,000 acres, destroyed an estimated 1,063 structures, damaged an estimated 280 structures and resulted in two fatalities. During 2017, SCE incurred approximately $35 million of capital expenditures related to restoration of service resulting from the December 2017 Wildfires.
>
> The causes of the December 2017 Wildfires are being investigated by Cal Fire and other fire agencies. ***SCE believes the investigations include the possible role of SCE's facilities***. SCE expects that one or more of the fire agencies will ultimately issue reports concerning the origins and causes of the December 2017 Wildfires but cannot predict when these reports will be released or if any findings will be issued before the investigations are completed.
>
> ***Any potential liability of SCE for December 2017 Wildfire-related damages will depend on a number of factors, including whether SCE is determined to have substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation.*** Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire

that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement. ***However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires.***

….

***Given the preliminary stages of the investigations and the uncertainty as to the causes of the December 2017 Wildfires, and the extent and magnitude of potential damages, Edison International and SCE are currently unable to reasonably estimate whether SCE will incur material losses and, if so, the range of possible losses that could be incurred.***

…. ***Should responsibility for damages be attributed to*** SCE for a significant portion of the losses related to the December 2017 Wildfires, SCE's insurance may not be sufficient to cover all such damages. SCE or its vegetation management contractors may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of insurance coverage.

In addition, SCE may not be authorized to recover its uninsured damages through customer rates if, for example, the CPUC finds that the damages were incurred because SCE was not a prudent manager of its facilities. ***The CPUC's Safety and Enforcement Division ("SED") is conducting an investigation to assess the compliance of SCE's facilities with applicable rules and regulations in areas impacted by the December 2017 Wildfires.***

381. Similarly, the 2017 10-K discussed another natural disaster which occurred in Santa Barbara County, California in January of 2018:

**Montecito Mudslides**

In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas (the "Montecito

> Mudslides"). According to Santa Barbara County, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures, and resulted in at least 21 fatalities, with two additional fatalities presumed.
>
> Six of the lawsuits mentioned above allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the Montecito Mudslides, resulting in the plaintiffs' claimed damages. SCE expects that additional lawsuits related to the Montecito Mudslides will be filed.
>
> ***As noted above, the cause of the Thomas Fire has not been determined. In the event that SCE is determined to have liability for damages caused by the Thomas Fire, SCE cannot predict whether the courts will conclude that the Montecito Mudslides were caused by the Thomas Fire or that SCE is responsible or liable for damages caused by the Montecito Mudslides. As a result, Edison International and SCE are currently unable to reasonably estimate whether SCE will incur material losses and, if so, the range of possible losses that could be incurred***. If it is determined that the Montecito Mudslides were caused by the Thomas Fire and that SCE is responsible or liable for damages caused by the Montecito Mudslides, then SCE's insurance coverage for such losses may be limited to its wildfire insurance. Additionally, if SCE is determined to be liable for a significant portion of costs associated with the Montecito Mudslides, SCE's insurance may not be sufficient to cover all such damages and SCE may be unable to recover any uninsured losses.
>
> If it is ultimately determined that SCE is legally responsible for losses caused by the Montecito Mudslides, SCE could be held liable for resulting Property Losses if inverse condemnation is found applicable. If SCE is determined to have been negligent, in addition to Property Losses, SCE could be liable for business interruption losses, evacuation costs, clean-up costs, medical expenses and personal injury/wrongful death claims associated with the Montecito Mudslides. These liabilities, in the aggregate, could be substantial. ***SCE cannot predict whether it will be subjected to regulatory fines related to the Montecito Mudslides***.

382. The statements referenced in ¶¶379-81 above were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) Edison's liability for the Thomas Fire and/or Montecito Mudslides was not merely speculative, but highly likely given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly

heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire; and

- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(iv) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas Fire, and therefore understood the extent of its potential liability; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

383. In addition, the risk factors referenced in ¶¶379-81 above relating to prospective citations and fines were false and misleading because at the time the statements were made, the risk had already materialized with respect to (i) Edison's direct awareness, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that it had started the Thomas Fire; and (ii) Edison's related awareness that it had caused the Montecito Mudslides, which resulted in twenty-two deaths, including child deaths.

**<u>Q4 2017 Earnings Call</u>**

384. That same day – February 22, 2018 – the SCE Defendants held a conference call with investors and analysts (the "Q4 2017 Earnings Call"). During the Q4 2017 Earnings Call, Defendant Pizarro discussed the recent wildfires. Incredibly, less than two months after Edison started the Thomas Fire, Defendant Pizarro (i) radically downplayed utility responsibility for the recent fires; (ii) pointed to a variety of alternate, non-utility-related explanations; and (iii) suggested that the "solution," at least in part, involved reducing the utilities' liability for wildfires:

> ***Wildfires pose a risk statewide, impacting the entire economy. Communities across California have been tragically affected as climate change has increased the severity and the frequency of wildfires in recent***

***years. Long-term drought in California and forest management policies have resulted in the build-up of unmanaged vegetation. The state has nearly 130 million dead trees on approximately 9 million acres due to prolonged drought conditions and bark beetle infestation. The combination of these conditions, along with decades of more buildings being permitted and constructed in higher fire risk areas, have contributed to catastrophic wildfires***, with eight of the state's 20 most destructive wildfires having occurred in just the last three years.

This is a statewide crisis that needs a statewide solution. We are engaged with state leaders including the Governor's office, legislative leaders and stakeholders across the economy on the solutions we believe are needed. ***First and foremost is the prevention and mitigation of catastrophic wildfires with sufficient fire suppression resources, and effective policies around vegetation management, hazardous fuels reduction, and zoning regulations for residential and commercial development in high fire risk areas***.

Second, our state's infrastructure must be hardened, with stronger building codes in high fire risk areas. Utilities and other operators of critical infrastructure must also partner with state agencies on improved standards for climate resilient infrastructure. As we think about how we design and operate our system, we should consider that roughly a quarter of our service territory is in designated high-fire risk areas. ***We should evaluate the safety impacts, along with the reliability and cost trade-offs***, of steps like undergrounding more of the distribution network in selected areas, installing steel or composite poles instead of wood ones in specific locations, ***and using further preventive public safety shutoffs of power under high-risk conditions such as red flag warnings, which we have done selectively in the past***.

***Third, when a catastrophic event occurs in spite of all these efforts, we need thoughtful policies around how financial risks are allocated, including fire suppression costs and damages. As a reminder, California's courts have held investor-owned utilities strictly liable, regardless of fault, for property damages and attorney's fees if utility equipment is found to be a substantial cause of a wildfire. This means that the utility can do everything right in the operation and maintenance of its equipment, but still be on the hook for these costs.*** The California courts have held utilities

liable regardless of fault by applying the principle of inverse condemnation, a principle typically applicable to government, not to private entities.

385. The statements referenced in ¶384 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the wildfire-related risks described by the Company were not limited to those arising from inverse condemnation, climate change, bark beetle infestations, dead trees, home construction in high fire areas, and/or prolonged drought conditions in California; (ii) more specifically, the SCE Defendants knew their potential liability included substantial risks created by the Company's own reckless disregard of safety, *e.g.,*:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;

- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire; and
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;

(iii), as a result of the above-described practices, the Company was in violation of state law and regulations; (iv) consequently, the Company was not "engaged" in the "prevention and mitigation of catastrophic wildfires"; (v) the Company had already been told by SED that it should not conflate safety and reliability; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

386. During the same call, Defendant Rigatti stated as follows, in part:

> For the year ended 2017, we have not recorded a liability associated with the December wildfires. ***Given the preliminary stages of the investigations and the uncertainty as to the causes and potential damages associated with the fires, we cannot determine that a liability is probable or a reasonable range of possible losses that could be incurred***. We will continue to update you as we have more information.

387. The statements referenced in ¶386 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings

between investigators and SCE representatives; (ii) Edison's liability for the Thomas Fire was not merely speculative, but probable; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>February 23, 2018 Business Update</u>**

388. On February 23, 2018, the Company filed a presentation on Form 8-K with the SEC – entitled "Business Update February 2018" – which included the following slide purporting to depict Edison's current approach to wildfire risk mitigation:




389. The statements referenced in ¶388 were materially false and misleading

because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, (i) the Company failed to mitigate interference with equipment by vegetation, and had been cited for such by CPUC's Electric Safety and Reliability Branch as recently as late May 2018; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (iv) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (v) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vi) the Company failed to use a "[d]ifferent operating protocol under Red Flag warnings" in the run-up to the Thomas Fire, which was preceded by a Red Flag Warning; (vii) the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q1 2018 10-Q**

390. On May 1, 2018, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2018 10-Q"). The Q1 2018 10-Q discussed the risks posed to the Company's financial condition and operations should it be held responsible for the Thomas Fire, stating in relevant part:

> **Southern California Wildfires**
>
> SCE is aware of multiple lawsuits filed related to the Thomas Fire naming SCE as a defendant. Several of the lawsuits also name Edison International as a defendant. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the

theory of inverse condemnation when a utilities' facilities were determined to be a substantial cause of a wildfire that caused property damage. ***Any potential liability for December 2017 Wildfire-related damages will depend on a number of factors, including whether SCE substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation***.

***Given the preliminary stages of the investigations and the uncertainty as to the causes of the Thomas Fire, and the extent and magnitude of potential damages, Edison International and SCE are currently unable to predict the outcome of the claims made against SCE and Edison International or reasonably estimate a range of losses that may be incurred.*** SCE and Edison International's potential liability related to the Thomas Fire could be substantial. ***Additionally, SCE could potentially be subject to fines for alleged violations of CPUC rules and laws in connection with the December 2017 Wildfires***.

…

**Montecito Mudslides**

In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas (the "Montecito Mudslides"). According to Santa Barbara County initial reports, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures and resulted in at least 21 fatalities, with two additional fatalities presumed.

***Of the lawsuits mentioned above, several allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the Montecito Mudslides, resulting in the plaintiffs' claimed damages. Some of the Montecito Mudslides lawsuits also name Edison International as a defendant. Edison International and SCE are currently unable to predict the outcome of the claims made against SCE and Edison International or reasonably estimate a range of losses that may be incurred***. SCE and Edison International's potential liability related to the Montecito Mudslides could be substantial, SCE's insurance may not be sufficient to cover such damages, and SCE may not be authorized to recover any uninsured damages in rates.

391. The statements referenced in ¶390 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) Edison's liability for the Thomas Fire and/or Montecito Mudslides was not merely speculative, but highly likely given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly

vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;

- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire;
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations; and

(iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

392. In addition, the risk factors referenced in ¶390 above relating to prospective citations and fines were false and misleading because at the time the statements were made, the risk had already materialized with respect to (i) Edison's direct awareness, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that it had started the Thomas Fire; and (ii) Edison's related awareness that it had caused the Montecito Mudslides, which resulted in twenty-two deaths, including child deaths.

393. The Q1 2017 10-Q further incorporated by reference the "Risk Factors" set forth in the 2017 10-K, including risks related to Edison's potential failure to remediate aging infrastructure, as set forth in ¶374 above.

394. The risk factors referenced in ¶393 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already: (i) come to fruition, albeit on a limited basis, with the July-August 2015 Long Beach outages – which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air – and the Liberty Fire; and (ii) partially materialized via the Thomas

Fire and subsequent mudslides. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶375 above.

**Q1 2018 Earnings Call**

395. That same day – May 1, 2018 – the SCE Defendants held a conference call with investors and analysts (the "Q1 2018 Earnings Call"). During the Q1 2018 Earnings Call, Defendant Pizarro continued to attribute the recent wildfires to non-utility-based causes, including climate change and construction in high fire areas, and to advocate for reduced the utilities' reduced wildfire liability.

396. In particular, Defendant Pizarro proposed "[a]n updated standard of liability that considers degree of fault, rather than the current standard of strict liability, would ensure that there is a fair sharing of the increasing risk of climate change impacts across society." He stated that Edison planned to challenge inverse condemnation in "appropriate cases, ***including the Thomas Fire lawsuits***."

397. Defendant Pizarro also stated, in part:

> With respect to the Southern California wildfires, a number of external agencies, including Cal Fire, the Ventura County Fire Department, and the CPUC's Safety and Enforcement Division are investigating ***the potential origins and causes of the Thomas Fire***. As we do, in all wildfire matters, SCE is also conducting its own investigation. The investigations continue and we currently cannot predict when they will be completed.

398. The statements referenced in ¶¶395-97 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had actually caused the Thomas Fire, a fact known to the SCE Defendants no later than December

27, 2017, due to meetings between investigators and SCE representatives; (ii) even under the fault-based system of liability, Edison would be held liable for the Thomas Fire, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire;
- the Company failed to properly assess the risks of its equipment, and therefore

had no strategy in place to remedy the above-discussed deficiencies; and (iii) as a

result, the Company's public statements were materially false and misleading at all relevant times.

**July 26, 2018 Press Release**

399. On July 26, 2018, the Company issued a press release filed on Form 8-K with the SEC entitled "Edison International Reports Second Quarter 2018 Results," in which Defendant Pizarro claimed, in part: "***[w]e continue our efforts along multiple paths to resolve wildfire-related issues***[.]"

400. The statements referenced in ¶399 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had partially materialized with the Thomas Fire; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company had no substantive program in

place to even begin to "resolve wildfire-related issues"; and (xii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>Q2 2018 10-Q</u>**

401. On July 26, 2018, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q2 2018 10-Q"). The Q2 2018 10-Q discussed the risks posed to the Company's financial condition and operations should it be held responsible for the Thomas Fire, stating in relevant part:

> **Southern California Wildfires**
>
> SCE is aware of multiple lawsuits filed related to the Thomas Fire naming SCE as a defendant. A number of the lawsuits also name Edison International as a defendant. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. ***The extent of potential liability for December 2017 Wildfire-related damages depends on a number of factors, including whether SCE substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation***.
>
> ***Given the ongoing uncertainty as to the causes of the Thomas Fire***, the complexity of several potential ignition points, and the potential for separate damages to be attributable to fires ignited at separate ignition points, ***Edison International and SCE are currently unable to reasonably estimate a range of losses that may be incurred, but such losses may be material***. ….
>
> Should responsibility for a significant portion of the damages related to the December 2017 Wildfires be attributed to SCE, SCE's insurance may not be sufficient to cover all such damages. In addition, ***SCE may not be authorized to recover its uninsured damages through electric service rates if, for example, the CPUC finds that the damages were incurred because SCE did not prudently manage its facilities***.

. . .

**Montecito Mudslides**

In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas. According to Santa Barbara County initial reports, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures and resulted in at least 21 fatalities, with two additional fatalities presumed.

***Of the lawsuits mentioned above, several allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the Montecito Mudslides, resulting in the plaintiffs' claimed damages. Some of the Montecito Mudslides lawsuits also name Edison International as a defendant. Edison International and SCE are currently unable to predict the outcome of the claims made against SCE and Edison International or reasonably estimate a range of losses that may be incurred***. SCE and Edison International's potential liability related to the Montecito Mudslides could be material, SCE's insurance may not be sufficient to cover such damages, and SCE may not be authorized to recover any uninsured damages in rates.

402. The statements referenced in ¶401 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company’s business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) Edison’s liability for the Thomas Fire and/or Montecito Mudslides was not merely speculative, but highly likely given that:

- the Company completed numerous work orders past their scheduled date of corrective action;

- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire;
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations; and

(iv) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas Fire, and therefore understood the extent of its potential liability; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

403. In addition, the risk factors referenced in ¶401 above relating to prospective citations and fines were false and misleading because at the time the statements were made, the risk had already materialized with respect to (i) Edison's direct awareness, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that it had started the Thomas Fire; and (ii) Edison's related awareness that it had caused the Montecito Mudslides, which resulted in twenty-two deaths, including child deaths.

404. The Q2 2018 10-Q further incorporated by reference the "Risk Factors" set forth in the 2017 10-K, including risks related to Edison's potential failure to remediate aging infrastructure, as set forth in ¶374 above.

405. The risk factors referenced in ¶404 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already: (i) come to fruition, albeit on a limited basis, with the July-August 2015 Long Beach outages – which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air – and the Liberty Fire; and (ii) partially materialized via the Thomas Fire and subsequent mudslides. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶375 above.

**Q2 2018 Earnings Call**

406. The same day, July 26, 2018, the SCE Defendants held a conference call with investors and analysts (the "Q2 2018 Earnings Call"). During the Q2 2018 Earnings Call, Defendant Pizarro stated, in part: "A number of external agencies have been investigating the ***potential origins and causes of the Thomas Fire*** …. As we do in all wildfire matters, SCE is also conducting its own review. The investigations continue and we currently cannot predict when they will be completed."

407. The statements referenced in ¶406 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire through the failure of its equipment, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

408. Also during the Q2 2018 Earnings Call, Defendant Pizarro stated, in part:

> ***Southern California Edison has spent extensive time reviewing and strengthening our wildfire mitigation and prevention efforts in preparation for the new normal***. Our focus has been on five major areas. ***First, vegetation management. We have increased the vegetation patrols in the most severe high-risk areas and we are evaluating opportunities to perform more expansive tree trimming and tree removal.*** As a reminder, high fire risk areas identified in the CPUC's fire risk maps account for approximately a quarter of our service territory.
>
> Second, hardening our system. We are increasing the use of fire-resistant poles, insulated conductor and non-expulsion fuses in select high fire risk areas. Third, operational practices. ***During Red Flag Warning conditions, we continue to restrict certain types of work and our standard procedure is to not automatically reenergize circuits in high fire risk areas after interruptions until lines are physically inspected. Also, we have refined our protocols for the de-energization of lines when critically necessary to prevent fires and protect public safety, and continue to discuss these with potentially impacted communities***.
>
> Fourth, partnerships. Wildfire response planning occurs with fire agencies, local emergency operation centers and community groups throughout the service territory.
>
> Finally, we maintain a 24-hour situational awareness center and around-the-

> clock incident management teams when conditions merit. In certain areas, we are also installing additional weather stations to improve our awareness of local conditions and high-definition cameras to provide early warning of fires both internally and to local fire agencies.

409. The statements referenced in ¶408 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, (i) the Company failed to mitigate interference with equipment by vegetation, and had been cited for such by CPUC's Electric Safety and Reliability Branch as recently as late May 2018; (ii) the Company failed to use a "[d]ifferent operating protocol under Red Flag warnings" in the run-up to the Thomas Fire, which was preceded by a Red Flag Warning; (iii) the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>July 27, 2018 Business Update</u>**

410. On July 27, 2018, the Company filed a presentation on Form 8-K with the SEC – entitled "Business Update July 2018" – which included the following slide:




411. The statements referenced in ¶410 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, (i) the Company failed to mitigate interference with equipment by vegetation, and had been cited for such by CPUC's Electric Safety and Reliability Branch as recently as late May 2018; (ii) the Company failed to use a "[d]ifferent operating protocol under Red Flag warnings" in the run-up to the Thomas Fire, which was preceded by a Red Flag Warning; (iii) the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to

de-energize could result in catastrophic financial consequences for the Company; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q3 2018 10-Q**

412. On October 30, 2018, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2018 10-Q"). The Q3 2018 10-Q discussed the risks posed to the Company's financial condition and operations should it be held responsible for the Thomas Fire, stating in relevant part:

> **Southern California Wildfires**
>
> SCE is aware of multiple lawsuits filed related to the Thomas Fire naming SCE as a defendant. A number of the lawsuits also name Edison International as a defendant. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. ***The extent of potential liability for December 2017 Wildfire-related damages depends on a number of factors, including whether SCE substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation***.
>
> ***Given the ongoing uncertainty as to the causes of the Thomas Fire,*** the complexity of several potential ignition points, and the potential for separate damages to be attributable to fires ignited at separate ignition points, ***Edison International and SCE are currently unable to reasonably estimate a range of losses that may be incurred, but such losses may be material***.....
>
> Should responsibility for a significant portion of the damages related to the December 2017 Wildfires be attributed to SCE, SCE's insurance may not be sufficient to cover all such damages. In addition, ***SCE may not be authorized to recover its uninsured damages through electric service rates if, for example, the CPUC finds that the damages were incurred because SCE did not prudently manage its facilities***…

> **Montecito Mudslides**
>
> In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas. According to Santa Barbara County initial reports, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures and resulted in at least 21 fatalities, with two additional fatalities presumed.
>
> ***Of the lawsuits mentioned above, several allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the Montecito Mudslides, resulting in the plaintiffs' claimed damages. Some of the Montecito Mudslides lawsuits also name Edison International as a defendant. Edison International and SCE are currently unable to predict the outcome of the claims made against SCE and Edison International or reasonably estimate a range of losses that may be incurred***. SCE and Edison International's potential liability related to the Montecito Mudslides could be material, SCE's insurance may not be sufficient to cover such damages, and SCE may not be authorized to recover any uninsured damages in rates.

413. The statements referenced in ¶412 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) Edison's liability for the Thomas Fire and/or Montecito Mudslides was not merely speculative, but highly likely given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached

wires;

- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas Fire;
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations; and

(iv) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas Fire, and therefore understood the extent of its potential liability; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

414. In addition, the risk factors referenced in ¶412 above relating to

prospective citations and fines were false and misleading because at the time the statements were made, the risk had already materialized with respect to (i) Edison's direct awareness, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that it had started the Thomas Fire; and (ii) Edison's related awareness that it had caused the Montecito Mudslides, which resulted in twenty-two deaths, including child deaths.

415. The Q3 2018 10-Q further incorporated by reference the "Risk Factors" set forth in the 2017 10-K, including risks related to Edison's potential failure to remediate aging infrastructure set forth in ¶374 above.

416. The risk factors referenced in ¶415 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already: (i) come to fruition, albeit on a limited basis, with the July-August 2015 Long Beach outages – which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air – and the Liberty Fire; and (ii) partially materialized via the Thomas Fire and subsequent mudslides. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶375 above.

**<u>Q3 2018 Earnings Call</u>**

417. The same day, October 30, 2018, the SCE Defendants held a conference call with investors and analysts (the "Q3 2018 Earnings Call"). During the Q3 2018 Earnings Call, Defendant Pizarro disclosed that Edison's electrical equipment was "associated with" at least one of the two points of origin of the Thomas Fire, and that the Company expected "to incur material losses in connection with the Thomas Fire":

> Based on the progress of our ongoing work in these areas with the information currently available to us, we believe that the Thomas Fire which developed in Ventura County in early December 2017 had at least

two separate ignition points. ***With respect to one of these ignition points, Koenigstein Road, SCE believes that its equipment was associated with this ignition***.

SCE is continuing to assess the progression of the fire from the Koenigstein Road ignition point and the extent of property and other damage that may be attributable to that ignition. At this time, SCE has not determined whether the separate ignition in the Anlauf Canyon area involved our equipment. In the case of both general areas, CAL FIRE has removed SCE equipment. We have not been granted access, which has delayed the completion of our own review.

***Given the uncertainty as to the contributing causes of the Thomas Fire, the complexities associated with multiple ignition points and the potential for separate damages to be attributable to fires ignited at separate ignition points, we are currently unable to reasonably estimate a range of losses that may be incurred***.

***However, we do expect to incur material losses in connection with the Thomas Fire.*** Given the importance of communicating not just with investors, but also with our communities and other stakeholders, we have echoed some of these disclosures in a separate press release issued simultaneously with today's earnings release.

418. The statements referenced in ¶417 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire through the failure of its equipment, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) consequently, Edison had been able to reasonably estimate a range of losses that it may have occurred since December 27, 2017; (iii) Edison's equipment was not merely "associated" with the ignition of the Thomas Fire, but actually caused it; (iv) Edison had caused the Thomas Fire at both ignition points; and (v) as a result, the Company's

public statements were materially false and misleading at all relevant times.

419. On October 31, 2018, an analyst report by SunTrust Robinson Humphrey stated that "the next key milestone for us is CalFire's report on the fire and their determination whether the utility violated any state codes." At the time, Edison was well-aware of its persistent violation of state codes leading up to and including the Thomas Fire, yet the market remained in the dark on this critical point.

**2018 10-K**

420. On February 28, 2019, the Company filed its annual statement on Form 10-K for the fiscal year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Pizarro, Payne, Rigatti, and Petmecky.

421. Discussing the ratemaking process overseen by CPUC, the 2018 10-K notes the importance of safety measures put in place by SCE, explaining:

> ***The CPUC is conducting a triennial safety model assessment proceeding ("S-MAP") to evaluate the utility models used to prioritize safety risks, examine the utilities' assessment of their key risks and their proposed mitigation programs, and develop requirements for annual reporting of risk spending and mitigation results.***

422. The statements referenced in ¶421 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that (i) they were already aware that SED was highly critical of Edison's risk assessment practices; (ii) they were already aware of SED's determination that it would be "unwise to accept Edison's risk assessment methods as a basis for determining reasonableness of safety-related program requests"; (iii) they were already aware of SED's determination that Edison classified major categories of spending – including grid improvement – as safety related, even though

they related to issues of customer satisfaction or electric service reliability, rather than safety; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

423. The 2018 10-K discussed Edison's purported infrastructure investment program, as well as the risks posed to the Company's financial condition and operations by its failure to remediate aging infrastructure, stating in relevant part:

> ***SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program. This substantial investment program elevates operational risks and the need for superior execution in SCE's activities. SCE's financial condition and results of operations could be materially affected if it is unable to successfully manage these risks as well as the risks inherent in operating and maintaining its facilities, the operation of which can be hazardous.*** SCE's inherent operating risks include such matters as the risks of human performance, workforce capabilities, public opposition to infrastructure projects, delays, environmental mitigation costs, difficulty in estimating costs or in recovering costs that are above original estimates, system limitations and degradation, and interruptions in necessary supplies.

424. The statements referenced in ¶423 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid methodology to evaluate

pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with the Thomas and Woolsey Fires; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) consequently, the Company did not elevate operational risks; (xii) the Company classified major categories of spending as safety related, even though they related to issues of customer satisfaction or electric service reliability, rather than safety; (xiii) the Company had already been told by SED that it should not conflate safety and reliability; and (xiv) as a result, the Company's public statements were materially false and misleading at all relevant times.

425. In addition, the risk factors referenced in ¶423 above relating to aging infrastructure were false and misleading because at the time the allegedly prospective risks were discussed, they had already: (i) come to fruition, albeit on a limited basis, with the July-August 2015 Long Beach outages, which affected to 30,000 customers, caused fires in several underground structures, and resulted in explosions that blew manhole covers into the air; and (ii) materialized via the Thomas Fire, Montecito mudslides, and the Woolsey Fire. Moreover, the SCE Defendants knew their claimed infrastructure investments were insufficient to mitigate the cited risks for the reasons described in ¶424 above.

426. The SCE Defendants acknowledged in 2018 10-K that their business may result in damage to private and public property, as well as injuries to bystanders, stating in relevant part:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. ***In addition, the risks associated with the operation of transmission and distribution assets and power generating facilities include public and employee safety issues and the risk of utility assets causing or contributing to wildfires. Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant***. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $100,000 per violation per day (capped at a maximum of $8 million), pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. ***Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.***

427. The risk factors referenced in ¶426 above relating to prospective citations and fines were false and misleading come to fruition, albeit on a limited basis, with respect to: (i) failing to maintain electrical equipment that injured three U.S. Marines in Twentynine Palms in 2015; (ii) the Potrero Fire of November 2015, in which the Company was cited for failing to replace or reinforce an unsafe utility pole; (iii) the fatal electrocution at Edison's Whittier facility, for which Edison was fined $50,000 on February 12, 2016; (iv) Edison's numerous citations for safety violations between April 4, 2016 and February 9, 2018; and (v) the Liberty Fire. In addition, (vi) the risks had already materialized via the Thomas Fire, Montecito mudslides, and the Woolsey Fire; and (vii) the SCE Defendants were directly aware, no later than December 27, 2017, due to meetings between investigators and SCE representatives, that Edison had started the

Thomas Fire. At all relevant times, the SCE Defendants knew their potential liability extended well beyond "inherent risks" to include risks created by the Company's own reckless disregard of safety, as described in ¶424 above.

428. The 2018 10-K also discussed various risks to the Company as a result of wildfire related liabilities, including its possible inability to pay distributions to investors who purchased in the Offering:

> ***Damage claims against SCE for wildfire-related losses may materially affect SCE's financial condition and results of operations.***
>
> ***Prolonged drought conditions and shifting weather patterns in California resulting from climate change as well as increased tree mortality rates have increased the duration of the wildfire season and the risk of severe wildfire events. Severe wildfires and increased urban development in high fire risk areas in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of utility practices and/or the failure of electric and other utility equipment. California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. The rationale generally stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement***. However, in December 2017, the CPUC issued a decision denying an investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires. An inability to recover uninsured wildfire-related costs could materially affect SCE's business, financial condition and results of operations. ***For example, if SCE is found liable for damages related to the 2017/2018 Wildfire/Mudslide Events, and SCE is unable to, or believes that it will be unable to, recover those damages through insurance or electric rates, SCE may not have sufficient cash or equity to pay dividends or may be restricted from declaring such dividends because it does not***

> ***meet CPUC or California law requirements related to the declaration of dividends*** . . . .

429. The 2018 10-K further stated that: "***[a]ny potential liability of SCE for damages related to the 2017/2018 Wildfire/Mudslide Events will depend on a number of factors, including whether SCE is determined to have substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation***."

430. The statements referenced in ¶¶428-29 above were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) Edison had caused the Woolsey Fire; (iv) Edison's liability for the Thomas Fire, Montecito Mudslides, and Woolsey Fire was not merely speculative, but highly likely; (v) Edison's liability would not be limited by any requirement that negligence be shown, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;

- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas and Woolsey Fires, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas and Woolsey Fires; and
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(vi) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas and Woolsey Fires, and therefore understood the extent of its potential liability; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

431. The 2018 10-K also discussed wildfire/mudslide events in southern California in 2017-2018, and stated, in relevant part:

> **Southern California Wildfires and Mudslide**
>
> Approximately 35% of SCE's service territory is in areas identified as high fire risk by SCE. ***Multiple factors have contributed to increased wildfires,***

> ***faster progression of wildfires and the increased damage from wildfires across SCE's service territory*** and throughout California. ***These include the buildup of dry vegetation in areas severely impacted by years of historic drought, lack of adequate clearing of hazardous fuels by responsible parties, higher temperatures, lower humidity, and strong Santa Ana winds***. ***At the same time that wildfire risk has been increasing in Southern California, residential and commercial development has occurred and is occurring in some of the highest-risk areas***. ***Such factors can increase the likelihood and extent of wildfires***.
>
> ….
>
> Multiple lawsuits related to the Thomas Fire and the Woolsey Fire have been initiated against SCE and Edison International. ***Some of the Thomas Fire-related lawsuits claim that SCE and Edison International have responsibility for the damages caused by the Montecito Mudslides based on a theory that SCE has responsibility for the Thomas Fire*** ….
>
> ***Edison International and SCE will seek to offset any actual losses realized in connection with the 2017/2018 Wildfire/Mudslide Events*** with recoveries from insurance policies in place at the time of the events and, to the extent actual losses exceed insurance, ***through electric rates*** …. SCE believes that in light of the CPUC's decision in cost recovery proceedings involving SDG&E, arising from a 2007 wildfire in SDG&E's service area, there is substantial uncertainty regarding how the CPUC will interpret and apply its prudency standard to an investor-owned utility in future wildfire cost-recovery proceedings. ***Accordingly, while the CPUC has not made a determination regarding SCE's prudency relative to any of the 2017/2018 Wildfire/Mudslide Events, SCE is unable to conclude, at this time, that uninsured CPUC-jurisdictional wildfire-related costs are probable of recovery through electric rates.***

432. The statements referenced in ¶431 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) they knew that the risk of wildfires in the Company's territory extended well beyond prolonged drought conditions, "lack of

adequate clearing," climate-related factors, stronger winds, and residential and commercial development to include risks created by the Company's own reckless disregard of safety; (ii) Edison's responsibility for the Thomas Fire was not a "theory" because Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017; (iii) Edison would be substantially limited in its ability to offset wildfire-related losses by raising rates, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas and Woolsey Fires, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter*

*alia*, the Thomas and Woolsey Fires; and

- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(iv) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas and Woolsey Fires, and therefore understood the extent of its potential liability; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

433. In a section of the 2018 10-K titled, "Internal Review," the SCE Defendants stated, in relevant part:

> *Thomas Fire*
>
> ….
>
> Based on currently available information, SCE believes that the Thomas Fire had at least two separate ignition points, one near Koenigstein Road in the City of Santa Paula and the other in the Anlauf Canyon area of Ventura County. With respect to the Koenigstein Road ignition point, witnesses have reported that a fire ignited in the vicinity of an SCE power pole and SCE later learned of a downed electrical wire at this location. ***SCE believes that its equipment was associated with this ignition*** …. ***SCE is continuing to assess the progression of the fire from the Koenigstein Road ignition point and the extent of damages that may be attributable to that ignition. At this time, based on available information, SCE has not determined whether the ignition in the Anlauf Canyon area involved SCE equipment*** ….
>
> *Montecito Mudslides*
>
> ***SCE's internal review also includes inquiry into whether the Thomas Fire proximately caused or contributed to the Montecito Mudslides***, the source of ignition of the portion of the Thomas Fire that burned through the Montecito area and other factors that potentially contributed to the losses that resulted from the Montecito Mudslides …. ***At this time, based on available information, SCE has not been able to determine the source of***

> ***ignition of the portion of the Thomas Fire that burned within the Montecito area. In the event that SCE is determined to have caused the fire that spread to the Montecito area, SCE cannot predict whether, if fully litigated, the courts would conclude that the Montecito Mudslides were caused or contributed to by the Thomas Fire or that SCE would be liable for some or all of the damages caused by the Montecito Mudslides.***
>
> *Woolsey Fire*
>
> SCE's internal review into the facts and circumstances of the Woolsey Fire is ongoing …. ***SCE is aware of witnesses who saw fire in the vicinity of SCE's equipment at the time the fire was first reported*** ….

434. The statements referenced in ¶433 above were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, and SCE's Castro Circuit was the point of origin of both of the Thomas Fire's ignition points, facts known to the SCE Defendants no later than December 27, 2017; (ii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iii) they were not merely "aware of witnesses" to the outbreak of the Woolsey Fire, because the witness who reported the Woolsey Fire was an employee of Edison's own contractor, thereby placing the SCE Defendants in a superior position to understand the fire's causes; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**Q1 2019 10-Q**

435. On April 30, 2019, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2019 10-Q"). The Q1 2019 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for

wildfires, stating in relevant part:

> **Southern California Wildfires and Mudslides**
>
> Approximately 35% of SCE's service territory is in areas identified as high fire risk by SCE. ***Multiple factors have contributed to increased wildfires, faster progression of wildfires and the increased damage from wildfires across SCE's service territory*** and throughout California. ***These include the buildup of dry vegetation in areas severely impacted by years of historic drought, lack of adequate clearing of hazardous fuels by responsible parties, higher temperatures, lower humidity, and strong Santa Ana winds***. ***At the same time that wildfire risk has been increasing in Southern California, residential and commercial development has occurred and is occurring in some of the highest-risk areas***. ***Such factors can increase the likelihood and extent of wildfires***.
>
> ….
>
> In March 2019, the VCFD and CAL FIRE issued separate reports finding that the ***Thomas Fire and the Koenigstein Fire*** were each caused by SCE equipment. At this time, based on available information, SCE has not determined whether its equipment caused the Thomas Fire. ***Based on publicly available radar data showing a smoke plume in the Anlauf Canyon area emerging in advance of the start time of the Thomas Fire indicated in the Thomas Fire report, SCE believes that the Thomas Fire started at least 12 minutes prior to any issue involving SCE's system and at least 15 minutes prior to the start time indicated in the report***. SCE has previously disclosed that SCE believed its equipment was associated with the ignition of the ***Koenigstein Fire***. SCE is continuing to assess the progression of the ***Thomas and Koenigstein Fires*** and the extent of damages that may be attributable to each fire.
>
> Multiple lawsuits related to the ***Thomas and Koenigstein Fires*** and the Woolsey Fire have been initiated against SCE and Edison International. Some of the ***Thomas and Koenigstein Fires*** lawsuits claim that SCE and Edison International have responsibility for the damages caused by the Montecito Mudslides based on a theory that SCE has responsibility for the ***Thomas and/or Koenigstein Fires*** and that the ***Thomas and/or Koenigstein Fires*** proximately caused the Montecito Mudslides.
>
> ….
>
> ***Edison International and SCE will seek to offset any actual losses realized in***

> ***connection with the 2017/2018 Wildfire/Mudslide Events*** with recoveries from insurance policies in place at the time of the events and, to the extent actual losses exceed insurance, ***through electric rates*** …. SCE believes that, in light of the CPUC's decision in a cost recovery proceeding involving SDG&E arising from several 2007 wildfires in SDG&E's service area, there is substantial uncertainty regarding how the CPUC will interpret and apply its prudency standard to an investor-owned utility in future wildfire cost-recovery proceedings. ***Accordingly, while the CPUC has not made a determination regarding SCE's prudency relative to any of the 2017/2018 Wildfire/Mudslide Events, SCE is unable to conclude, at this time, that uninsured CPUC-jurisdictional wildfire-related costs are probable of recovery through electric rates.***

436. The statements referenced in ¶435 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) they knew that the risk of wildfires in the Company's territory extended well beyond prolonged drought conditions, "lack of adequate clearing," climate-related factors, stronger winds, and residential and commercial development to include risks created by the Company's own reckless disregard of safety; (ii) Edison's responsibility for the Thomas Fire was not a "theory" because Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017; (iii) as of December 27, 2017, the SCE Defendants knew that both ignition points of the Thomas Fire had been linked to SCE's Castro Circuit, and were therefore not two entirely separate fires ("the Thomas and/or Koenigstein Fires") with divergent causes and culprits; (iv) Edison would be substantially limited in its ability to offset wildfire-related losses by raising rates, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached

wires;

- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas and Woolsey Fires, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas and Woolsey Fires; and
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(v) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas and Woolsey Fires, and therefore understood the extent of its potential liability; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

437. In a section of the Q1 2019 10-Q titled, "External Investigations and

Internal Review," the Company stated, in relevant part:

> *Thomas Fire*
>
> ….
>
> On March 13, 2019, the VCFD and CAL FIRE issued a report concluding, after ruling out other possible causes, that the Thomas Fire was started by SCE power lines coming into contact during high winds, resulting in molten metal falling to the ground. However, the report does not state that molten metal was found on the ground in that location during their investigation. ***At this time, based on available information, SCE has not determined whether its equipment caused the Thomas Fire***. Based on publicly available radar data showing a smoke plume in the Anlauf Canyon area emerging in advance of the report's indicated start time, ***SCE believes that the Thomas Fire started at least 12 minutes prior to any issue involving SCE's system and at least 15 minutes prior to the start time indicated in the report. SCE is continuing to assess the progression of the Thomas Fire and the extent of damages that may be attributable to that fire***
>
> ….
>
> *Montecito Mudslides*
>
> ***SCE's internal review includes inquiry into whether the Thomas and/or Koenigstein Fires proximately caused or contributed to the Montecito Mudslides***, whether, and to what extent, the Thomas and/or Koenigstein Fires were responsible for the damages in the Montecito area and other factors that potentially contributed to the losses that resulted from the Montecito Mudslides …. ***At this time, based on available information, SCE has not been able to determine whether the Thomas Fire or the Koenigstein Fire, or both, were responsible for the damages in the Montecito area. In the event that SCE is determined to have caused the fire that spread to the Montecito area, SCE cannot predict whether, if fully litigated, the courts would conclude that the Montecito Mudslides were caused or contributed to by the Thomas and/or Koenigstein Fires or that SCE would be liable for some or all of the damages caused by the Montecito Mudslides***.
>
> *Woolsey Fire*

> SCE's internal review into the facts and circumstances of the Woolsey Fire is ongoing …. ***SCE is aware of witnesses who saw fire in the vicinity of SCE's equipment at the time the fire was first reported*** ….

438. The statements referenced in ¶437 above were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, and SCE's Castro Circuit was the point of origin of both of the Thomas Fire's ignition points, facts known to the SCE Defendants no later than December 27, 2017; (ii) as of December 27, 2017, the SCE Defendants knew that both ignition points of the Thomas Fire had been linked to SCE's Castro Circuit, and were therefore not two entirely separate fires ("the Thomas and/or Koenigstein Fires") with divergent causes and culprits; (iii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iv) they were not merely "aware of witnesses" to the outbreak of the Woolsey Fire, because the witness who reported the Woolsey Fire was an employee of Edison's own contractor, thereby placing the SCE Defendants in a superior position to understand the fire's causes; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

439. In a section of the Q1 2019 10-Q titled "Recovery of Wildfire-Related Costs," the Company stated that:

> SB 901 requires investor-owned utilities to prepare annually, for CPUC approval, ***wildfire risk mitigation plans, and compliance with an approved plan is one of the factors that the CPUC can consider in addressing cost recovery***. On February 6, 2019, in compliance with SB 901, SCE filed its wildfire mitigation plan for 2019. ***While SCE takes the position in its wildfire mitigation plan that substantial compliance with the plan, once approved, will demonstrate that SCE prudently operated its system and***

***met the CPUC's prudent manager standard regarding wildfire risk mitigation***, the CPUC may not agree with SCE's position.

440. The statements referenced in ¶439 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison would be substantially limited in its ability to meet the CPUC's prudence manager standard for cost recovery purposes, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;
- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas and Woolsey Fires, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could

result in catastrophic financial consequences for the Company;

- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas and Woolsey Fires; and
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(ii) Edison understated the extent of its potential wildfire liability; (iii) Edison overstated its ability to recover wildfire-related costs; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>Q2 2019 10-Q</u>**

441. On July 25, 2019, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q2 2019 10-Q"). The Q2 2019 10-Q discussed the risks posed to the Company's financial condition and operations should they be responsible for wildfires, stating in relevant part:

> **Southern California Wildfires and Mudslides**
>
> …. ***Multiple factors have contributed to increased wildfires, faster progression of wildfires and the increased damage from wildfires across SCE's service territory*** and throughout California. ***These include the buildup of dry vegetation in areas severely impacted by years of historic drought, lack of adequate clearing of hazardous fuels by responsible parties, higher temperatures, lower humidity, and strong Santa Ana winds***. ***At the same time that wildfire risk has been increasing in Southern California, residential and commercial development has occurred and is occurring in some of the highest-risk areas***. ***Such factors can increase the likelihood and extent of wildfires***.
>
> ….
>
> In March 2019, the VCFD and CAL FIRE issued separate reports finding that the ***Thomas Fire and the Koenigstein Fire*** were each caused by SCE equipment. At this time, based on available information, SCE has not

determined whether its equipment caused the Thomas Fire. ***Based on publicly available radar data showing a smoke plume in the Anlauf Canyon area emerging in advance of the start time of the Thomas Fire indicated in the Thomas Fire report, SCE believes that the Thomas Fire started at least 12 minutes prior to any issue involving SCE's system and at least 15 minutes prior to the start time indicated in the report***. SCE has previously disclosed that SCE believed its equipment was associated with the ignition of the ***Koenigstein Fire***. SCE is continuing to assess the progression of the ***Thomas and Koenigstein Fires*** and the extent of damages that may be attributable to each fire.

Multiple lawsuits related to the ***Thomas and Koenigstein Fires*** and the Woolsey Fire have been initiated against SCE and Edison International. Some of the ***Thomas and Koenigstein Fires*** lawsuits claim that SCE and Edison International have responsibility for the damages caused by the Montecito Mudslides based on a theory that SCE has responsibility for the ***Thomas and/or Koenigstein Fires*** and that the ***Thomas and/or Koenigstein Fires*** proximately caused the Montecito Mudslides.

….

***Edison International and SCE will seek to offset any actual losses realized in connection with the 2017/2018 Wildfire/Mudslide Events*** with recoveries from insurance policies in place at the time of the events and, to the extent actual losses exceed insurance, ***through electric rates*** …. SCE believes that, in light of the CPUC's decision in a cost recovery proceeding involving SDG&E arising from several 2007 wildfires in SDG&E's service area, there is substantial uncertainty regarding how the CPUC will interpret and apply its prudency standard to an investor-owned utility in future wildfire cost-recovery proceedings for fires ignited prior to July 12, 2019. ***Accordingly, while the CPUC has not made a determination regarding SCE's prudency relative to any of the 2017/2018 Wildfire/Mudslide Events, SCE is unable to conclude, at this time, that uninsured CPUC-jurisdictional wildfire-related costs are probable of recovery through electric rates.***

442. The statements referenced in ¶441 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading

statements and/or failed to disclose that: (i) they knew that the risk of wildfires in the Company's territory extended well beyond prolonged drought conditions, "lack of adequate clearing," climate-related factors, stronger winds, and residential and commercial development to include risks created by the Company's own reckless disregard of safety; (ii) Edison's responsibility for the Thomas Fire was not a "theory" because Edison had caused the Thomas Fire, a fact known to the SCE Defendants no later than December 27, 2017; (iii) as of December 27, 2017, the SCE Defendants knew that both ignition points of the Thomas Fire had been linked to SCE's Castro Circuit, and were therefore not two entirely separate fires ("the Thomas and/or Koenigstein Fires") with divergent causes and culprits; (iv) regardless of *when* the wildfires in question occurred, Edison would be substantially limited in its ability to offset wildfire-related losses by raising rates, given that:

- the Company completed numerous work orders past their scheduled date of corrective action;
- the Company failed to replace or reinforce unsafe utility poles and/or attached wires;
- the Company failed to mitigate interference with equipment by vegetation;
- the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC;
- the Company failed to utilize a statistically-valid methodology to evaluate pole-loading;
- the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed;
- the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure;

- the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas and Woolsey Fires, despite knowing that their pole stock was particularly vulnerable in high wind events, and that failure to de-energize could result in catastrophic financial consequences for the Company;
- the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had materialized with, *inter alia*, the Thomas and Woolsey Fires; and
- the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies;
- the Company was in violation of state law and regulations;

(v) consequently, Edison had not prudently managed and operated its facilities prior to the Thomas and Woolsey Fires, and therefore understood the extent of its potential liability; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

443. In a section of the Q2 2019 10-Q titled, "External Investigations and Internal Review," the Company stated, in relevant part:

> *Thomas Fire*
>
> ....
>
> On March 13, 2019, the VCFD and CAL FIRE issued a report concluding, after ruling out other possible causes, that the Thomas Fire was started by SCE power lines coming into contact during high winds, resulting in molten metal falling to the ground. However, the report does not state that molten metal was found on the ground in that location during their investigation. ***At this time, based on available information, SCE has not determined whether its equipment caused the Thomas Fire***. Based on publicly available radar data showing a smoke plume in the Anlauf Canyon area emerging in advance of the report's indicated start time, ***SCE believes that the Thomas Fire started at least 12 minutes prior to any issue involving SCE's system and at least 15 minutes prior to the start time indicated in the report. SCE is continuing to assess the progression of the***

> ***Thomas Fire and the extent of damages that may be attributable to that fire***….
>
> *Montecito Mudslides*
>
> ***SCE's internal review includes inquiry into whether the Thomas and/or Koenigstein Fires proximately caused or contributed to the Montecito Mudslides***, whether, and to what extent, the Thomas and/or Koenigstein Fires were responsible for the damages in the Montecito area and other factors that potentially contributed to the losses that resulted from the Montecito Mudslides …. ***At this time, based on available information, SCE has not been able to determine whether the Thomas Fire or the Koenigstein Fire, or both, were responsible for the damages in the Montecito area. In the event that SCE is determined to have caused the fire that spread to the Montecito area, SCE cannot predict whether, if fully litigated, the courts would conclude that the Montecito Mudslides were caused or contributed to by the Thomas and/or Koenigstein Fires or that SCE would be liable for some or all of the damages caused by the Montecito Mudslides***.
>
> *Woolsey Fire*
>
> SCE's internal review into the facts and circumstances of the Woolsey Fire is ongoing …. ***SCE is aware of witnesses who saw fire in the vicinity of SCE's equipment at the time the fire was first reported*** ….

444. The statements referenced in ¶443 above were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison had caused the Thomas Fire, and SCE's Castro Circuit was the point of origin of both of the Thomas Fire's ignition points, facts known to the SCE Defendants no later than December 27, 2017; (ii) as of December 27, 2017, the SCE Defendants knew that both ignition points of the Thomas Fire had been linked to SCE's Castro Circuit, and were therefore not two entirely separate fires ("the Thomas and/or Koenigstein Fires") with divergent

causes and culprits; (iii) Edison had caused the Montecito Mudslides, which were a direct consequence of the Thomas Fire caused by Edison; (iv) they were not merely "aware of witnesses" to the outbreak of the Woolsey Fire, because the witness who reported the Woolsey Fire was an employee of Edison's own contractor, thereby placing the SCE Defendants in a superior position to understand the fire's causes; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

**The Thomas Fire**

445. The Thomas Fire was a partial materialization of the risks concealed by the Company's failure to maintain its electrical infrastructure and otherwise mitigate the risk of wildfires. Accordingly, Edison shares plunged $10.26, nearly 15%, to close at $70.00 on December 5, 2017 from the previous day's closing price of $80.26, wiping out more than $3 billion in market value, on the market's understanding – later confirmed by Cal Fire – that SCE had caused the Thomas Fire:



446. On December 11, 2017, after the market closed, SCE issued a press release entitled "Southern California Edison Responds to Area Fires." Buried within the last paragraph was a significant disclosure, "***SCE believes the investigations now include the possible role of its facilities***."

447. Upon this partial confirmation of the market's informed reaction to the Thomas Fire, Edison's stock price fell $4.40 per share, or approximately 6%, to close at $68.58 per share on December 12, 2017.

**The Woolsey Fire**

448. On November 9, 2018, the Company issued a press release providing an update on the Woolsey Fire, which obliquely – and misleadingly – referred to "an outage in the vicinity" of the fire. In fact, the circuit interruption in question had occurred at ground zero of the fire. This was the first indication that Edison had caused the Woolsey Fire:

> ROSEMEAD, Calif., November 9, 2018 — Southern California Edison's Emergency Operations Center has mobilized resources and crews to assist first responders and to begin restoring power in communities affected by the wildfires in Ventura and Los Angeles counties as soon as fire officials say it is safe.
>
> ***The company's top priority continues to be the safety of customers, employees and communities.*** SCE is working closely with first responder partners and is prepared to safely and quickly restore power as soon as possible.
>
> As of 5:45 p.m., 23,000 customers were without power, with 20,000 of them in Los Angeles County, many affected by the fires. SCE is currently monitoring several fires impacting customers within its service territory, including the Hill Fire in Ventura County and the Woolsey Fire in Ventura and Los Angeles counties, which has moved into the Malibu area.
>
> ***The fires have damaged SCE equipment and lines and caused outages in fire-affected areas.*** Once it is safe to do so and access has been granted,

> SCE's damage assessment teams will determine what equipment and repairs are needed before repairs can begin. SCE air patrols may also be required to fully assess damage caused by the fires in more remote areas, but that access is limited due to flight restrictions for fire-fighting operations.
>
> ***SCE has been in communication with the California Public Utilities Commission with respect to these fires and has submitted an initial electric safety incident report on the Woolsey Fire reporting an outage in the vicinity. The information in the report is preliminary. There has been no determination of origin or cause of either wildfire***. SCE will fully cooperate with any investigations.
>
> * * *
>
> **Edison's Efforts at Managing the Wildfire Threat in California**
>
> ***Safety is the company's top priority and a core value for SCE***. Our employees work vigilantly year-round to strengthen the electric system and protect the public and our employees against a variety of natural and man-made threats. ***We have long taken substantial steps to reduce the risk of wildfires in our service territory and*** continue to look for ways to enhance our operational practices and infrastructure. ***SCE employs design and construction standards, vegetation management practices and other operational practices to mitigate wildfire risk and has collaborative partnerships with fire agencies to maintain fire safety.***

449. The statements referenced in ¶448 were materially false and misleading because the SCE Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the SCE Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company completed numerous work orders past their scheduled date of corrective action; (ii) the Company failed to replace or reinforce unsafe utility poles and/or attached wires; (iii) the Company failed to mitigate interference with equipment by vegetation; (iv) the Company failed to assess, remediate, repair, and/or replace aging and/or overloaded poles as prescribed by CPUC; (v) the Company failed to utilize a statistically-valid

methodology to evaluate pole-loading; (vi) the Company relied on software updates that had not been independently verified and validated to allow for fewer pole assessments than were actually needed; (vii) the Company deployed a "run-to-failure" maintenance model that consciously allowed for equipment failure; (viii) the Company's noncompliant electricity networks created a significantly heightened risk of wildfires in California, which had partially materialized with the Thomas and Woolsey Fires; (ix) the Company failed to properly assess the risks of its equipment, and therefore had no strategy in place to remedy the above-discussed deficiencies; (x) the Company was in violation of state law and regulations; (xi) the Company failed to de-energize in high-wind, high-fire scenarios, including the Thomas Fire, despite:

- knowing that their pole stock was particularly vulnerable in high wind events,
- knowing that failure to de-energize could result in catastrophic financial consequences for the Company; and
- reassuring investors that they would do so in such circumstances;

(xii) consequently, the Company had not "taken substantial steps to reduce the risk of wildfires in [its] service territory," "mitigate[ed] wildfire risk," or "maintain[ed] fire safety"; (xiii) as a result, the Company's public statements were materially false and misleading at all relevant times.

450. Between November 10 and 11, 2018, it was gradually revealed by local news sources that SCE had filed an incident report with CPUC on the evening of November 8, stating that there was an interruption to SCE's Big Rock 16 kV circuit near its Chatsworth substation two minutes before the first report of a fire came in. The substation is near E Street and Alfa Road in Ventura County — which is also where Cal Fire says the Woolsey Fire began.

451. On November 12, 2018, CPUC launched an investigation into Edison's subsidiary, SCE, in order to "assess the compliance of electrical facilities with

applicable rules and regulations in fire-impacted areas." According to CPUC – and echoing earlier reports regarding the November 8 incident report – electrical infrastructure may have suffered malfunctions near ground zero of the blazes.

452. Specifically, it was reported that on the day the fires began, SCE issued an alert to CPUC that a substation circuit near the Woolsey Fire origin "relayed," or sensed a disturbance on the circuit, just two minutes before Cal Fire said that the devastating fire began.

453. Following the November 10-12 disclosures of the November 8, 2018 incident report and CPUC's announcement, Edison's stock price fell $7.44 per share, or more than 12%, to close at $53.56 per share on November 12, 2018. Over the following days, as the Hill and Woolsey Fires continued to burn, Edison's stock price continued to fall, closing at $47.19 on November 15, 2018, a total drop of 32% from its price prior to CPUC's announcement. The risks concealed by the Company's failure to maintain its electrical infrastructure and otherwise mitigate the risk of wildfires had further materialized.

454. On October 29, 2019, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2019 10-Q"). The Q3 2019 10-Q made fresh disclosures regarding SCE's role in causing the Woolsey Fire, and stated, in relevant part:

> SCE has received a non-final redacted draft of a report from the [Ventura County Fire Department ("VCFD")] subject to a protective order in the litigation related to the Woolsey fire and, other than the information disclosed in this Form 10-Q, is not authorized to release the report or its contents to the public at this time. ***The draft report states that the VCFD investigation team determined that electrical equipment owned and operated by SCE was the cause of the Woolsey Fire. Absent additional evidence, SCE believes that it is likely that its equipment was associated with the ignition of the Woolsey Fire***.

455. The same day the SCE Defendants held a conference call with investors

and analysts (the "Q3 2019 Earnings Call"), during which Defendant Pizarro declined to answer an analyst's question regarding "any violations found in the report" provided to SCE.

456. Following the SCE Defendants' disclosure that they had caused the Woolsey Fire, Edison's stock price declined by $3.24 per share, or more than 5%, to close at $62.16 per share on October 30, 2019.

## CLASS ACTION ALLEGATIONS

457. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Edison securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and/or materialization of known risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

458. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Edison securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Edison or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

459. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

460. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

461. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Edison;
- whether the Individual Defendants caused Edison to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Edison securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

462. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no

difficulty in the management of this action as a class action.

463. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Edison securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Edison securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

464. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

465. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 11 of the Exchange Act Against Defendants Edison, SCE, SCE Trust VI, Payne, Petmecky, Erickson, and the Underwriter Defendants)**

466. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

467. This claim is premised on strict liability under Section 11 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

468. This claim is asserted by Plaintiffs against Defendants Edison, SCE, SCE Trust VI, Payne, Petmecky, Erickson, and the Underwriter Defendants on behalf of all persons who acquired shares traceable to the Offering, in which the shares issued pursuant to the Offering Documents were sold.

469. Defendants Payne, Petmecky, and Erickson are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in ¶¶346-51 above. Defendant Payne is further strictly liable under the Securities Act for misrepresentations and omissions in the Registration Statement because he was a director of the Company at the time of its filing.

470. Edison is strictly liable as an Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in ¶¶346-51 above.

471. SCE is strictly liable as an Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in ¶¶346-51 above.

472. SCE Trust VI is strictly liable as an Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in

¶¶346-51 above.

473. The Underwriter Defendants are strictly liable under the Securities Act as named underwriters for the misrepresentations and omissions made in the Registration Statement, as identified in ¶¶346-51 above.

474. None of the Defendants named in ¶468 above conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in ¶¶346-51 above were true, were without omissions of material fact, and were not misleading.

475. By reason of the conduct alleged herein, each of the Defendants named in ¶468 above has violated Section 11 of the Securities Act.

476. Plaintiffs and the Class have sustained enormous damages because the value of their Edison securities has declined precipitously.

477. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that Edison offered the shares covered by the Registration Statement to the investing public.

478. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants named in ¶468 above and each of them, jointly and severally.

**COUNT II**

**(Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants)**

479. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. This claim is premised on the remedies available under Section 12 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

480. This claim is asserted by Plaintiffs against the Underwriter Defendants, on behalf of all persons who acquired Edison securities pursuant to the Offering.

481. By means of the Registration Statement and Prospectus, each of the Underwriter Defendants offered, promoted, and sold Edison securities in the Offering, and therefore were liable under Section 12(a)(2) for the misrepresentations and omissions contained in the Prospectus and repeated in the Registration Statement.

482. None of the Underwriter Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and Prospectus, and identified in ¶¶346-51 above were true, were without omissions of material fact, and were not misleading.

483. By reason of the conduct alleged herein, each of the Underwriter Defendants has violated Section 12(a)(2) of the Securities Act.

484. Plaintiffs and the Class have sustained enormous damages because the value of their Edison securities has declined precipitously.

485. Plaintiffs and the Class hereby tender their shares to the Underwriter Defendants and demand rescission.

486. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants first sold Edison securities pursuant to the Prospectus to the investing public.

## COUNT III

**(Violations of Section 15 of the Securities Act Against Defendants Pizarro, Rigatti, Payne, and Petmecky)**

487. Plaintiffs repeat and reallege each and every allegation contained above as

if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

488. This claim is premised on control person liability under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

489. Defendants Pizarro, Rigatti, Payne, and Petmecky, by virtue of their offices, directorship and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of SCE within the meaning of Section 15 of the Securities Act. Defendants Pizarro, Rigatti, Payne, and Petmecky, had the power and influence and exercised the same to cause SCE to engage in the acts described herein.

490. Defendants Pizarro and Rigatti, as Edison's CEO and CFO, respectively, exercised control by virtue of their positions over Edison and SCE, and exercised control by virtue of their positions over Defendants Payne and Petmecky, their subordinates.

491. Defendants Payne and Petmecky, as SCE's CEO and CFO, respectively, exercised control by virtue of their positions over SCE.

492. Defendants Pizarro, Rigatti, Payne, and Petmecky's positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

493. By virtue of the conduct alleged herein, the Defendants Pizarro, Rigatti, Payne, and Petmecky are liable as control persons for the violations of Section 11 by the persons they controlled, as alleged in Count I.

494. None of the Defendants named in ¶489 above conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in ¶¶346-51 above were true, were without omissions of material fact, and were not misleading.

495. Each of the Defendants named in ¶489 above is liable to Plaintiffs and the Class for damages suffered as a result of the Securities Act violations of the persons they controlled.

## COUNT IV
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the SCE Defendants)

496. Plaintiffs repeat and reallege ¶¶1 to 465 above. This claim is asserted against the SCE Defendants and is premised upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

497. During the Class Period, the SCE Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Edison securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Edison securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the SCE Defendants, and each of them, took the actions set forth herein.

498. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the SCE Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities

analysts and the media that were designed to influence the market for Edison securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Edison finances and business prospects.

499. By virtue of their positions at Edison, the SCE Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the SCE Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the SCE Defendants. Said acts and omissions of the SCE Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the SCE Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

500. Information showing that the SCE Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Individual Defendants' knowledge and control. As the senior managers and/or directors of Edison, the Individual Defendants had knowledge of the details of Edison internal affairs.

501. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Edison. As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Edison businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Edison

securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Edison business and financial condition which were concealed by the SCE Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Edison securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the SCE Defendants, and were damaged thereby.

502. During the Class Period, Edison securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the SCE Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Edison securities at prices artificially inflated by the SCE Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Edison securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Edison securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

503. By reason of the conduct alleged herein, the SCE Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

504. As a direct and proximate result of the SCE Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities

during the Class Period, upon the disclosure or materialization of the risk that the Company had been disseminating misrepresentations to the investing public.

**COUNT V**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

505. Plaintiffs repeat and reallege ¶¶1 to 465 above.

506. During the Class Period, the Individual Defendants participated in the operation and management of Edison, and conducted and participated, directly and indirectly, in the conduct of Edison business affairs. Because of their senior positions, they knew the adverse non-public information about Edison's false and misleading statements made to investors during the Class Period.

507. As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Edison financial condition and results of operations, and to correct promptly any public statements issued by Edison which had become materially false or misleading.

508. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Edison disseminated in the marketplace during the Class Period concerning Edison results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Edison to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Edison within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Edison securities.

509. Each of the Individual Defendants, therefore, acted as a controlling person of Edison. By reason of their senior management positions and/or being directors of Edison, each of the Individual Defendants had the power to direct the

actions of, and exercised the same to cause, Edison to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Edison and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

510. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Edison.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 27, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Louis C. Ludwig*

Patrick V. Dahlstrom (*pro hac vice*)

Louis C. Ludwig (*pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jlindenfeld@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

***Attorneys for Plaintiffs***

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and admitted to practice before this Court, *Pro Hac Vice*. I am over the age of 18 and not a party to the within action. My business address is Pomerantz LLP, Ten South La Salle Street, Suite 3505, Chicago, Illinois 60603.

On November 27, 2019, I caused to be served the following document:

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

By posting the documents to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 27, 2019, at Chicago, Illinois.

*s/Louis C. Ludwig*
Louis C. Ludwig

**Exhibit A**

John W Spiegel john.spiegel@mto.com, larry.polon@mto.com

Charles S Duggan charles.duggan@davispolk.com, ecf.ct.papers@davispolk.com

Neal Alan Potischman neal.potischman@davispolk.com, sce.uw.team@davispolk.com, felicia.yu@dpw.com, angela.quach@dpw.com, ecf.ct.papers@dpw.com

Jennifer Pafiti disaacson@pomlaw.com, ahood@pomlaw.com, kmsaletto@pomlaw.com, abarbosa@pomlaw.com, jpafiti@pomlaw.com

Adam C McCall amccall@zlk.com

John M Sorich john.sorich@piblaw.com, rhonda.viers@piblaw.com

Patrick V Dahlstrom pdahlstrom@pomlaw.com

Lauren Claire Barnett lauren.barnett@mto.com, gigi.ruegsegger@mto.com

Jeremy A Lieberman disaacson@pomlaw.com, jalieberman@pomlaw.com, abarbosa@pomlaw.com

Dana M Seshens dana.seshens@davispolk.com

Louis C Ludwig lcludwig@pomlaw.com

Leigh R Handelman lsmollar@pomlaw.com

Craig T Cagney craig.cagney@davispolk.com

John Michael Gildersleeve lori.cruz@mto.com, john.gildersleeve@mto.com

Mariel Alexandria G Gerlt-Ferraro laura.bremmer@piblaw.com, mariel.gerlt-ferraro@piblaw.com, julia.hernandez@piblaw.com

Adam Marc Apton aapton@zlk.com

Jordan L Lurie jllurie@pomlaw.com