# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

GLEN BARNES, *et al.*,
Plaintiffs,
vs.
EDISON INT'L, *et al.*,
Defendants.

Case No.: CV 18-09690 CBM(FFMx)

**ORDER RE: MOTION TO DISMISS [152,153,154]**

The matters before the Court are the Edison Defendants[1] and the Underwriter Defendants'[2] motion to dismiss Lead Plaintiff Iron Workers Local

[1] The Edison Defendants are: Edison International ("Edison"); Southern California Edison Company ("SCE"); Defendant Theodore F. Craver, Jr. ("Craver"), CEO of Edison from 2008 to September 30, 2016; Defendant Pedro J. Pizarro ("Pizarro"), CEO of Edison International since October 2016, President of Edison International from June 2016 to September 2016, and President of SCE from October 2014 to May 2016; Defendant Maria Rigatti ("Rigatti"), CFO of Edison International since October 2016 and former CFO of SCE; Defendant Kevin M. Payne ("Payne"), President and CEO of SCE since June 2016; Defendant William M. Petmecky ("Petmecky"), Vice President, CFO, and Controller of SCE since October 2016; and Defendant William James Scilacci ("Scilacci"), CFO of Edison International until his resignation on September 30, 2016.

[2] The "Underwriter Defendants" are Defendants J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, RBC Capital Markets, LLC, Wells Fargo Securities, LLC, Citigroup Global Markets, Inc., Mizuho Securities USA LLC, MUFG Securities Americas Inc., PNC Capital Markets LLC, TD Securities LLC, U.S. Bancorp Investments, Inc., Academy Securities LLC, U.S. Bancorp Investments, Inc., Academy Securities, Inc., C.L. King & Associates LLC, and Samuel A. Ramirez & Company, Inc.

580 Joint Funds ("Lead Plaintiff") and additional named plaintiff Irving Lichtman's, on behalf of the Irving Lichtman Revocable Living Trust ("Lichtman") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, Second Amended Complaint ("SAC"). (Dkt. Nos. 151, 152, 154.)

## I. BACKGROUND

Plaintiffs filed the original complaint against Defendants on November 16, 2018. (Dkt. 1.) Plaintiffs filed a consolidated amended complaint on May 10, 2019, and a SAC on November 27, 2019. (Dkt. 47, 66, 151.) Plaintiffs allege the following causes of action in the SAC:

Count I: Violations of Section 11 of the Exchange Act

Count II: Violations of Section 12(a)(2) of the Securities Act (against Underwriter Defendants)

Count III: Violations of Section 15 of the Securities Act (against Defendants Pizarro, Rigatti, Payne, and Petmecky)

Count IV: Violations of Section 10(b) of the Exchange Act (against the SCE Defendants (who are grouped with the Edison Defendants)), and

Count V: Violations of Section 20(a) of the Exchange Act (against Defendants Craver, Pizarro, Scilacci, Rigatti, Payne, and Petmecky (who are grouped with the Edison Defendants)).

### A. Edison and SCE Fail to Maintain Electrical Infrastructure

Plaintiffs allege violations of federal securities laws against the Edison and Underwriter Defendants arising from disclosures the Edison Defendants made

before and after the December 4, 2017, Thomas Fire[3] and the November 8, 2018, Woolsey Fire.[4]

Edison is a publicly traded electric corporation and public utility that develops and operates infrastructure for the production and distribution of energy (e.g., power plants and electric lines), and supplies electricity to residential, commercial, industrial, and other customers. (SAC ¶¶ 69-70.) Edison is the parent company of SCE, a Los Angeles County based investor-owned public utility company that provides electricity to residents and businesses within a 50,000 square mile area in central and southern California. (*Id.* ¶¶ 70-71.)

Edison is required to comply with statutes and regulations promulgated by its regulator, the California Public Utilities Commission ("CPUC"), obligating it to properly construct, inspect, maintain, repair, and operate its power lines and electrical equipment. (*Id.* ¶¶ 5, 83-84.) These obligations include, *inter alia*, the trimming of vegetation surrounding electrical equipment, minimizing "the risk of catastrophic wildfire posed by electrical equipment," ensuring power lines can withstand winds up to ninety-two miles per hour in extreme fire areas, and inspecting overhead transformers and wooden poles. (*Id.* ¶¶ 85-90.) Since 2007, CPUC has fined Edison for over $78-million arising from safety violations related to electric and fire-related to incidents. (*Id.* ¶ 94.) During the Class Period, CPUC fined Edison and SCE multiple times, including for numerous violations of CPUC General Order 95 for failure to complete worker orders related to electric pole safety by their corrective date. (*Id.* ¶¶ 111-27.) Plaintiffs thus allege Edison was

---

[3] The Thomas Fire was a wildfire that burned more than 280,000 acres and destroyed 1,063 structures in Ventura and Santa Barbara counties. (SAC ¶¶ 220, 221.) The Thomas Fire also triggered mudslides on January 9, 2018, which resulted in twenty-two deaths and further property damage. (*Id.* ¶ 224.)

[4] The Woolsey Fire was a wildfire that burned 98,000 acres and 1,600 structures in Ventura and Los Angeles counties. (SAC ¶¶ 245, 255.)

aware of the significant safety risks posed by its management of electrical infrastructure and compliance (or lack thereof) with the relevant rules and regulations prior to the Thomas and Woolsey Fires. (*Id.* ¶ 93.)

Plaintiffs allege Edison and SCE "failed to maintain its electrical infrastructure" prior to and during the Thomas and Woolsey fires by:

- Failing to inspect and repair electrical poles. In SCE's 2015 General Rate Case ("GRC"),[5] SCE admitted that it does not "underground" powerlines or "fire harden" its distribution system on a system-wide basis, despite the ability to do so, because of costs. (*Id.* ¶ 142.) During the same GRC, SCE admitted it only replaces a fraction of the tens of thousands of electrical poles in need of replacement each year. (*Id.* ¶ 143.) Plaintiffs allege that Former Employee ("FE") 1, a planner in SCE's Deteriorated Pole Replacement Program ("DPRP") from January 2014 to March 2018, said the DPRP identified 40,000 works orders for pole replacement in 2014 and 45,000 in 2015, which contrasts with the 23,000 poles SCE identified to CPUC as having been replaced prior to 2016. (*Id.* ¶¶ 142-45.) FE 2, who worked variously as a contractor and district manager of SCE in regions affected by the Thomas and Woolsey Fires, states that the results of each district's pole replacement program were included in reports to Greg Ferree, Vice President of Distribution in SCE's Transmission & Distribution Division. (*Id.* ¶¶ 146-48.) FE 3, a biologist for SCE from April 2016 to March 2017 in Rosemead, California, stated that SCE would delay pole replacement in the area in which the Thomas

[5] "GRCs are triennial proceedings in which SCE projects its costs for a three-year period and, after public comment and hearings, CPUC sets how much SCE may collect in rates." (Dkt. No. 125-1 (Edison Dfs.' Mot. to Dismiss) at p. 5, n. 3.)

Fire started if they displayed any signs of nesting birds, resulting in delay of 20-30% of poles that needed replacement. (*Id.* ¶¶ 149-54.)

- Pole loading issues. CPUC previously ordered Edison to conduct a sample of SCE-owned and jointly-owned poles to determine whether pole loading complied with then-current standards. (*Id.* ¶ 156.) The results found that 22.3% of the over 5,000 poles tested failed to meet design standards. (*Id.*) In the 2012 GRC, CPUC emphasized to SCE the fire risk posed by overloaded poles. (*Id.* ¶ 157.) In its 2015 GRC, SCE estimated 22% of its utility poles were overloaded, and that 23.7% of the poles in High Fire Threat Areas were overloaded. (*Id.* ¶ 163.) In its 2018 GRC, SCE disclosed to CPUC that, after modifying the software used to calculate pole loading safety factors, the percentage of poles requiring remediation was reduced to 9%. (*Id.* ¶ 164.) Plaintiffs allege that FE 1 stated that the modified software – called SPIDACalc – was less strict about which poles were likely to fall, thus reducing the number of poles in need of remediation in the year before the Thomas Fire. (*Id.* ¶ 165.) In 2017, the Safety & Enforcement Division ("SED") of CPUC objected to the use of SPIDACalc software because it had not been independently tested and verified. (*Id.* ¶ 168.) In its 2018 GRC, SCE disclosed it had failed to assess 30% of the total poles it had disclosed in its 2015 GRC projections. (*Id.* ¶ 169.)
- Vegetation management issues. Plaintiffs allege that FE 4, an Emergency Management Specialist at SCE from May 2014 to September 2015, stated that a proposed fire mitigation program recommending the removal of large areas of dried vegetation to reduce the risk of wildfires was not implemented by SCE. (*Id.* ¶¶ 173-78.)

- Down Wires. Plaintiffs allege FE 5, an Incident Investigation Manager at SCE from March 2010 to October 2014, stated that SCE had no program to inspect regularly and upgrade conductor wires, fuses, or transformers attached to utility poles, and that he received multiple reports of "down wires" daily. (*Id.* ¶¶ 179-82.) FE 5 states he recommended action be taken to correct down wires due to the fire risk they posed, but those "recommendations were usually not implemented" and stopgap measures were used to fix the down wire problem. (*Id.* ¶¶ 183-85.)
- Run to failure approach. Plaintiffs allege SCE's maintenance failures were the result of a practice whereby equipment was only replaced when it broke. (*Id.* ¶ 186-87.) In its 2015 GRC, SCE stated that, at least for some equipment, it adopted a "run to failure" approach to maintenance. (*Id.* ¶ 189.) FE 6, a former CPUC investigator, characterized SCE's maintenance program as "run to failure" and noted that SCE sometimes did not know when electrical equipment was installed on its poles. (*Id.* ¶ 193.) Lawsuits against SCE following the Woolsey Fire likewise allege SCE's run to failure policy caused the Woolsey Fire, as evidenced by SCE's failure to repair a power pole identified as needing replacement allegedly caused the Thomas Fire. (*Id.* ¶¶ 194-95.)

California inverse condemnation law holds a utility strictly liable for wildfire damages if the utility's equipment ignites a wildfire. (*Id.* ¶ 77.) Because the frequency of wildfires in the western United States has increased by 400% since 1970 and deferred utility equipment maintenance has been cited as a cause, California's investor-owned utilities stand to incur massive losses. (*Id.* ¶¶ 72-77.) Since the passage of California Senate Bill 901 in August 2018, utilities may impose a special fee on customers to pay costs related to wildfire damages in

excess of their insurance if, under the Prudent Manager Standard,[6] regulators determine that utilities met fire mitigation and prevention standards. (*Id.* ¶¶ 209-11.) Thus, if the utility is found to have acted negligently, it must absorb the costs in excess of the utility's insurance. (*Id.* ¶ 212.) If, however, the utility demonstrates to CPUC that its actions met the Prudent Manager Standard, it may pass wildfire costs in excess of its insurance to the utility's customers (i.e., "rate recovery"). (*Id.* ¶¶ 210-11.)

**B. The Thomas and Woolsey Fires**

On December 4, 2017 – the day before the Thomas Fire – the National Weather Service issued its highest wildfire alert, a Red Flag Warning, for Southern California. (*Id.* ¶¶ 218-19.) Edison failed to de-energize its facilities despite having the ability to do so in response to the Red Flag Warning. (*Id.* ¶ 221.) In contrast, San Diego Gas & Electric ("SDG&E"), another utility, de-energized its facilities. (*Id.*) The Thomas Fire started on December 5, 2017, and multiple witnesses attested to seeing an SCE transformer on a utility pole explode nearby the epicenter of the fire. (*Id.* ¶ 223.) The Thomas Fire also triggered mudslides in its burn area on January 9, 2018. (*Id.* ¶ 224.) Significantly, on December 27, 2017, SCE claims investigators Rick McCollum and Julie Olin identified an SCE circuit (the "Castro Circuit") in the vicinity of the epicenter and reported that at 6:41 p.m. on December 4, 2017, SCE's substation reported a remote automatic recloser alert system. (*Id.* ¶ 233.) In March 2019, CPUC and county investigators released a report concluding that power lines owned and operated by SCE were the cause of the Thomas Fire, as high winds blew Edison powerlines into each other, creating an electrical arc that deposited molten material on nearby vegetation. (*Id.* ¶ 227.)

---

[6] Under the Prudent Manager Standard, a utility has the burden to affirmatively prove that it reasonably and prudently operated and managed system by showing that its actions, practices, methods, and decisions were reasonable in light of what it knew or should have known at the time, and in the interest of achieving safety, reliability, and reasonable cost. (CAC ¶ 207.)

Regarding the Woolsey Fire, Plaintiffs allege the Edison Defendants were aware of the risks of failing to de-energize facilities during High Fire Threat Warnings because (1) CPUC adopted Resolution ESRB-8 on July 12, 2018, which ordered utilities to engage with local communities in developing de-energization programs and required utilities to submit a report after de-energization events or after high-fire threat events where utilities provided notification of possible de-energization; and (2) Edison was a party to July 13, 2018 proceedings in which CPUC affirmed the denial of SDG&E's request to pass rates to customers based in part on SDG&E's failure to de-energize lines. (*Id.* ¶¶ 240-243.) Two days before the Woolsey Fire started, Edison notified customers that it might de-energize its facilities as a safety measure due to a Red Flag Warning. (*Id.* ¶ 241.) Edison ultimately elected not to de-energize its lines. (*Id.* ¶ 244.)

The Woolsey Fire started on November 8, 2018 in Simi Valley near the Boeing Rocketdyne complex, which according to CPUC contains SCE's Chatsworth substation. (*Id.* ¶¶ 245-46.) A Ventura County Fire Department incident report states a Rocketdyne employee identified power lines as the cause of the fires. (*Id.* ¶ 248.) Likewise, Plaintiffs allege Dirk Delong Obenshain, an electrician with a contractor for SCE, initially reported the fire, which started while he was working in the area. (*Id.* ¶¶ 249-50.) Edison de-energized the facilities in the fire-affected area three hours after the fire was reported. (*Id.* ¶ 253.) Six hours after the fire started, SCE sent an "Electric Safety Incident Report" to CPUC stating the Chatsworth substation suffered an outage at the "big Rock 16kV circuit" at 2:22 p.m., two minutes before the Woolsey fire began. (*Id.* ¶ 254.) Approximately two weeks after the Woolsey Fire was contained, SCE released a public statement and submitted a supplemental letter to CPUC acknowledging it found a "guy wire" in proximity to a jumper[7] at a lightweight

[7] A "jumper" connects the conductors on either side of a double dead end pole at the top of the utility pole. (SAC ¶ 260.)

steel pole. (*Id.* ¶ 255.) SCE's press release stated it was reviewing whether the November 8 outage was related to contract being made between the guy wire and the jumper cable. (*Id.* ¶ 259.) SCE previously identified more than 2,600 guy wires with noncompliant safety factors as of March 2016. (*Id.* ¶ 262.)

**C. Alleged Materially False and Misleading Statements**

Plaintiffs' SAC challenges the statements made by the Edison Defendants in Form 10-K filings, Form 10-Q filings, and related conference calls with investors ("Earnings Calls") from 2015 to 2018.

*First*, Plaintiffs argue that the Edison Defendants' statements regarding focus on safety and risk mitigation[8] were false, misleading, or omitted material information because the Edison Defendants failed to reference safety-related protocols it previously failed to adopt, and for which it had been cited by CPUC. Specifically, Plaintiffs' state that the Edison Defendants must have fabricated its focus on safety and risk mitigation, given purported deficiencies in its infrastructure maintenance and alleged responsibility for the Thomas and Woolsey Fires.

*Second*, Plaintiffs allege that the statements regarding the extent to which Edison and SCE may be liable for property damage caused by wildfires, especially considering strict liability under California's laws of inverse condemnation[9] were false because the Edison Defendants' liability was not limited to fault arising from inverse condemnation and drought conditions, as the Edison Defendants knew of wildfire risks created by its "reckless disregard of safety." (*Id.* ¶ 324.)

*Third*, in regards to Edison and SCE's liability for the Thomas and Woolsey Fire, Plaintiffs argue that the Edison Defendants' stated in its disclosures that the

---

[8] *See* SAC ¶¶ 271, 273, 282, 287, 293, 296, 298, 303, 306, 308, 312, 314, 317-319, 321, 325, 334, 339, 342, 355, 358-59, 364, 367, 370, 374, 393, 399, 404, 415, 423, 448.

[9] *See* SAC ¶¶ 276, 278, 284, 287, 290, 293, 300, 303, 328, 330, 336, 339, 352, 355, 361, 364, 377, 426, 439.

causes of the Thomas Fire were "being investigated by Cal Fire and other fire agencies," that "SCE believes the investigations include the possible role of SCE's facilities," and "SCE may not be authorized to recover its uninsured damages through customer rates if, for example, the CPUC finds that … SCE was not a prudent manager of its facilities." (*Id.* ¶ 379.)[10] Plaintiffs allege these disclosures were misleading because the Edison Defendants knew they caused the Thomas Fire no later than December 27, 2017, the date on which investigators identified the Castro Circuit nearby the epicenter of the Thomas Fire and reported that at 6:41 p.m. on December 4, 2017, SCE's substation reported a remote automatic recloser alert system. Plaintiffs allege these statements were misleading as to the Woolsey Fire because the Edison Defendants knew they caused the Woolsey Fire because a contemporaneous witness identified a power line as the ignition point on November 8, 2018.

Plaintiffs further allege the Edison Defendants' acts or omissions caused stock prices to remain artificially inflated, until three periods in which the concealed risk materialized and resulted in significant price drops. On December 5, 2017 – the day after the Thomas Fire ignited – "Edison shares plunged $10.26, nearly 15%, to close at $70.00 on December 5, 2017 from the previous day's closing price of $80.26, wiping out more than $3-billion in market value."[11] (*Id.* ¶ 445.) Plaintiffs attribute this loss to "the market's understanding . . . that SCE had caused the Thomas Fire[.]" (*Id.*)

Next, on December 11, 2017, SCE issued a press release in which it stated its belief that agency "investigations now include the possible role of [SCE] facilities" in causing the Thomas Fire. (*Id.* ¶ 446.) Plaintiffs allege this disclosure partially confirmed the market's informed reaction to the Thomas Fire, so stock

---

[10] *See* SAC ¶¶ 379-81, 384, 386, 396-97, 401, 406, 412, 417, 428-29, 431, 433, 435, 437, 441, 443.

[11] Based on these allegations, the price of the stock dropped 12.78%, not 15%.

prices fell by $4.40 per share to close at $68.58 per share on December 12, 2017. (*Id.* ¶ 411.)

Lastly, Plaintiffs allege three interrelated events materialized the risk of Edison stock in relation to the Woolsey Fire, resulting in losses to Edison investors. On November 9, 2018 – the day after the Woolsey Fire ignited – the Edison Defendants issued a press statement referring to an outage at SCE facilities nearby the epicenter of the Woolsey Fire. (*Id.* ¶ 448.) In the next two days, local news sources reported that SCE had filed an incident report with CPUC on the evening of November 8, 2018 stating an interruption at an SCE circuit near the epicenter of the fire occurred two minutes before the fire was first reported. (*Id.* ¶ 450.) Then, on November 12, 2018, CPUC announced it was investigating whether SCE facilities near the epicenter of the Woolsey Fire complied with state law and regulations. (*Id.* ¶ 451.) Plaintiffs allege the Edison Defendants' announcement, combined with local news reports and the CPUC investigation, informed the market that "the risks concealed by the [Edison Defendants'] failure to maintain its electrical infrastructure and otherwise mitigate the risk of wildfires had now materialized." (*Id.* ¶ 453.) Edison stock prices correspondingly fell $7.44 per share to close at $53.56 per share on November 12, 2018. The price of the stock continued to fall over the next few days, and ultimately closed at $47.19 per share on November 15, 2018. (*Id.*)

## II. JURISDICTION

The Court has jurisdiction over this action under Exchange Act.

## III. DISCUSSION

### A. Request for Judicial Notice

Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal

Rule of Evidence 201. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

The Edison Defendants request that the Court take judicial notice of the following:

1. Ex. 1: 2016 Form 10-K, filed by Edison/SCE with the SEC on February 21, 2017 (exhibits omitted).

2. Ex. 2: Q1 2017 Form 10-Q, filed by Edison/SCE with the SEC on May 1, 2017 (exhibits omitted).

3. Prospectus, filed by SCE with the SEC on June 19, 2017.

4. Q3 2017 Form 10-Q, filed by Edison/SCE with the SEC on October 30, 2017 (exhibits omitted).

5. 2017 Form 10-K, filed by Edison/SCE with the SEC on February 22, 2018 (exhibits omitted).

6. 2018 Form 10-K, filed by Edison/SCE with the SEC on February 28, 2019 (exhibits omitted).

7. Press Release, "SCE Releases Long Beach Outage Investigation Reports" (Nov. 17, 2015).

8. Press Release, "Southern California Edison Responds to Area Fires" (Dec. 11, 2017).

9. 2018 GRC Report, "Risk and Safety Aspects of SCE's 2018-2020 General Rate Case Application 16-09-001" (Jan. 31, 2017).

10. Cal Fire/VCFD Investigation Report (Mar. 14, 2019).

Each of these exhibits is incorporated by reference into the SAC. Therefore, the Court denies the request to take judicial notice of the documents.

**B. Puzzle Pleading**

The Edison Defendants argue the SAC should be dismissed because Plaintiffs have engaged in "puzzle pleading," whereby Plaintiffs filed voluminous, scattershot securities complaints.

"A 'puzzle pleading' is a complaint that forces the defendants and/or court to sort out the alleged statements and match them with the corresponding alleged facts in order to solve the puzzle of interpreting Plaintiff's claims." *Jiangchen v. Rentech, Inc.*, CV 17-1490-GW, 2017 U.S. Dist. LEXIS 222743, at *12 (C.D. Cal. Nov. 17, 2017). In *In re Splash Technology Holdings, Inc. Securities Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001) ("*Splash*") and *Patel v. Parnes*, 253 F.R.D. 531, 551-52 (C.D. Cal. 2008), district courts dismissed voluminous securities complaints under Fed. R. Civ. P. 8(a) because the confusing, unclear allegations were not "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

Here, the 175-page operative complaint contains 510 paragraphs of allegations. Although, as in *Splash* and *Patel*, some portions of the SAC contain long quotations and cross-references between paragraphs, Plaintiff's SAC meets the Rule 8(a) requirement. Defendants have been provided with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nothing is particularly puzzling about the underlying circumstances of this case and what is being alleged against Defendants. Thus, Plaintiffs' SAC is not a "puzzle pleading."

**C. Count II and III: Section 12(a) and Section 15 of the Securities Act**

Defendants argue that the Securities Act claims are untimely because Plaintiffs allege that they discovered the alleged misstatements in the Offering Documents more than a year before filing the Securities Act claims in the Consolidated Amended Complaint on April 29, 2019.[12] Plaintiffs argue that statute of limitation arguments are inapplicable at this stage. *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 916 (N.D. Cal. 2015) ("A defendant seeking to

[12] Although the original complaint was filed on November 16, 2018, the Securities Act claims, Counts II and III, were not in the original complaint. They were first plead in the Consolidated Amended Complaint filed on April 29, 2019.

establish, on a motion to dismiss, that a plaintiffs Section 11 claim is time-barred faces an 'especially high hurdle.'").

Claims brought under the Securities Act are barred "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The one-year period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). "Plaintiffs are considered to have discovered a fact when a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) (internal quotation marks omitted). "This is a 'fact intensive' inquiry, and some courts have held it is 'usually not appropriate' to conduct it at the pleading stage." *In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF, 2020 U.S. Dist. LEXIS 195597, at *28 (N.D. Cal. Oct. 2, 2020).

While Defendants face a high hurdle in establishing untimeliness on a motion to dismiss, the facts are sufficient to satisfy that burden with respect to Plaintiffs' allegation that Defendants' Prospectus and Registration Statement contained misrepresentations and omissions "regarding the Company's safety record, dedication to infrastructure improvement, wildfire mitigation efforts, lack of any coherent approach to risk assessment, and citations and critical response by the CPUC and the SED." (SAC ¶¶ 7, 469, 473) Here, Plaintiffs claim the "market understood that Edison had [] caused the Thomas Fire" on December 4, 2017, and despite Southern California Edison Company's ("SCE") knowing that its equipment had caused the Thomas Fire, the SCE Defendants "spent the next ten months telling investors and analysts that they had no direct knowledge of the Company's liability or the extent thereof." (SAC ¶¶ 8, 9, 13, 445) If the June

2017 Offering Documents concealed the risk that SCE could recklessly cause a material wildfire, as Plaintiffs allege, then Plaintiffs should have discovered facts constituting the violation on December 4, 2017, when the markets purportedly understood that SCE had caused the Thomas Fire. Because claims must be brought within one year after discovery of an untrue statement or omission, *NCUA Bd. v. RBS Sec.*, 833 F.3d 1125, 1129 (9th Cir. 2016), Plaintiffs' Securities Act causes of action are time barred. 15 U.S.C. § 77m. Accordingly, the Court dismisses Count II and III with prejudice.

**D. Count IV: Section 10(b) of the Exchange Act**

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). Falsity, scienter, and loss causation must be plead "with particularity." *Id.* at 604-05.

At the pleading stage, "a complainant stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995 ("PSLRA")]." *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Rule 9(b) governs all claims sounding in fraud, and requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, as applied to securities claims alleging fraud, Rule 9(b) requires the false statement/omission be pled with particularity.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") heightened the pleading standard applicable to putative class actions alleging securities fraud based on misleading statements or omissions by adding a requirement that a

plaintiff plead intent to defraud, otherwise known as scienter, with particularity. 15 U.S.C. § 78u-4(b)(1) and (2). Section 78u-4(b) of Title 15, regarding "requirements for securities fraud actions," provides, in relevant part:

> (1) Misleading statements and omissions. In any private action arising under this title in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind. In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.

The twin dictates of Rule 9(b) and the PSLRA impose a burden on the plaintiff to plead both falsity and scienter with particularity. *See Metzler Invest. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). "[The PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Id.* at 1061 (emphasis in original). "[I]n order to state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a 'strong inference' of scienter – i.e., a strong inference that the defendant acted with an intent to deceive, manipulate or defraud." *Id.*; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

**1. Statements Related to Safety and Risk Mitigation**

**A. Puffery**

Plaintiffs assert that Edison Defendants' safety-related statements[13] were material assertions of objective and verifiable fact and such statements are actionable where it "could have, and should have had, some basis in objective and verifiable fact." *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-CV-04883-BLF, 2017 U.S. Dist. LEXIS 64297, at *39 (N.D. Cal. Apr. 27, 2017). The Edison Defendants argue general references to the focus or commitment of SCE on safety, infrastructure investment, or mitigation of wildfire risks are mere puffery.

"Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

Here, Defendants' statements are "subjective assessments" which vaguely refer to the Edison Defendants' prioritization, improvement, and funding of safety procedures. *Id.* Such an assessment "hardly amounts to a securities violation." *Id.* Plaintiffs argue determining puffery is fact-intensive and is therefore "premature" in a motion to dismiss. Because courts routinely dismiss securities actions premised on puffery at the motion to dismiss stage, that argument fails. *See, e.g., Id.*

Plaintiffs next argue that even if the disclosures amounted to "general statements of optimism," such statements are actionable "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). Although Plaintiffs identify specific examples of safety-related statements they believe were "material assertions of objective and verifiable fact," those statements fall short. The Edison Defendants' statement that they "have *long*

---

[13] *See* SAC ¶¶ 271, 273, 282, 287, 293, 296, 298, 303, 306, 308, 312, 314, 317-319, 321, 325, 334, 339, 342, 355, 358-359, 364, 367, 370, 374, 393, 399, 404, 415, 423, 448.

*taken substantial* steps to reduce the risk of wildfires" is merely a generalized and subjective assessment of its efforts. So, too are the statements that the Edison Defendants adopted "effective vegetation management" and "different protocols under Red Flag warnings."

**B. Falsity**

The Edison Defendants argue Plaintiffs failed to plead the falsity of the Edison Defendant's statements related to safety and risk management. These statements are:

- "SCE is investing in and strengthening its electric grid and driving operational and service excellence in improving system safety, reliability, and service." (SAC ¶ 271.)
- "SCE's infrastructure is aging and could pose a risk to system reliability. In order to mitigate this risk, SCE is engaged in a significant and ongoing infrastructure investment program …", and "[i]n addition to operating practices designed to reduce the risk of wildfires, SCE also invests significant amounts of capital to reduce wildfire risk." (SAC ¶¶ 325, 367.)
- "[W]e have elevated safety to one of our company's core values and dedicated additional senior leadership in this area." (SAC ¶ 334.)
- "Safety is the company's top priority and a core value for SCE. … We have long taken substantial steps to reduce the risk of wildfires in our service territory and continue to look for ways to enhance our operational practices and infrastructure." (SAC ¶ 448.)[14]

Plaintiffs allege the statements were false because CPUC previously cited the Edison Defendants for failing to maintain its infrastructure (*see* SAC ¶¶ 114-127), failing to use a statistically valid methodology to calculate pole-loading (*see*

[14] *See also* SAC ¶¶ 273, 282, 287, 293, 296, 298, 303, 306, 308, 312, 314, 317-319, 321, 339, 342, 355, 358-359, 364, 367, 370, 374, 393, 399, 404, 415, 423.

SAC ¶¶ 299, 309, 344), failing to repair and replace dysfunctional poles as CPUC required (*see* SAC ¶¶ 307, 385, 424), rewriting its software to reduce the number of repairs it needed to complete (SAC ¶¶ 297, 320, 440), misclassifying customer and service expenses as safety related (SAC ¶¶ 307, 360, 422), deploying a "run-to-failure" maintenance model (SAC ¶¶ 280, 334, 413), failing to properly assess equipment risks (SAC ¶¶ 283, 368, 424), having no strategy in place to remedy known deficiencies (SAC ¶¶ 307, 335, 400), and failing to de-energize during high-wind events (SAC ¶¶ 221, 381, 432).

Here, although Plaintiffs identify numerous instances in which the Edison Defendants failed to adequately maintain infrastructure, those failures do not convert unactionable puffery into actionable statements. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606 (holding statements not capable of "objective verification" are not actionable). Relying on *Khoja*, Plaintiffs argue that even if the statements were not false, the Edison Defendants were required to make further disclosures to prevent these general statements from being misleading. *Khoja*, 899 F.3d at 1008 ("Even if a statement is not false, it may be misleading if it omits material information. 'Disclosure is required … only when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading.'") Even assuming, *arguendo*, the Edison Defendants' statements regarding safety and risk management were actionable, Plaintiffs fail to identify specifically how each statement would mislead investors. The Ninth Circuit, in evaluating a similar argument in *Police Ret. Sys.*, 759 F.3d at 1060, ruled that a statement of corporate optimism may form a basis for a securities fraud claim, but "the context in which the statements were made is key." In that case, the statements of puffery were not actionable because "the market already knew" of the financial difficulties facing the company, so "any reasonable investor would have understood" that general statements related to the company's growth were "mere corporate optimism." *Id.*

Here, Plaintiffs' own allegations reveal that the market was aware of the safety failures in the Edison Defendant's infrastructure, as each of CPUC's admonitions of the Edison Defendants which purportedly evidence the misleading nature of the statements was publicly available. In this context, the Edison Defendants' general statements related to prioritization of safety would not mislead a reasonable investor, who would be aware of the Edison Defendants' previous disclosures to CPUC. Therefore, Plaintiffs failed to plead sufficient facts to conclude falsity or material misrepresentations of the Edison Defendant's statements related to safety and risk management.

**2. Statements Related to Wildfire Liability**

Plaintiffs identify statements made by the Edison Defendants indicating they could face strict liability for wildfire-related property damage as misleading because the Edison Defendants failed to disclose that the risks extended beyond inverse condemnation or drought conditions, but included the risk factors stemming from the Edison Defendants' aging infrastructure. These statements include:

- "Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations . . . Uninsured losses . . . may not be recoverable in customer rates." SAC ¶ 278.
- "Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to the be result of the failure of electric and other utility equipment. . . . [P]laintiffs pursuing these claims have relied on . . . inverse condemnation, which can impose strict liability … for property damage." (SAC ¶ 361.)
- "The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property

> and injury to employees and the general public … penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations." (SAC ¶ 328.)[15]

When deciding whether an omission is actionable, the Ninth Circuit holds that the touchstone is whether the omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Police Ret. Sys.*, 759 F.3d at 1061. (citation omitted).

Here, contrary to Plaintiffs' contentions, none of the statements made by the Edison Defendants is false or misleading. In each instance, the Edison Defendants reported the potential liability they faced for property damage caused by wildfires in California. Plaintiffs argue that *Flynn v. Sientra, Inc.*, No. CV-15-07548, 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) is "directly on point" because that court "found falsity where defendants warned generally about risks of product contamination … but 'knew or recklessly disregarded' that the risk had already materialized." In *Flynn*, the district court held the plaintiffs adequately pleaded the falsity of statements in the defendant's SEC filings stating its products "may not be manufactured in accordance with" regulatory requirements, "may not be able to maintain compliance with regulatory requirements," and that there were "inherent risks in contracting with manufacturers located outside the United States" because the defendant knew that defects in its products had been reported to its regulators and an internal investigation revealed the existence of the defect. *Id.* at *11. But unlike *Flynn*, where the plaintiffs pleaded that the product had been found defective at the time the statements were made, Plaintiffs do not plead facts that SCE had already been found liable for the two wildfires or denied recovery rates at the time they made statements related to liability. Thus, *Flynn* is not persuasive.

---

[15] (*See also* SAC ¶¶ 276, 284, 287, 290, 293, 300, 303, 330, 336, 339, 352, 355, 364, 377, 426, 439.)

As discussed above, the holding of *Plumley* controls and the Edison Defendants cannot be found to have materially omitted the risks posed by its infrastructure when that information was publicly available through its filings with CPUC. Furthermore, the Ninth Circuit does not require that securities disclosures contain the entire universe of information available "because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Police Ret. Sys.*, 759 F.3d at 1061.

**3. Statements Related to Liability for the Thomas and Woolsey Fires**

Plaintiffs also allege Defendants made materially false or misleading statements regarding the extent of their liability for the Thomas and Woolsey Fires, including:

- "The causes of the December 2017 Wildfires are being investigated by Cal Fire and other fire agencies. … SCE may not be authorized to recover its uninsured damages through customer rates, if, for example, the CPUC finds that … SCE was not a prudent manager of its facilities. The [SED] is conducting an investigation to assess the compliance of SCE's facilities with applicable rules and regulations…" (SAC ¶ 380.)
- "SCE will seek to offset any actual losses … to the extent actual losses exceed insurance, through electric rates … [W]hile the CPUC has not made a determination regarding SCE's prudency relative to any of the 2017/2018 Wildfire/Mudslide Events, SCE is unable to conclude, at this time, that uninsured CPUC-jurisdictional wildfire-related costs are probable of recovery through electric rates." (SAC ¶ 431.)
- "SCE's internal review into the facts and circumstances of the Woolsey Fire is ongoing. SCE has reported to the CPUC that there

> was an outage on SCE's electric system … SCE is aware of witnesses who saw fire in the vicinity of SCE's equipment at the time the fire was first reported. … SCE believes that its equipment could be found to have been associated with the ignition of the Woolsey Fire." (SAC ¶ 433; Dkt. No. 152-3 (Exh. 564-4).)[16]

Plaintiffs argue these statements were false or misleading because (1) Edison caused the Thomas Fire, "a fact known to the [Edison] Defendants no later than December 27, 2017, due to meetings between investigators and SCE representatives[;]" (2) the Edison Defendants caused the Montecito Mudslides, which were the consequence of the Thomas Fire; (3) the Edison Defendants' liability for the Thomas Fire was not merely speculative due to its numerous failures in maintaining infrastructure and safety and operations; (4) an employee of the Edison Defendants was a witness to the outbreak of the Woolsey Fire and reported it to the Edison Defendants, such that they were in a superior position to know the cause of the fire; and (5) the Edison Defendants therefore understood they had not met the prudent manager standard. The Edison Defendants argue that the extent of their liability for either fire was purely speculative at the time the statements were made, so the Edison Defendants were not required to disclose that they failed to meet the prudent manager standard and could not recover their losses in rates.

Here, regarding the Thomas Fire, the SAC alleges only that Defendants were aware of the name of the defective circuit in the area of the fire on December 27, 2017. (SAC ¶ 233.)[17] For the Woolsey Fire, Plaintiffs allege only that an

---

[16] (*See also* SAC ¶¶ 379-81, 384, 386, 396-97, 401, 406, 412, 417, 428-29, 435, 437, 441, 443.)

[17] The SAC alleges: "During meetings between investigators and SCE representatives on December 27, 2017, SCE claims investigators … confirmed the identity of SCE's Castro Circuit, and further reported that at 6:41 p.m. on December 4, SCE's substation reported a remote automatic reclosure alert to its system." (SAC ¶ 233.)

employee of the Edison Defendants first reported the outbreak. These allegations reveal only that the Edison Defendants knew of the possible role their infrastructure had in causing the fires, which the Edison Defendants repeatedly disclosed. Seemingly, the Edison Defendants could not have known, at the time the statements were made, that CPUC would determine in a future proceeding that their conduct would not meet the standard required to avail themselves of rate recovery. Therefore, Plaintiffs fail to plead sufficient facts in Counts I and IV to satisfy the Rule 9 or the PSLRA standard.

Plaintiffs' Count I, Section II of the Exchange Act, cause of action arises from the same alleged misrepresentations and omissions that fail to plead falsity. Count V, Section 20(a), requires an underlying primary violation of the securities laws. *In re Rigel Pharms., Inc. Secs. Litig., Inter-Local Pension Fund GCC/IBT v. Deleage*, 697 F.3d 869, 886 (9th Cir. 2012);15 U.S.C. §§ 77o, 78t(a). Because Plaintiffs failed to adequately plead a violation of the federal securities laws, it follows that Plaintiffs also failed to adequately plead violations of section 20(a). *Id.*

## IV. CONCLUSION

Accordingly, Counts I, IV and V are dismissed without prejudice and Counts II and III are dismissed with prejudice.[18] If Plaintiffs choose to file an amended complaint, the amended complaint must be filed **no later than Wednesday, April 14, 2021**. Failure to file an amended complaint will result in the dismissal of Counts I, IV and V.

**IT IS SO ORDERED.**

DATED: April 5, 2021

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

[18] Because the SAC fails to allege falsity, the Court does not reach scienter or loss causation.